# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| KONNECH, INC., | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 4:22-cv-03096 |
| | § | |
| v. | § | |
| | § | |
| TRUE THE VOTE, INC., *et al.,* | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' MOTION TO DISSOLVE PRELIMINARY INJUNCTION

Defendants Catherine Engelbrecht, Gregg Phillips, and True the Vote, Inc. petition this Court to dissolve the preliminary injunction issued on October 31, 2022, pursuant to 28 U.S.C. § 1292(a)(1), which provides in pertinent part that "the courts of appeals shall have jurisdiction of appeals from: Interlocutory orders of the district courts of the United States . . . or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions . . ." *See also* FED. R. APP. P. 4(a)(1)(A).

This Court in *Phillips*, No. 22-20578, 2022 WL 17175826, at *1 (5th Cir. Nov. 22, 2022) (hereafter "*Phillips I*"), ruling on Petitioner's first petition for writ of mandamus (titled "Mandamus from the United States District Court for the Southern District of Texas," hereafter "First Petition"), filed on November 3, 2022, stated "the district court's TRO was invalid because it disregarded the order of operations imposed by the Federal Rules." This Court went on to hold that "[i]t necessarily follows that any contempt order premised on violations of the [invalid] TRO was 'bottomed irrevocably on a mistake of law,'" citing *United States v. Dickinson*, 465 F.2d 496, 514 (5th Cir. 1972). It necessarily follows that the preliminary injunction, which mirrors the TRO, must be dissolved. In the alternative, Petitioners assert that because the preliminary injunction like

the TRO puts the "cart before the horse," and amounts to a premature discovery order, the Court of Appeals on its own may and should dissolve the preliminary injunction.

## I. Introduction: Respondents and the District Court were Confused About Which Computers are at Issue.

In *Phillips I*, this Court held that the proceedings below failed to identify any "emergency," or danger of irreparable harm, that would justify a TRO or preliminary injunction. The Court could also have premised its finding there was no emergency on Respondent's failure to state a CFAA claim with any likelihood of success on the merits. In any event, these are the two primary deficiencies we address here.

The pleadings referring to web pages and podcast transcripts Respondent cites to justify the allegation of an emergency CFAA claim are consistent about one thing: the parties are talking about computers, but they're not talking about the same computer.

Respondent, outraged by what it views as defamation, has filed its Complaint, Motion for TRO, and other pleadings with what it admits are imaginary violations of the "***Konnech computer***". We know the Konnech computer has never been breached, because the Konnech computer, Konnech assured visitors to its website, is secure. The Konnech computer has reportedly never been hacked, by anybody, anywhere. The Konnech computer is owned by Konnech. The Konnech computer is physically located in the United States.

Meanwhile, the computer *Petitioners* are talking about in their podcast is not in the U.S. Petitioners' public statements and testimony consistently features a "server," as a type of computer is called, located in *China*. This server was *not* secure. This server was *not* owned by Konnech. This server was *easily accessed* by third parties. Petitioners consistently averred the server alluded to in the podcast was in China, as did Respondents, *see* Compl. ¶ ¶ 46-48. *There is no evidence in the record indicating otherwise.*

If the unaccessed Konnech Computer and the Accessed Chinese Server look like two different computers, that's because they are. Respondent's invocation of CFAA penalties and fines fails for lack of subject matter jurisdiction. The courts – district and appellate – must take notice that the podcast statements made by or attributed to Petitioner Gregg Phillips, on which Respondent relies, show he has consistently said he viewed data from a computer *in China*.

In Respondent Konnech, Inc's Response to Petitioner's Petition for Writ of Mandamus (hereafter, "Response"), Respondent offered neither contrary evidence nor even a rebuttal rooted in Petitioners' actual statements. Its Response simply appended transcripts from Petitioners' podcasts, which confirmed Respondent's wholesale reliance on conjectural square brackets and tortured paraphrasing to allege conclusory "access" of a "Konnech computer" in the United States. What claim had Konnech, then, to any likelihood of success, much less such urgency that would justify imprisoning human beings?

## II.    The District Court Committed a Clear Abuse of Discretion by Ordering Injunctions and Incarcerations with Minimal Due Process.

The Fifth Circuit has recently explained that "Mandamus is proper only in 'exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion.' An 'abuse of discretion' becomes a 'clear abuse of discretion" when it 'produce[s] a patently erroneous result.'" *In re Abbott*, 956 F.3d 696, 707 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, __ U.S. ___, 141 S. Ct. 1261 (2021) (citations omitted). "In such cases, mandamus provides a useful safety valve for promptly correcting serious errors." *Id.* quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (internal citations omitted).

Though the standards for securing federal court jurisdiction against individuals are perhaps lower than those for imprisoning American citizens[1], there are standards. In the context of the punitive rush to judgment that took place in the court below, it's useful to consider that "[s]ubject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).

Respondent here has staked its claim to the power of the federal courts (1) on conclusions of law – e.g., that all three Petitioners "accessed" a "Konnech computer" – and (2) on implausible representations of Petitioners' public statements that would not have survived a motion to dismiss, had Petitioners been allowed traditional due process and were the concomitant standard burden of proof applied and administered. They certainly would not have satisfied the even higher standard required for a TRO or a preliminary injunction. The court below should not have credited Respondent's misreading of Petitioners' public statements as true. It should have examined the record itself and demanded more evidence-based allegations from Respondent.

Almost the entirety of the Complaint and Motion for TRO are taken up by (1) Respondent's battery of tendentious, disparaging, and extraneous allegations designed to inflame the reader, and (2) Respondent's defamation claims. The kernel of Respondent's CFAA claims comes from allegations in Paragraphs 7, 40-42, and 46-48 of the Complaint. Based on these allegations, Respondent sought a TRO and, later, preliminary injunction, not on grounds of evidence that any

---

[1] For a court to imprison someone over non-disclosure of a name that is legally irrelevant in a civil lawsuit is to deny the imprisoned not just procedural but substantive due process — especially if that denial is motivated by a political side-taking of the sort, the lower court has already engaged. Such imprisonment is a grave deprivation of liberty with no compelling government justification whatsoever.

of its U.S.-based computers had been accessed, but by virtue of selected quotes Respondent has strung together from Gregg Phillips's podcast statements about a server in China. Strikingly, in Paragraphs 46-48 of the Complaint, Respondent *admits* that Phillips was always talking about a server in China:

> 46. . . . Defendants have falsely accused Konnech of storing sensitive and personal data— including social security numbers, email addresses, phone numbers, and banking information—on 1.8 million U.S. poll workers *on servers in China*, and otherwise running their election logistics application through *Chinese servers*." . . . .

> 47. And during the September 5, 2022 "Tiger Project" podcast advertised by Defendants, Defendant Phillips falsely claimed that Konnech "left a database open that had the personal identifying information of over a million Americans living *on an open server in China*."

> 48. Similarly, on the "Here's How They'll Try to Steal the Midterm" podcast mentioned above, Defendant Phillips falsely claimed that Konnech's election software "apps *were running from China, the database is running in China. It's on the Chinese internet, meaning the Chinese own it*."

> (emphases added)

So it's inexplicable that, though Phillips never mentioned Konnech in the quoted podcast segments, Konnech, in its Complaint's Paragraphs 40-42, tries to insert itself into a stated CFAA claim via two misleading methods: (1) Konnech ends Phillips's quoted content and then inserts the word "Konnech" in place of the Chinese server or data Phillips is talking about, and (2) Konnech keeps the quotation marks but inserts "[Konnech]" in square brackets meant to signify to a reasonable reader that "Konnech" is plausibly what Phillips was speaking about. We can see the latter misleading method at work in Paragraph 40, which refers to the Prophets and Patriots podcast:

> Indeed, Defendant Phillips admitted on that podcast[2] that "[w]e took [Konnech's data] directly" and that Defendant True the Vote plans to publicly "release all of [Konnech's] data" through "drops" to subscribers of Defendants' website.

---

[2] "Prophets and Patriots": https://rumble.com/v1h1pj9-rumble-only-prophets-and-patriots-episode-20-with-gregg-phillips-and-steve-.html

What Phillips said was "We took *it* directly" -- and it's not at all clear from the context what he meant by "it" or even "took" -- and, much later, "we're gonna release *all of our research*" (i.e., the Election Breach Information discussed in the First Petition) (emphases added). If one listens to the podcast from which Respondent cherry-picks, at 39:50, or reads the highlighted transcript Respondent provided, *see* Response at 53-54 and 56, it is clear Phillips is talking about a server in China:

> . . . But what if your data was all being filtered *through China*? . . .

> . . . We took it directly. That was on a Friday after Friday. Now, my guys invited me to Dallas on a Friday night. We went, met at a hotel room, towels under the doors. It was pretty weird. I mean, it was like some kind of a James Bond kind of thing or some sort of weirdness like that. And they proceeded to show me everything. They showed me the database, they showed me where it lived. *It lives on the main unicorn* [sic – Unicom] *backbone in China, which is the main Internet in China.*

(emphases added). In Paragraph 41, Respondent misrepresents the contents of another podcast:

> 41.    Defendant Phillips repeated these claims on an August 30, 2022 podcast titled, "Here's How They'll Try to Steal the Midterms,"[3] where Phillips described, once again, traveling to Dallas, Texas to meet his so-called "analysts," where they "plugged one of their computers into the television" and began "scrolling through millions and millions of records about Americans," *all of which he claims to have obtained by gaining unauthorized access to Konnech's protected computers*. Defendant Phillips also described how he "immediately drove down to Houston" and got Defendant Engelbrecht "to come over and meet [him]" that next morning, where they came up with a plan to file a complaint with the FBI *and turn over the data they stole*. (emphases added)

To patch together Paragraph 41, Respondent must forage across the transcript, piecing together language out of context to suit its narrative. The "plugged one of their computers" language comes from the 35:29 mark. But Phillips's statement there plainly says the accessed server was in China, and at 34:54 he even explains how he knew it was in China:

---

[3] *See* https://rumble.com/v1hz1jr-heres-how-theyll-try-to-steal-the-midterms-gregg-phillips-interview.html.

> [The website Binary Edge] tells you where it lives, where does the server live, and you could actually track it down and you track it down to China. On the main unicorn [sic; Unicom] backbone in China, it was almost impossible for me to believe.

For the language about "scrolling through millions and millions of records," Respondent must leap to a different part of the transcript, at 36:57. But once again, the full quote (from 36:21 to 37:14) even of this excerpt shows Phillips was clear about the server being in China, and "Konnech's computers" are nowhere in sight:

> [T]he other thing that your fearless listeners need to understand is that **by Chinese law, if something comes onto the Chinese backbone, in other words, it's in the Chinese Internet**, that means the CCP owns it. What I'm telling you is that that night in mid-January of 2021, I personally witnessed the <u>scrolling through of millions and millions of records about Americans</u>. We later found out that that was attached directly to the [Chinese] social scoring system . . .

> (emphases added)

Respondent employs a similarly misleading device in Paragraph 42 of its Complaint, where, it rewrites conversations to which it was not a party:

> 42.     Likewise, on a September 2, 2022 podcast hosted by Defendant Phillips called "Patriot Games" . . . Defendant Engelbrecht . . . confessed to how Defendants conspired to *unlawfully access **Konnech's** protected computers*, and how she and True the Vote "pulled in [Defendant Phillip's] team, and asked them to take a deeper dive" *around the security of **Konnech's** software*. Defendant Phillips told The Pit attendees that they accessed **Konnech's** alleged **Chinese server** by using a password after finding vulnerabilities in the server.

(emphases added). The Court would hear in the audio of the actual podcast no such "confession" of unlawful access. But even if Petitioner Engelbrecht, who was not alleged to be present, could have somehow "confessed" to accessing a server, *Respondent itself* makes clear that the server each Petitioner was referring to was an insecure "Chinese server", which is fatal to Respondent's allegation anyone gained access to one of its secure, U.S.-based computers.

It has become clear that Respondent does not want to acknowledge ownership of the only server (the Chinese Server) for which it offers such weak "evidence" of access, by at most *one*

Petitioner. Respondent's reluctance could be due to the fact that Konnech really did not own the server – though it still very much wants entrée to federal jurisdiction and CFAA penalties. Or Konnech did own the server in China, but knows its customers, to say nothing of regulators, would be alarmed if it said so. Konnech compromised by arguing that when Petitioners clearly speak of an insecure Chinese server that Konnech does not claim to own, they are somehow referring to an unidentified U.S. server that Konnech does own. This misshapen compromise fails to state a claim under the CFAA and certainly fails to meet the even higher burden of showing a likelihood of success on the merits or a danger of irreparable harm.

III. **Where the Parties' Publicly Available Statements Agree There's No Evidence of Access of Konnech's Computers, Respondent Failed to Show Either Likelihood of Success on the Merits or Imminent Harm**

A. **Respondent Failed to State a Claim Under the CFAA.**

The first problem with Respondent's strained claim of a violation of the CFAA is that Respondent's Complaint was equally vague about stating which provision of the CFAA the Petitioners had supposedly violated. This alone should be fatal, let alone support a preliminary injunction.

We may be reasonably certain Respondent did not have in mind any particular section of the CFAA, including but not limited to Section 1030(a)(1)[4], Sections 1030(a)(2)(A) or (B)[5],

---

[4] Section 1030(a)(1) relates to access that acquired "information that has been determined by the United States Government pursuant to an Executive order or statute to require protection."

[5] These subsections relate to one who "intentionally accesses a computer without authorization or exceeds authorized access" and "obtains" either "(A) information contained in a financial record of a financial institution, or of a card issuer . . . , or . . . in a file of a consumer reporting agency on a consumer" or "(B) information from any department or agency of the United States."

Section 1030(a)(3)[6], Section 1030(a)(5)[7], Section 1030(a)(6)[8], or Section 1030(a)(7)[9]. One might guess Respondent intended to plead a cause of action under Section 1030(a)(2)(C), which relates to "intentional" access that acquires "information from any protected computer", but whether Petitioner Phillips, the only person in the room during any arguable "access", did so "intentionally" is a question of fact and law that neither Respondent nor the district court addressed below.

Respondent's Complaint, in Paragraphs 85 and 99, mentions the $5,000.00 threshold of Section 1030(a)(4), suggesting that perhaps it intended to claim a violation of that section, which applies to whoever "knowingly *and with intent to defraud*, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." (emphasis added). But Respondent failed to plead any "intent to defraud" on Petitioners' part, and even if it had, such a pleading would have demanded a fact-based inquiry that would have required discovery or testimony in the ordinary course of a civil lawsuit. In short, it is impossible to conclude that Respondent even stated a claim under the CFAA, let alone that it met the higher standards necessary for a preliminary injunction and TRO.

---

[6] This section relates to a "nonpublic computer of a department or agency of the United States."

[7] This section refers to "transmission of a program, information, code, or command" that damages a computer, such as malware.

[8] Section 1030(a)(6) applies to whoever "knowingly and with intent to defraud traffics . . . in any password or similar information through which a computer may be accessed without authorization, if-- (A) such trafficking affects interstate or foreign commerce."

[9] This section requires an "intent to extort."

### B. Respondent's Claims of Access Implicated Novel Legal Conclusions Not Addressed Below.

Respondent alleges that Defendants have stated that the Chinese Server was "unsecured" and "was left with default password on [the] database...." Compl. ¶ 24 (screenshot); *see also* Response at 5, 101, 133, 136, 167, 180, 214. But whether access is "without authorization" or "exceeds" what is authorized is a complex legal and factual question that the district court did not so much as pause to address. Moreover, whether a party can be held to access "without authorization" a computer that auto-populates with its own password, in some factually undeveloped fashion,[10] is a novel question of law glossed over by Respondent and the district court. Respondent's claim is not only factually problematic but implicates complex legal arguments. In *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), the Ninth Circuit engaged in a lengthy analysis of the statutory language, legislative history[11], the Supreme Court's opinion in *Van Buren v. United States*, __ U.S. ___, 141 S. Ct. 1648 (2021), and the plain meanings of the terms employed to find that the party accused of access there, hiQ Labs, had "raised a serious question" of law as to whether, "where access is open to the general public," as arguably was the case here, "the CFAA 'without authorization' concept is inapplicable." *hiQ Labs*, 31 F.4th at 1195.

---

[10] How exactly the computer did this is not clear from the record, which should also be fatal to any preliminary injunction that fails to explain it.

[11] For example, the Court observed that the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, contained language nearly identical to the CFAA provision at issue, and noted that "[t]he similarity of language in [the SCA and the CFAA] is a strong indication that [they] should be interpreted *pari passu*." *hiQ Labs*, 31 F.4th at 1200 (citing *Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973). The Court cited the House Committee on the Judiciary, which stated, of section 2701, that "[a] person may reasonably conclude that a communication is readily accessible to the general public if the ... means of access are widely known, and if a person does not, in the course of gaining access, encounter any warnings, encryptions, password requests, or other indicia of intended privacy." *See* H.R. Rep. No. 99-647, at 62 (1986). Whether the Chinese Server's means of access was "widely known" is a question of fact yet to be decided, and the record is still incomplete on whether the person who did "access" the Chinese Server encountered any indicia of privacy.

In this case, Respondent acknowledges that the accessed server in China featured a pre-loaded password that did not even require anyone to type in a password to access the server. Respondent has argued that use of the password – and whether "use" is even the correct concept is unknowable without testimony from the person who actually accessed the Chinese server – was "unauthorized," but Respondent can offer no legal support for this conclusion. The district court here seems to have simply assumed that such access of the Chinese server was "unauthorized access", without considering whether the existence of a default password on the server rendered access the equivalent of, say, password sharing among friends and family, which would inadvertently "make criminals of large groups of people who would have little reason to suspect they are committing a federal crime." *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012).

## C. Respondent's Claims Could Not Survive the Lower Standard of a Motion to Dismiss.

The Supreme Court has warned that "the tenet that a court must accept as true [on a motion to dismiss] all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Ashcroft*, 556 U.S. at 678–79 (2009). Here, Respondent's claims of "access" are both (1) conclusory in nature – as even a cursory examination of its cited statements confirms – and (2) conclusions of law masquerading as factual allegations.

The second major problem with Respondent's claims of "access" under *Ashcroft* is that "only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a *plausible* claim for relief will . . . be a context-specific task that *requires the reviewing court to draw on its judicial experience and common sense.*" *Ashcroft*, 556 U.S. at 678–79, (emphasis added; citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (2009). "Nor do we accept conclusory allegations [or] unwarranted deductions." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004). As we have shown above and show further below, Respondent's patchwork argument of literary interpretation in place of factual allegations has never been plausible enough to survive the lower standard of a motion to dismiss, let alone justify a preliminary injunction.

### D.  Konnech Confirmed No One Accessed Its U.S.-Based Computers.

Since the CFAA's enactment, proper claims of computer access have been founded on a plaintiff's specific allegations that a computer the plaintiff owned, bearing a unique and identifiable IP address, was accessed by a computer operated by defendant, which bears a different, unique identifiable IP address.[12] Here, Respondent has never made the necessary allegations

---

[12] For example, in *Hovanec v. Miller*, 2019 WL 2774338 (W.D.Tex. 2019), the district court engaged in a lengthy analysis of whether a person using an email address on a device with IP address 108.65.34.232, running on a Mac operating system and AT&T Uverse internet account, could be the same person using a different email address at the same IP address. This is how courts identify computers, and proper defendants. *See Live Face on Web, LLC v. Tweople, Inc.*, No. 6:14-CV-44-ORL-22TBS, 2014 WL 12611359, at *1 (M.D. Fla. Sept. 29, 2014 (noting counterclaim plaintiff could "competently" make allegation of computer access "because it was able to track and record [defendant's] IP address when [defendant] accessed video files stored on [plaintiff's] server"); *CoStar Realty Info., Inc. v. Field*, 737 F. Supp. 2d 496, 506 (D. Md. 2010) (noting plaintiffs had "offered sufficient evidence that at least raises a reasonable inference that IP addresses assigned to" defendant's computers had accessed plaintiff's database); *Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 761–62 (W.D. Va. 2014) (discussing IP addresses of plaintiff and defendant and noting defendant had provided "an IP address for this alleged 'third computer,' but provide[d] only his bald allegation to link it to Plaintiff"); *Hately v. Torrenzano*, No. 1116CV01143GBLMSN, 2017 WL 2274326, at *2 (E.D. Va. May 23, 2017) (noting that Comcast records showed a computer with an identifiable IP address, belonging to defendant, had accessed plaintiff's Google account); *Francis v. API Tech. Servs., LLC*, No. 4:13-CV-627, 2014 WL 11462449, at *1 (E.D. Tex. Sept. 11, 2014) (discussing allegations of "hacking" IP address of plaintiff's home computer); *Vine Oil & Gas LP v. Indigo Mins., LLC*, No. 4:19-CV-00346, 2019 WL 4140842, at *2 (E.D. Tex. Aug. 30, 2019) (noting "hundreds" of different IP addresses were alleged to have accessed the plaintiff's database); *Vest Safety Med. Servs., LLC v. Arbor Env't, LLC*, No. CV H-20-0812, 2020 WL 4003642, at *1 (S.D. Tex. July 15, 2020) ("Vest alleges that it examined its website's IP address logs and discovered that Defendants had accessed the website"); *Pixsys Techs., Inc. v. Agemni, L.L.C.*, No. 2:13-CV-1929-SLB, 2013 WL 5739027, at *3 (N.D. Ala. Oct. 22, 2013) (noting IP addresses belonging to defendant had accessed plaintiff's computer); *D&J Optical, Inc. v. Wallace*, No. 1:14CV658-MHT, 2015 WL 1474146, at *3 (M.D. Ala. Mar. 31, 2015) (pointing out that plaintiff's identified "server was remotely accessed from an IP address assigned

regarding either party's computers, even after Petitioners identified, in their First Petition, the specific IP address of the Chinese server, whose access Petitioner Phillips did not witness but surmised after the fact.

Paragraphs 25 and 50 of Respondent's Complaint made clear that all of *Konnech's* "U.S. customer data is secured and stored exclusively on protected computers *located within the United States*." (emphasis added). In an earlier filing, *see* Ex. A, Respondent's THE TRUTH ABOUT KONNECH (which Petitioners provided the district court in their September 12, 2022, "Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction"), Petitioners showed the district court that Respondent had made even more comprehensive statements[13] that should have called into serious question Respondent's argument that Petitioners ever "accessed" "Konnech computers":

---

to" defendant); *Earthcam, Inc. v. Oxblue Corp.*, No. 1:11-CV-02278-WSD, 2012 WL 12836518, at *2 (N.D. Ga. Mar. 26, 2012) (tracking defendant's use of IP addresses to access plaintiff's computer).

[13] Respondent's September 10, 2022 statement was accessed before Respondent's removal of it at: https://www.konnech.com/images/THE_TRUTH_ABOUT_KONNECH_web_version_09102022.pdf. Respondent's admissions are currently preserved, among other places, by the Wayback Machine's Web Archive at https://web.archive.org/web/20220920173106/https://www.konnech.com/images/THE_TRUTH_ABOUT_KONNECH_web_version_09102022.pdf and the Fairfax (Va.) GOP website at https://fairfaxgop-quickfix1.netdna-ssl.com/wp-content/uploads/2022/10/KONNECH-WEBCACHE-STATEMENT.pdf.

**Accusation:** True the Vote claims to have downloaded personal data on 1.8 million U.S. poll workers early in 2021 from an unsecured Konnech server in Wuhan, China.

**Truth:** Konnech thoroughly investigated True the Vote's claims and found no evidence whatsoever of any breach of our systems or Konnech data anywhere in the world.

Konnech has never stored customer data on servers in China. Konnech stores all customer data exclusively in its country of origin. This means that data belonging to Konnech's U.S. customers is stored on secure servers within the United States. <u>It never leaves the U.S.</u>

In this document[14] we can see Respondent's crystalline clarity, after having "thoroughly investigated" Petitioners' podcast statements, that it has failed to state a claim of computer access, a likelihood of success in showing the same, or any irreparable harm at all:

- Konnech "found no evidence whatsoever of any breach of our systems or Konnech data *anywhere in the world*" (emphasis added)

- "Konnech *has never stored customer data on servers in China.*" (emphasis added)

- "Konnech stores all customer data exclusively in its country of origin."

- "This means that data belonging to Konnech's U.S. customers is stored on secure servers within the United States. <u>It never leaves the U.S.</u>" (emphasis in original)

Respondent could not have made it any plainer that it lacks any evidence of "access" to its computers, that it has no computers in China – the only place Petitioners have talked about servers being – and that the personally sensitive U.S. poll worker data Respondent seeks to complain about here has never been stored by Konnech outside the U.S., "its country of origin". Moreover, Respondent has an affirmative duty to disclose any access of its computers to affected parties, such

---

[14] Indeed, Respondent here so successfully made the case for the lack of any "access" of its computers under the CFAA, and therefore the lack of any federal jurisdiction under that act, that Respondent scrubbed the content from its website soon after putting it up, on September 10, 2022 -- two days before filling its Complaint and motion for TRO.

as its customers, and it has not done so, confirming the absence of proof of any access of Respondent's computers by Petitioners or anyone else.

Respondent has argued, in its Response to Petitioner's First Petition, that "Petitioners also claim that because Respondent found no breach of its system after conducting an internal investigation—as described in a document entitled 'The Truth About Konnech'—that Respondent's computers were not hacked. However, the fact that Respondent could not find a breach doesn't mean it didn't happen." Setting aside the fact that Konnech's admissions were damaging enough to its argument to be scrubbed from its website within days, Respondent appears to agree that the existence of a breach is, at best, a debatable matter – one that requires proper factual development and expert testimony, as well as a conclusion of law forthcoming only after full briefing. But Respondent did not offer factual evidence or expert testimony, and the district court made no reasoned conclusions of law tied to those facts.

Thus, the parties *agree* there is no evidence Petitioners ever accessed Konnech's computers. This case of first impression thus features the unusual CFAA plaintiff who insists to the world that it has thoroughly audited its systems and can confirm it has never been hacked, while arguing to the courts that its obvious misrepresentations of Petitioners' public statements about servers in China somehow prove that Respondent's U.S.-based computers *were* hacked.

### E.  Respondent Has Failed to Claim the Only "Accessed" Computer Was Its Own.

In lieu of its 273-page Response to the First Petition, Respondent had at hand a short, simple means to state a claim of CFAA "access" here: Respondent could have claimed ownership of the IP address Petitioners provided, in their First Petition, for the accessed server based in China. Respondent did not.

Instead, Respondent falls back on its shamelessly misleading use of square brackets in quotations to suggest that when Petitioners said "computer", in statements scattered across the Internet, they can only have meant "[Konnech] computer," and that when Petitioners said "the data" or "it" they were, by some means inaudible to the average listener, talking about "[Konnech] data."[15]

### F. Petitioners' Unrebutted Testimony Also Made Clear Their Public Statements Showed No "Access" to a "Konnech Computer".

Petitioners have been consistent in maintaining both publicly and in court that they never "accessed" a "Konnech computer". In what remains the only testimony on the record, Petitioners consistently made clear that they did not hack into or take data from the only server they have ever talked about, an *insecure* server based in *China*. *See* First Petition (discussing distinction between Chinese Server Data and Election Breach Information). Indeed, in the only actual evidence presented to the district court by either party, Petitioners' unrebutted testimony at the October 27 show-cause hearing made clear only a server in China had been "accessed," and not by Petitioners. Thus, the parties agree that there is no evidence or even a plausible allegation of access of Respondent's computers by Petitioners.

Respondents in their Response to the First Petition fail to set out how they can allege Petitioners had "admitted" "access" to a computer owned by Konnech, let alone that any harm was imminent. Taking judicial notice of the parties' public statements, the lower court should have concluded that Respondent's claims of "access" were based solely on demonstrably "conclusory

---

[15] For example, at page 7 of the Response, Konnech starts by quoting from Petitioner Phillips' podcast about going into the Dallas hotel room, but then Konnech is obliged to drop the quotation marks as it makes up a not-even-paraphrased allegation that Phillips "proceeded to hack into Plaintiff's server." The next sentence exemplifies Respondent's misleading insertion of square brackets ([ ]) to insert Konnech into its narrative, when no such identification occurred in the original: "Indeed, Phillips admitted on that podcast that he and his team "took [Respondent's data] directly." In the very next paragraph, the misrepresentations continue, as Respondent claims Petitioners' statements prove they "began looking at Respondent's data on a server Petitioners claimed they hacked into." *Id.*

allegations" and "unwarranted deductions." Had it been considering a motion to dismiss, the court could have rejected, as lacking "facial plausibility", Respondent's plainly flawed conclusion of fact and law: that Petitioners, by "admitting" to accessing a computer in China, thereby "admitted" to accessing a computer of Konnech's in the U.S. The lower court could not possibly have gone on to draw "the reasonable inference" that Petitioners were liable – and that it had jurisdiction.

The district court could have readily consulted the podcasts offered as the sole basis for federal jurisdiction, as part of the documents incorporated into the complaint by reference or documents integral to the claim, as well as items subject to judicial notice and matters of public record. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Agrilectric Power Partners, Ltd. v. Gen. Elec. Co.*, 20 F.3d 663, 664-65 (5th Cir. 1994). If a district court wishes to allow quotations from public transcripts to form the basis of emergency *ex parte* hearings and liberty-depriving incarceration, the court must satisfy due process by making a reasonable independent inquiry as to whether Respondent's representations of Petitioners' statements amount to conclusory and unwarranted inferences or even, as here, outright misrepresentations.

The simplest route the court could have taken here, before issuing injunctions and contempt orders, would have been to take judicial notice of Konnech's own public statements, or require Konnech to specify the IP address of its allegedly accessed computer. Better yet, the court could have subjected a Respondent witness to the same cross-examination it conducted with Petitioners. This should have been done before the district court simply assumed Respondent had stated a claim, that its computers or data were somehow experiencing irreparable harm, or that its imaginary claim of access had any likelihood of success on the merits, and before the court allowed *ex parte* hearings, early discovery of Petitioners, and a contempt order without any testimony at all from Respondent.

### G. Respondent Failed to Show Imminent Harm to Any Computer, While Petitioners Have Already Been Gravely Harmed by Its Implausible Claims.

Respondent's Complaint and Motion for TRO are breathless in their allegations that Respondent required urgent, even *ex parte*, relief for some unidentified U.S-based computer, lest Petitioners seek to harm that unidentified computer or disclose data from it. But where Respondent's sole allegation of computer access was based not on evidence but a circuitous argument that when Petitioners spoke about a computer in China, not Konnech's, they were somehow identifying a U.S-based computer that Respondent says has never been accessed, the district court unequivocally abused its discretion in finding any likelihood of imminent harm to a "Konnech computer".

At the same time, the individual Petitioners, Engelbrecht and Phillips, have already been harmed by the TRO and injunction below. They were subjected to injunctions that were a physical impossibility with which to comply, together with incalculable cost and stress. They were held in contempt and confined in jail for a week under an invalid order of contempt, causing immeasurable damage to their reputations. The balance of harms here thus tilts in favor of Petitioners, and the harms are no longer even speculative. The harm to Petitioners is real and has already been visited upon them.

### H. Undoing the Violation of Due Process Below

It took Petitioners some time to fully grasp the scope of Konnech's obfuscations. The court below took no such time. In its rush to judgment, fueled by its admitted suspicion about Petitioners and stated lack of "confidence" in their probity, *see* First Petition DOC 30 TR at 49, the district court held one extraordinary "emergency" hearing that excluded Petitioners' counsel entirely, and several unusual hearings that omitted *any* testimony from Respondent – including testimony on the crucial claims Konnech made on its website (on September 12, 2022) titled THE TRUTH

ABOUT KONNECH, where Respondent insisted its U.S-based computers were *never* accessed.
Inexplicably convinced by Respondent's overwrought misrepresentations of Petitioners' public statements, unwilling to examine Respondent's claims itself, the court then enjoined Petitioners to do or refrain from doing about a dozen things that were either pointless or physical impossibilities:

| Petitioners Were Enjoined ... | Injunction Should Be Vacated Because... |
|---|---|
| (i) from accessing or attempting to access Konnech's protected computers | Petitioners can of course agree not to do these things. But Respondent has provided neither evidence nor allegation that Petitioners accessed, or even said they accessed, a computer alleged to belong to Konnech.<br><br>Rather, unrebutted evidence shows that one Defendant (Phillips) saw data from a server, *located in China*, *after* it was accessed, which server Konnech denies owning, and unrebutted evidence from Respondent confirms no one accessed its computers. |
| (ii) to return to Konnech all property and data obtained from Konnech's protected computers, whether original, duplicated, computerized, handwritten, or any other form whatsoever | Unrebutted testimony: no access, no data. |
| (iii) from using, disclosing, or exploiting the property and data downloaded from Konnech's protected computers | See above item (ii). |
| (iv) to preserve, and not to delete, destroy, conceal or otherwise alter, any files or other data obtained from Konnech's protected computers | See above. |
| (v) to identify each individual and/or organization involved in accessing Konnech's protected computers | Respondent has provided no evidence whatsoever that Petitioners were "involved" in "accessing" any computer alleged to belong to Konnech – rather, unrebutted evidence shows one Defendant saw data from a server, *located in China*, *after* it was accessed, which server Konnech denies owning. |
| (vi) to confidentially disclose to Konnech how, when, and by whom Konnech's protected computers were accessed | See above response to (v). |

| (vii) to identify all persons and/or entities, in Petitioners' knowledge, who have had possession, custody or control of any information or data from Konnech's protected computers | Petitioners have identified all persons they were aware had possession of data from the server located in China, but have no information on data taken from a computer alleged to have been owned by Konnech. |
| --- | --- |

And, of course, based on Respondent's empty claim of computer access by both Petitioners, the district court ordered Petitioners Engelbrecht and Phillips incarcerated.

## Conclusion

The plain language of the TRO that ultimately led to the finding of contempt ordered Petitioners, in pertinent part, to "identify each individual involved in accessing **Konnech's protected computers**" (item v) (and, redundantly, to "disclose" "by whom", item (vi)). But there is no credible allegation in this case that anyone "accessed" a "*Konnech computer*", or even one in the United States. In fact, the parties agree Petitioners did not "access" a "Konnech computer". Respondent has presented no plausible allegations for, and dispositive evidence against, any CFAA violation.

The TRO and preliminary injunction were thus based on (1) a flawed Complaint and other pleadings and representations that improperly alleged computer access, along with (2) a judicial process that did (a) not allow Petitioners to take testimony from Respondent or (b) make the barest independent investigation into Petitioners' statements, on podcasts, that Respondent misrepresented as "admitting" "access" to a "Konnech computer" in the United States.

WHEREFORE, the preliminary injunction should be vacated (though Petitioners can readily agree to abide by the superfluous injunctions of romanettes (i) through (iv)), and the district court should review whether it has subject matter jurisdiction in the first instance.

Respectfully submitted,

GREGOR | WYNNE | ARNEY, PLLC

By: */s/ Michael J. Wynne*
Michael J. Wynne

Attorney at Law
Texas State Bar No. 00785289
SDTX No.  0018569
909 Fannin Street, Suite 3800
Houston, TX 77010
Telephone: (281) 450-7403
mwynne@gwafirm.com

Cameron Powell, Esq.
Attorney at Law
DC Bar No. 00459020
Telephone: (503) 502-5030
cpowell@gwafirm.com

James L. Turner
Of Counsel
Texas State Bar No. 20316950
Telephone: (713) 305-5457
jturner@gwafirm.com

COUNSEL FOR DEFENDANTS

**Certificate of Conference**

I certify that I have attempted to confer with lead counsel for the Plaintiff and as of the time of this filing, I have not received a response. I must assume then that lead counsel for Plaintiff is opposed to this motion.

By: */s/ Michael J. Wynne*
Michael J. Wynne

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF e-service on December 1, 2022, on the following counsel of record:

Constantine Z. Pamphilis
Kasowitz Benson Torres LLP
Wedge International Tower
1415 Louisiana, Suite 2100
Houston, Texas 77002
dpamphilis@kasowitz.com

ATTORNEYS FOR PLAINTIFF

By: */s/ Michael J. Wynne*
Michael J. Wynne