**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **KONNECH, INC.,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:22-CV-03096** |
| | § | |
| **TRUE THE VOTE, INC., GREGG** | § | |
| **PHILLIPS, and CATHERINE** | § | |
| **ENGELBRECHT,** | § | |
| | § | |
| **DEFENDANTS.** | § | |

**PLAINTIFF KONNECH, INC.'S MOTION TO SHOW CAUSE AND
FOR CONTEMPT AGAINST DEFENDANTS RELATED TO THE PRELIMINARY
INJUNCTION AND DIRECT ORDERS FROM THE BENCH**

Kasowitz Benson Torres LLP

Constantine Z. Pamphilis
Attorney in Charge
Texas State Bar No. 00794419
SDTX Bar No. 19378
DPamphilis@kasowitz.com
Nathan W. Richardson
Texas State Bar No. 24094914
SDTX Bar No. 24094914
NRichardson@kasowitz.com
1415 Louisiana Street, Suite 2100
Houston, Texas 77002
(713) 220-8800
(713) 222-0843 (fax)

*Attorneys for Plaintiff Konnech, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 2

   A.   The Court Issues a TRO and Then Preliminary Injunction ............................................ 2

   B.   Defendants Evade Compliance ...................................................................................... 3

   C.   Defendants Admit Contempt ......................................................................................... 5

       1.   The October 6 Hearing ........................................................................................ 5

       2.   The October 27 Show Cause Hearing ................................................................. 6

       3.   The October 31 Show Cause Hearing ............................................................... 10

   D.   Defendants' Contempt Knows No Bounds .................................................................. 11

ARGUMENT ...................................................................................................................... 14

   A.   Defendants Are In Contempt of the Preliminary Injunction ........................................ 14

       1.   Section 3 of the Preliminary Injunction ............................................................ 14

       2.   Section 4 of the Preliminary Injunction ............................................................ 16

       3.   Section 6 of the Preliminary Injunction ............................................................ 16

       4.   Section 7 of the Preliminary Injunction ............................................................ 17

   B.   Defendants Are In Contempt of The Court's Direct Orders From the Bench ................. 18

   C.   The Court Should Issue Compensatory and Coercive Fines for Defendants' Contempt . 19

PRAYER ............................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberti v. Klevenhagen*,
   46 F.3d 1347 (5th Cir. 1995) ................................................................19

*American Airlines, Inc. v. Allied Pilots Ass'n*,
   228 F.3d 574 (5th Cir. 2000) ................................................................19

*In re Bradley*,
   588 F.3d 254 (5th Cir. 2009) ...........................................................19, 20

*Hill v. Schilling*,
   No. 3:07-cv-2020-L, 2018 WL 6492508 (N.D. Tex. Dec. 10, 2018) ....................19

*In re Jankovic*,
   738 Fed. Appx. 268 (5th Cir. 2018) (mem. op.) ...................................15

*Shillitani v. U.S.*,
   384 U.S. 364 (1966).............................................................................19

*Test Masters Ed. Svs., Inc. v. Singh*,
   428 F.3d 559 (5th Cir. 2005) ................................................................19

*United States v. Fidanian*,
   465 F.2d 755 (5th Cir. 1972) ................................................................19

**Statutes**

28 U.S.C. § 1826(a) .........................................................................18, 20

COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030.............................2

TEX. CIV. PRAC. & REM. CODE § 143.001 ..........................................2

Plaintiff Konnech, Inc. ("Konnech") requests that this Court order Defendants True the Vote, Inc., Gregg Phillips, and Catherine Engelbrecht ("Defendants") and their counsel of record to appear and show cause why they should not be held in contempt for violating the Court's direct order from the bench at the prior October 27, 2022 show cause hearing and the Preliminary Injunction signed by this Court on October 31, 2022, based on the following grounds:

## PRELIMINARY STATEMENT

Defendants' contempt is undeniable and inexcusable. For nearly three months, Defendants have defied this Court's orders—including a TRO, Preliminary Injunction, and a direct order from the bench—requiring them to identify everyone who was involved in accessing the personal identifying information ("PII") of U.S. poll workers on Konnech's computers, to describe how they did it, and to identify everyone who has had possession of it. Defendants have treated compliance with the Court's orders like a game of cat and mouse, and they have refused to comply with this Court's orders even after being jailed for their contempt of the Court's TRO.

Now, Defendants are in contempt of Sections 3, 4, 6 and 7 of the Preliminary Injunction signed on October 31, 2022, and entered by the clerk on November 3, 2022. Defendants violated Sections 3, 6 and 7 of the Preliminary Injunction for the same reasons that they violated Sections 5, 6 and 7 of the TRO, which are identical. There is evidence to suggest that Defendants also violated Section 4 of the Preliminary Injunction which required them to return all Konnech data in their possession to Konnech. On October 28, Defendants filed an affidavit signed by Defendant Engelbrecht which attached text messages of her alleged communications with the FBI about Konnech. Embedded in those text messages is a spreadsheet titled "Sort by State PII filter SSN Dupes DLN," which, considering that this file is contained in text messages between Defendants and purported FBI agents with whom Defendants were in contact concerning Konnech, the data therein may include stolen Konnech data. Therefore, given Defendants' testimony at the show

cause hearing that they never had such PII, Defendants may be in further contempt of the Preliminary Injunction by refusing to return the data contained in this file to Konnech, as required by Section 4 of the Preliminary Injunction.  Additionally, Defendants also refused to comply with the Court's direct order from the bench on October 27 to name every person in the hotel room where Defendants claimed to have accessed PII on Konnech's computers.

The only appropriate description of Defendants' conduct is contemptuous.  Defendants are blatantly defying the Preliminary Injunction and a bench order for them to provide testimony— which renders them recalcitrant witnesses—and they should be held in contempt of Court for their misconduct.

## FACTUAL BACKGROUND

### A.    The Court Issues a TRO and Then Preliminary Injunction

On September 12, 2022, Konnech filed suit against Defendants claiming, among other things, violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq*., and the Texas Harmful Access by Computer Statute, TEX. CIV. PRAC. & REM. CODE § 143.001.  (Doc. 1). That same day, the Court issued an *ex parte* TRO.  (Doc. 9).  And, after full briefing from the Parties and a hearing on October 6, the Court issued a Preliminary Injunction which ordered that Defendants, their agents and assigns, (1) not access or attempt to access Konnech's computers; (2) not use or exploit the data taken from Konnech's computers;  (3) identify each individual and/or organization involved in accessing Konnech's computers; (4) return to Konnech all data obtained from its computers; (5) preserve any data obtained from Konnech's computers; (6) disclose to Konnech how, when and by whom its computers were accessed; and (7) identify all persons and/or entities who have had possession, custody or control of any information or data from Konnech's computers.  (Doc. 57).  As the Court explained in its Memorandum Opinion and Order, "[t]his data, whether acquired from Konnech or China, is personal and confidential to Konnech and the

poll workers of the various counties and States in the United States where the workers are employed." (Doc. 57 at p. 6). As such, "[i]n accessing Konnech's computer and/or collecting, storing or retrieving data known to belong to Konnech, the defendants have interfered with Konnech's lawful right to control its own computers and data, and, moreover, protect the personal and confidential data of individuals who serve as 'poll workers.'" (*Id*. at p. 7). And furthermore, as the Court explained, "Konnech and Yu are under threats as a result of the defendants' media events, whereby they announced their intent to release to the public all of the data that they acquired from Konnech's protected computers. To do so, in the Court's opinion, would destroy trust in the governmental entities by the public and, trust between the governmental entities and Konnech." (*Id*.).

## B.    Defendants Evade Compliance

Despite Konnech's extensive efforts to gain Defendants' compliance with the TRO, they admittedly refused to comply even at the show cause hearing and after the Court provided them with a second chance to purge their contempt. (*See e.g.*, Ex. A, Letters to Counsel Seeking Compliance). The stated basis of Defendants' initial refusal to comply with Sections 5, 6 and 7 of the TRO, which are the same as Sections 3, 6 and 7 of the Preliminary Injunction, was that "this is a matter that has been turned over to the FBI," and that "they do not want to compromise an ongoing [FBI] investigation[.]," which they have admitted is targeting the Defendants. (Ex. B, Sept. 14 Letter from Counsel). Defendants also claimed in that September 14 letter that their "independent contractor" was responsible for gaining unauthorized access to Konnech's computers and taking its data. (*Id*.).

On September 15, Defendants filed a sealed, *ex parte* letter with the District Court which claimed that they could not comply with Section 5 of the TRO (same as Section 3 of the Preliminary Injunction), and instead revealed only to the Court the identity of a single individual

3

Defendants claimed was responsible for accessing Konnech's computers and stealing its data, because they said that the individual was "integral" to an FBI investigation.  (Ex. C, Sept. 15 Ex Parte Letter).  That same letter was sent to the FBI "to allow the FBI the opportunity to be heard on this sensitive issue if that is its choice."  (*Id.*).  That same day, counsel for Defendants sent a letter to Konnech contradicting their prior position on TRO compliance.  (Ex. D, Sept. 15 Letter from Counsel).  Specifically, just one day after stating that the hacker was their "independent contractor," Defendants claimed that the hacker was "not contracted to [Defendants] or paid by [Defendants]."  (*Id.*).  Defendants also claimed that they only viewed a "screen share" of "certain elements of the data," and that the data was merely "characterized" to Defendants as showing Konnech's data. (*Id.*)  And notably—although Defendants again changed their story at the October 27 show cause hearing—the September 15 letter claimed that an individual hacker "turned over to True the Vote a hard drive device containing" the data stolen from Konnech, which Defendants then turned over to the FBI.  (*Id.*)

Despite Defendants' ever-changing story, Konnech continued to seek Defendants' compliance with the TRO through communications on September 15, 16, 17 and 20, 2022; but Defendants would not comply.  (*See* Ex. A, Letters to Counsel Seeking Compliance).  Konnech asked Defendants to sign an affidavit swearing to the statements made in their counsel's September 15 letter.  But after initially indicating that Defendants would do so, they ultimately refused.

Accordingly, on September 21, 2022, Konnech filed a Motion to Show Cause and For Contempt Against Defendants related to the TRO.  (Doc. 16).  That same day, the parties filed a stipulation to extend the expiration of the TRO.  (Doc. 18).  And on September 26, 2022, the Court approved the parties' stipulation, and set a hearing on Konnech's Motion for preliminary injunction for October 6, 2022.  (Doc. 20).

**C.      Defendants Admit Contempt**

**1.      The October 6 Hearing**

On October 5, 2022, in their response to the Motion for Preliminary Injunction, Defendants admitted that, not only were they involved with hacking Konnech's computers, but they know how it was done: "In this case, the server in China that was accessed had a pre-loaded password (i.e., 'password') that did not even require typing in a password to enter the server[.]" (Doc. 24).  This is important because Section 6 of the Preliminary Injunction requires that Defendants disclose confidentially to Konnech how its computers were accessed without authorization. (Doc. 57).  But Defendants would later testify that this statement in their court filings was untrue.  (*See* Ex. E, Oct. 27 Hrg. Tr. at 74:3-22; 132:23-133:4).

At a hearing on October 6 to address, among other things, Konnech's original Motion for Contempt and Konnech's Motion for Preliminary Injunction, Defendants failed to present any evidence in response to either motion and instead relied solely on argument of counsel.  At that hearing, counsel for Defendants admitted that they had not complied with the TRO.  (Ex. F, Oct. 6 Hrg. Tr. at 19:20-24) ("Yes, Your Honor.  And it is a fact that we have not given up the name of the individual.").  Counsel for Defendants also admitted that Defendants did have possession of Konnech's data before giving it to the FBI.  (*Id*. at 22:7-10) ("THE COURT: . . . when Phillips claims that he turned it over to the FBI, he had to have possession of it at the time in order to turn it over?  MR. AKERS:  Actually, yes.").  Notably, counsel for Defendants also stated that there was only one person in that Dallas hotel room with Phillips in January 2021, Mike Hasson, and provided that name to Konnech after repeatedly refusing to comply with this Court's orders that he do so in open court.  (*Id*. at 50:10-16).  However, as is evident from the record now, there was a third, still unidentified person in the hotel room that Defendants concealed until cross-examination at the October 27 show cause hearing, and who Defendants are still refusing to

5

identify in violation of the Preliminary Injunction and the Court's bench order.

Importantly, however, both Defendants and their counsel have told the Court that the FBI has no interest in protecting the information required by the TRO and now Preliminary Injunction. (*Id*. at 25:7-25 (answering that "they [the FBI] were not interested in the protection of this information," when asked by the Court what the FBI's position was on the TRO requirements); Ex. E, Oct. 27 Hrg. Tr. at 151:24-152:3; 152:8-16). Unsurprisingly, the FBI has made no effort to intervene in this matter whatsoever. (Ex. F, Oct. 6 Hrg. Tr. at 38:9-14) ("THE COURT: . . . I need to know whether or not it is this national security issue. I need to know whether or not the Department of Justice is involved in this in some way. They have got thousands of lawyers all over this country. Surely somebody could have contacted the Court by now.").

### 2.    The October 27 Show Cause Hearing

On October 17, 2022, the Court issued a Show Cause Order requiring Defendants to appear and show cause on October 27, 2022 for why they should not be held in contempt of the TRO. (Doc. 33). Defendants, however, confirmed their contempt of the TRO, and now the Preliminary Injunction, while testifying at the show cause hearing.

For the first time since the inception of this lawsuit, and despite the TRO's (and now Preliminary Injunction's) requirement that Defendants disclose each person "involved" in accessing Konnech's computers, Defendants waited until cross-examination at the October 27 hearing to admit that there was a third person in the hotel room. (Ex. E, Oct. 27 Hrg. Tr. at 39:3-6). Phillips admitted under oath that this third, unnamed person, was "involved" in accessing Konnech's data. (*Id*. at 58:11-22). Defendants made the same admission in their Mandamus Petition filed in the Fifth Circuit. (Ex. G, Mandamus at p. 29) (admitting that "[a]side from the other individuals in the hotel room and the FBI agents, Phillips had no knowledge of who may

have accessed the Konnech-protected computers."). But when pressed and further ordered directly by the Court to reveal that person's name, Phillips refused to do so, falsely claiming that he is a confidential informant himself. (Ex. E, Oct. 27 Hrg. Tr. at 40:3-14) ("THE COURT: You are at liberty to say because I'm ordering you to give the name. THE WITNESS: I'm a confidential informant, too. I can't do it."). To be sure, Phillips' reason that he could not give the name— because he is a confidential informant—is belied by his own testimony a short while later when he testified that "I'm not a confidential informant anymore." (*Id*. at 102:1-4). Engelbrecht, who admitted that "I believe I know the third person," likewise refused to provide the name of the third person involved, which the Court ordered disclosed. (*Id*. at 151:10; 152:20-22) (answering "yes" to the Court's question if it was her "personal choice or decision to not disclose the name").

Also, at the October 27 Show Cause hearing, Defendants contradicted their prior statements that they were provided with a hard drive with Konnech's data when they testified that they were never provided with any copy of the data. (*Id*. at 34:22-25). But just a short time later during his testimony, Defendant Phillips again changed his testimony, saying that he could not recall if he ever was provided with a hard drive of the data. (*Id*. at 51:10-23). Defendant Engelbrecht similarly could not recall when pressed. (*Id*. at 144:11-16).

At the conclusion of the October 27 show cause hearing, the Court found Defendants in contempt and directed the Defendants to purge their contempt by October 31 or face jailtime. (*Id*. at 172:21-173:5).

The day after the October 27 Show Cause hearing, Defendants filed affidavits in a "Submission of Evidence in Furtherance of Request to Purge Finding of Contempt." (Doc. 46). However, far from purging their contempt, Defendant Phillips admitted his contempt when he swore that he would "with all diligence, expedience, and in good faith," provide the information

required by Section 6 of the TRO (same as Section 6 of the Preliminary Injunction).  (*Id.*).  But it has been over a month since that affidavit was filed, and Defendants have made no effort to comply, despite the Preliminary Injunction also ordering that Defendants provide that information.

The same "Submission of Evidence" submitted by Defendants also suggests Defendants' further contempt when Defendants submitted selected texts, along with the affidavit of Defendant Engelbrecht, which contain her communications about Konnech with purported FBI agents, and which demonstrates Defendants may be in possession of personal identifying information, despite their testimony to the contrary.  Specifically, despite testifying that they never possessed any Konnech data (*see e.g.*, Ex. E, Oct. 27 Tr. at 33:12-22), Defendants produced text messages with "Huy Nguyen – FBI Special Agent" which suggest that they have a 78 KB spreadsheet on Ms. Engelbrecht's phone entitled:

SORT_BY_STATE_PII_filter_SSN_Dupes_DLN_FINAL_MERGED_WITH_COUNTIES.ods.



(Doc. 46-2).  Below is a copy of an enlarged version of that screenshot:



According to its title, this spreadsheet contains PII (i.e., personal identifying information), and although Defendants' counsel claim that they do not know whether the spreadsheet contains PII, including social security numbers, from any Konnech computer, given that it was submitted as evidence in connection with this matter, it appears to relate to Konnech.  Therefore, given Defendants' testimony at the show cause hearing that they never had such information, Defendants may be in further contempt of the Preliminary Injunction by refusing to return the data to Konnech, as required by Section 4 of the Preliminary Injunction.  (Ex. E, Oct. 27 Hrg. Tr. at 33:12-22; 34:22-25).

9

### 3.    The October 31 Show Cause Hearing

On October 31, 2022, the Defendants asked to delay the second show cause hearing by six hours while they waited for the FBI to contact them.  (Ex. H, Oct. 31 Hrg. Tr. at 7:1-5).  The Court did not delay the proceeding and no FBI support for the Defendants' position has materialized in the five weeks since that hearing.  As a result of their unabated contempt, the Court ordered Defendants detained until they complied.  (*Id*. at 16:16-17:11).  In doing so, the Court addressed the inconsistencies and the evasiveness of Defendants' answers.  (*Id*. at 7:10-8:19) ("I have never gotten a straight answer from either of them as to what happened in the hotel room . . . Whatever their knowledge is, they have evaded the Court.").

On November 3, 2022, Defendants filed an Application for Mandamus and Emergency Motion for Release from Detention Pending Determination of the Application for Mandamus.  On November 7, 2022, a Fifth Circuit panel released Defendants from detention.  Then, on November 22, that same Fifth Circuit panel granted Defendants' Mandamus.  Konnech seeks a rehearing *en banc* of that decision.  Although the Fifth Circuit reminded Defendants of the deadline to file a notice of appeal for the Preliminary Injunction, the Defendants failed to do so.  Instead, on the deadline for filing their notice of appeal, Defendants filed a second Petition for Writ of Mandamus directed at the Preliminary Injunction.  However, that second Petition for Writ of Mandamus was dismissed the next day since it was not filed as an original proceeding.  There is presently no appeal or mandamus concerning the Preliminary Injunction.[1]

---

1 On December 1, 2022, after Defendants' deadline to file a notice of appeal of the preliminary injunction had already expired, Defendants filed a Motion to Dissolve Preliminary Injunction in this Court.  (Doc. 65).  Konnech is opposed to the relief sought in the Motion to Dissolve and will file a response in opposition before the submission date.

Defendants' contempt of the Preliminary Injunction and the Court's direct bench order remains unabated and they have made no effort to purge it.

**D.     Defendants' Contempt Knows No Bounds**

Defendants' contempt for the Court and its rulings has been on full public display since they were found in contempt.   On the day before the October 31 hearing, Defendant Phillips ReTruthed a post referring to the October 31 hearing that stated "corrupt judges play games":



Then, on October 31, Defendant Phillips' podcast page (@RealPatriotGames) ReTruthed a meme that depicts a photoshopped image of Judge Hoyt with a communist party symbol emblazoned on his clothing:



Further, Defendants used their incarceration for profit.  For example, within just a few hours after being taken into custody, Defendant Engelbrecht's social media page (@truethevote) posted a link for donations "to help in our cause."  (Ex. I, Oct. 31 True the Vote Post).  Then, on Thursday, November 3, Defendant Engelbrecht—who referred to herself as a "political prisoner"—released a recorded voice message from federal detention, where she plugged a website that is selling merchandise with Defendants' pictures on everything from t-shirts, to coffee mugs, mouse pads, and even socks, with all proceeds going to Defendants' legal defense.  (Ex. J, Nov. 3 True the Vote Post).  Defendant True the Vote also posted a link to the website on November 5, stating that the merchandise was created "to support Catherine and Gregg in their fight against government tyranny."  (Ex. K, Nov. 5 True the Vote Post) (emphasis added).

Additionally, Defendants' malice against Konnech's CEO, Eugene Yu, is so apparent that they have resorted to using profanity to attack and to try and intimidate him (Defendants even used the hashtag #discoverywillbefun):



After initially deleting the prior "MOFO" post, Defendant Phillips doubled down just a couple days later with a similar message, except this time adding xenophobic comments about t-shirts being made in China:



Defendants' conduct is contemptuous, juvenile, and reprehensible.

## ARGUMENT

### A.      Defendants Are In Contempt of the Preliminary Injunction

Though the Preliminary Injunction was issued over a month ago, Defendants have still not complied with Sections 3, 4, 6, and 7 of the Preliminary Injunction.

#### 1.      Section 3 of the Preliminary Injunction

Section 3 of the Preliminary Injunction requires Defendants to identify each individual and/or organization involved in accessing Konnech's computers.   (Doc. 57).   Phillips acknowledged on the witness stand during the October 27 show cause hearing that, although this third person may not have been the person who did the actual act of "accessing" Respondent's computers, the third person was in that room and nevertheless "involved."  (Ex. E, Oct. 27 Hrg.

Tr. at 58:11-22).  In fact, Defendants' defiance of court orders is so blatant, that Phillips even refused to give the name to the Court confidentially.  (*Id*. at 103:3-11).  Defendants claim that they cannot identify the third person because he is an FBI confidential informant in an unrelated matter.[2] However, Defendants have presented no evidence and cited no authority to warrant their refusal to disclose the individual's identity.  *See In re Jankovic*, 738 Fed. Appx. 268, 270 (5th Cir. 2018) (mem. op.) (affirming civil contempt where defendant failed to comply with court order and "provided no documentation that he had done so.").

Importantly, by Defendants' own admission, the FBI has eliminated their excuse for non-compliance.  Counsel for Defendants confirmed during the October 6 hearing that the FBI was "not interested in the protection of this information," that is, the information required by the Preliminary Injunction, including the names of the individuals acting in concert with Defendants. (Ex. F, Oct. 6 Hrg. Tr. at 25:7-25).  Engelbrecht confirmed the FBI's position while on the stand at the October 27 show cause hearing.  (Ex. E, Oct. 27 Hrg. Tr. at 151:24-152:3; 152:8-16).

Defendant Phillips' reason that he could not give the name of the third person involved in accessing Konnech's computers without authorization as required by Section 3 of the Preliminary Injunction—because he is a confidential informant—is belied by his own testimony when he testified that "I'm not a confidential informant anymore." (*Id*. at 102:1-4).  Defendant Engelbrecht, also admitted her contempt when she testified that "I believe I know the third person," but likewise refused to provide the name of the third person involved. (*Id.* at 151:10; 152:20-22) (answering "yes" to the Court's question if it was her "personal choice or decision to not disclose the name").

---

[2] As the Court correctly observed, nobody needed to know that this unnamed person is a confidential informant, and that Phillips is the one who disclosed, not only that the third person is a confidential informant, but also what he does as a confidential informant.  (*Id*. at 103:12-105:12).

Defendants are in contempt of Section 3 of the Preliminary Injunction as they have failed and refused to provide Konnech with the information which it requires in the over 30 days since the Preliminary Injunction was issued.

### 2.      Section 4 of the Preliminary Injunction

Section 4 of the Preliminary Injunction requires Defendants to return to Konnech all property or data obtained from Konnech's computers, whether original, duplicated, handwritten, or any other form, whatsoever obtained from any source.  As reflected in the text messages produced by Defendants depicted above, they may possess a copy of a spreadsheet containing PII, including social security numbers, sorted by state.  (Doc. 46-2).  Since Defendants claimed that these text exchanges concerned Konnech, it appears that this spreadsheet contains PII illegally obtained from Konnech's computers.  Defendants may therefore be in contempt of Section 4 of the Preliminary Injunction by refusing to return the data to Konnech as they have failed and refused to provide Konnech with the data which it requires in the over 30 days since the Preliminary Injunction was issued.

### 3.      Section 6 of the Preliminary Injunction

Section 6 of the Preliminary Injunction requires Defendants to disclose to Konnech how its computers were accessed.  At The Pit event, Defendants claimed that Respondent's computers were accessed by a default password.  (Doc. 1).  And in an October 5 filing, Defendants further admitted that, not only were Defendants involved with hacking Konnech's computers, but they knew how it was done: "In this case, the server in China that was accessed had a pre-loaded password (i.e., 'password') that did not even require typing in a password to enter the server[.]" (Doc. 24).  But when Defendant Phillips took the stand, he would not testify as to how Konnech's computers were accessed and feigned ignorance as to whether a default password was utilized.

(Ex. E, Oct. 27 Hrg. Tr. at 74:3-22).  Defendant Engelbrecht, likewise, did not testify as to how Konnech's computers were accessed.  (*Id*. at 132:23-133:4).

Immediately after the show cause hearing, in an October 28 affidavit, Defendant Phillips swore that he would "with all diligence, expedience, and in good faith," provide the information required by Section 6 of the TRO, and now the Preliminary Injunction.  (Doc 46).  However, it has been over five weeks since that affidavit was filed, and over a month since the Preliminary Injunction was issued, and Defendants have still made no attempt to comply.  Defendants are in contempt of Section 6 of the Preliminary Injunction.

### 4.      Section 7 of the Preliminary Injunction

Section 7 of the Preliminary Injunction requires Defendants to identify all persons and/or entities in their knowledge who have had possession, custody or control of any information or data from Konnech's computers.  Defendants confirmed their contempt of this section of the Preliminary Injunction in Defendant Phillips' affidavit and at the October 27 show cause hearing. While Defendants have repeatedly changed their story, their current position on Section 7 of the Preliminary Injunction is that, "to the best of [Phillips'] personal knowledge, the only persons and/or entities who have had the electronic information to which I understand the order is directed" are Mike Hasson and the FBI, "including but not necessarily limited to Special Agents Huy "Bobby" Nguyen and/or Keven McKenna."  (Doc. 46).  First, Section 7 of the Preliminary Injunction requires Defendants to base their disclosure on their "knowledge" (all 3 Defendants); not the "best" of only Defendant Phillips' knowledge.  Second, Section 7 of the Preliminary Injunction is not limited to "electronic information to which [Defendant Phillips] understand[s] the [Preliminary Injunction] is directed;" it encompasses "any information or data from Konnech's protected computers."  (*Id*.).

Third, Section 7 of the Preliminary Injunction requires Defendants to identify "all persons and/or entities," with any information or data from Konnech's computers, but they have admittedly refused to identify the third person in the hotel room that viewed the data, or anyone at the FBI other than two agents and, most notably, themselves.  Defendants previously represented to the Court that Defendants did have possession of Konnech's data before giving it to the FBI.  (Ex. F, Oct. 6 Hrg. Tr. at 22:7-10) ("THE COURT: . . . when Phillips claims that he turned it over to the FBI, he had to have possession of it at the time in order to turn it over?  MR. AKERS:  Actually, yes.").

Defendants are in contempt of Section 7 of the Preliminary Injunction as they have failed and refused to provide Konnech with the information which it requires in the over 30 days since the Preliminary Injunction was issued.

## B.    Defendants Are In Contempt of The Court's Direct Orders From the Bench

Entirely separate and apart from the Preliminary Injunction, Defendants are in contempt of direct orders of the Court when they refused to comply after being ordered by the Court to disclose the name of the third person while testifying.  Defendant Phillips was specifically ordered to give the name of the third person while testifying.  (Ex. E, Oct. 27 Hrg. Tr. at 40:3-14) ("THE COURT: You are at liberty to say because I'm ordering you to give the name.  THE WITNESS:  I'm a confidential informant, too.  I can't do it.").  As authorized by the U.S. Code:

> [w]henever a witness in any proceeding before or ancillary to any court . . . refuses without just cause shown to comply with an order of the court to testify or provide other information . . .the court, upon such refusal . . . may summarily order his confinement . . . until such time as the witness is willing to give such testimony or provide such information.

28 U.S.C. § 1826(a).  Therefore, when Defendant Phillips refused to comply with the Court's direct order to give the name, he was in contempt of that order.  Additionally, Defendant Engelbrecht, who admitted that "I believe I know the third person," likewise refused to provide the name of the

18

third person involved, which the Court ordered disclosed. (*Id*. at 151:10; 152:20-22) (answering "yes" to the Court's question if it was her "personal choice or decision to not disclose the name").

Defendants remain in contempt of the Court's orders from the bench on October 27 for them to disclose the name of the third person.

**C.      The Court Should Issue Compensatory and Coercive Fines for Defendants' Contempt**

It is well settled law that "the power to punish for contempt," and in particular civil contempt, "is an inherent power of the federal courts and that it includes the power to punish violation of their own orders."  *In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009) (quoting *United States v. Fidanian*, 465 F.2d 755, 757 (5th Cir. 1972)); *Shillitani v. U.S.*, 384 U.S. 364, 368 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.").  Upon a finding of contempt, courts have broad discretion in how they choose to exercise their contempt power.  *Test Masters Ed. Svs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) *Hill v. Schilling*, No. 3:07-cv-2020-L, 2018 WL 6492508, at *10 (N.D. Tex. Dec. 10, 2018).

"Judicial Sanctions" may be employed "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."  *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000).  These losses can include both direct losses "for the damages sustained" (*id*.), as well as attorneys' fees incurred in seeking compliance.  *Hill*, 2018 WL 6492508 at *10.  Further, though the United States Supreme Court has noted that "the paradigmatic civil contempt sanction order . . . involves confining the contemnor until he complies," "the closest analogy to that paradigm civil contempt situation" is a "per diem fine imposed for each day a contemnor fails to comply[.]"  *Alberti v. Klevenhagen*, 46 F.3d 1347, 1359 (5th Cir. 1995).  The Court's contempt power also includes the power to jail litigants for contempt

as well as recalcitrant witnesses.[3] *In re Bradley*, 588 F.3d at 265 ("Imprisonment is an appropriate remedy for either civil or criminal contempt."); 28 U.S.C. § 1826(a).

Konnech seeks Defendants' immediate compliance with Sections 3, 4, 6, and 7 of the Preliminary Injunction, as well as the Court's direct order from the bench.  In the event that Defendants do not immediately comply, Konnech requests that the Court set a hearing requiring Defendants to show cause why they should not be held in contempt.  Konnech also requests all compensatory sanctions, including fees and costs Konnech incurred in seeking compliance and the money Konnech spent on additional IT security to determine how Defendants gained unauthorized access to Konnech's computers.  Konnech also requests coercive sanctions, including a per diem fine imposed for each day that Defendants refuse to comply, that the Court deems necessary to obtain Defendants' compliance and to deter further contempt.

### PRAYER

In sum, Konnech, Inc. respectfully requests that the Court, without a hearing, enter an order directing that Defendants appear before the Court and show why they should not be held in contempt of the Preliminary Injunction and direct Court order from the bench.  Konnech, Inc. further respectfully requests that, after hearing, the Court enter an order: (i) holding Defendants in contempt; (ii) awarding Konnech compensatory and coercive sanctions which the Court deems necessary to obtain Defendants' compliance and to deter further contempt; and (iii) for such other and further relief to which Konnech, Inc. may be justly entitled.

---

[3] The Court previously ordered Defendants detained in a federal detention center until they complied with the TRO.  Defendants, however, were not coerced by the detention, and remained in detention for seven days before they were released by the Fifth Circuit.

Dated: December 5, 2022

KASOWITZ BENSON TORRES LLP

By:     */s/ Constantine Z. Pamphilis*
        Constantine Z. Pamphilis
        Attorney in Charge
        Texas State Bar No. 00794419
        SDTX Bar No. 19378
        DPamphilis@kasowitz.com
        Nathan W. Richardson
        Texas State Bar No. 24094914
        SDTX Bar No. 24094914
        NRichardson@kasowitz.com
        1415 Louisiana Street, Suite 2100
        Houston, Texas 77002
        (713) 220-8800
        (713) 222-0843 (fax)

        *Attorneys for Plaintiff Konnech, Inc.*

## CERTIFICATE OF CONFERENCE

I hereby certify that, as stated herein, I have attempted to obtain Defendants' voluntary compliance with the Preliminary Injunction, but Defendants have refused.  And on December 5, 2022, I contacted Defendants' counsel to confer on this motion, and I was informed that Defendants are opposed.

*/s/ Nathan W. Richardson*
Nathan W. Richardson

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, true and correct copies of the above and foregoing were forwarded via email and through the ECF system, to all parties and counsel of record.

*/s/ Constantine Z. Pamphilis*
Constantine Z. Pamphilis

21

# Exhibit A

# KASOWITZ BENSON TORRES LLP

Constantine Z. Dean Pamphilis
Direct Dial: (713) 220-8852
Direct Fax: (713) 222-0843
DPamphilis@kasowitz.com

1415 LOUISIANA STREET, SUITE 2100
HOUSTON, TEXAS 77002
(713) 220-8800
FAX: (713) 222-0843/0940

ATLANTA
LOS ANGELES
MIAMI
NEW YORK
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

September 15, 2022

**VIA EMAIL**

Brock Akers
The Akers Firm
3401 Allen Parkway
Suite 101
Houston, Texas 77019
bca@akersfirm.com

RE:   Cause No. 4:22-cv-03096; *Konnech, Inc. v. True the Vote, et al.*, In the United
States District Court, Southern District of Texas, Houston Division.

Dear Mr. Akers:

I write in response to your September 14, 2022 letter ("Letter") to seek Defendants'
voluntary compliance with the TRO.

<u>First</u>, the Defendants' refusal to comply with significant portions of the TRO (Item nos. 5,
6 and 7 in your Letter, which are subparagraphs v, vi and vii in the TRO) because they have
provided the FBI with the same information does not excuse their non-compliance with the TRO.
Your Letter admits the Defendants know who stole Konnech's data, how it was stolen, and who
else has it, but that Defendants will not disclose such information even though the TRO requires
it. Three days ago, Judge Hoyt ordered the Defendants to <u>immediately</u>:

v.     [I]dentify each individual and/or organization involved in accessing Konnech's
protected computers;

vi.    [C]onfidentially disclose to Konnech how, when, and by whom Konnech's
protected computers were accessed; and

K A S O W I T Z   B E N S O N   T O R R E S   LLP

Brock Akers
September 15, 2022
Page 2

       vii.     [I]dentify all persons and/or entities, in Defendants' knowledge, who have had possession, custody or control of any information or data from Konnech's protected computers.

And, even though the Court was not required to consider it, the Defendants' allegations of the FBI's involvement was brought to the Court's attention before the TRO was issued. Defendants' refusal to provide Konnech with this information directly violates the TRO and is frankly stunning. This information is essential to enable Konnech to protect its data and needs to be turned over immediately.

      Second, Defendants' refusal to immediately "return to Konnech all property and data obtained from Konnech's protected computers, whether original, duplicated, computerized, handwritten, or any other form whatsoever" is also shocking, particularly because it is apparent that Defendants are acting in concert with others that still have Konnech's property and data.  The basis for your clients' refusal to comply -- that they turned all of Konnech's data over to the FBI -- is also demonstrably false.  In the event that you are planning to make such representation to the Court, you should first review the Complaint and Motion for TRO carefully as both demonstrate that your clients have recently, repeatedly and publicly stated that they plan to release, or already have released, stolen Konnech data to their subscribers and/or others, including The Pit attendees—even after claiming they had turned over all such data to the FBI.

      Third, your Letter demonstrates a fundamental misunderstanding of whether the Konnech property and data (which your Letter admits your clients accessed) came from a Konnech "protected computer."  While you claim in your Letter that you are not "playing semantics," that is precisely what your clients' position on "protected computers" demonstrates.  Specifically, you state that your responses to the seven items in your Letter are all "properly modified" by "Konnech's protected computers."  Konnech's Motion for TRO and Complaint expressly define the term "protected computer" under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").  Further, the TRO expressly states that "Defendants have admitted to gaining unauthorized access to Konnech's *protected computers* and obtaining information therefrom."  So that there's no misunderstanding, the term "protected computer" is defined under the CFAA as a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States."  18 U.S.C. § 1030(e)(2).  Your Letter states unequivocally that the Konnech data your clients obtained came from an "open source."  Again, in the event that you are planning to make that representation to the Court, please review the Complaint and Motion for TRO carefully as both demonstrate that your clients have publicly claimed that they used a "default password" to access Konnech data which, as a matter of law, constitutes hacking, and is not "open source" as you claim in your Letter.  In any event, the term "protected computer" has nothing to do with the security features of a "computer" (as that term is also defined under the CFAA).  Rather, a "protected computer" is merely a computer that is connected to the internet—which indisputably applies to Konnech's computers even with

KASOWITZ BENSON TORRES LLP

Brock Akers
September 15, 2022
Page 3

Defendants' admission that they obtained Konnech's data on an "open source" from the internet. *See Merritt Hawkins & Assoc., LLC v. Gresham*, 948 F. Supp. 2d 671, 673-74 (N.D. Tex. 2013) (explaining that any computer connected to the internet is a "protected computer" under the CFAA).[1]

With the above in mind, we ask that you ensure **Defendants immediately comply with the TRO by 3:00 PM CT today**. Defendants' failure to do so will leave us no option but to seek immediate court intervention.

Separately, in response to your request, we can agree to extend the expiration date of the TRO. However, since that agreement will require the entry of an agreed TRO, I would suggest that the parties agree to convert the TRO into a preliminary injunction and avoid the preliminary injunction hearing altogether.

Sincerely,

Dean Z. Pamphilis

---

[1] To the extent Defendants intend to try to hide behind the still yet unidentified alleged "independent contractors" that provided them with Konnech's data, the CFAA does not limit liability to direct access; it penalizes indirect access and conspiracy to violate the CFAA as well.

# KASOWITZ BENSON TORRES LLP

Constantine Z. Dean Pamphilis
Direct Dial: (713) 220-8852
Direct Fax: (713) 222-0843
DPamphilis@kasowitz.com

1415 LOUISIANA STREET, SUITE 2100
HOUSTON, TEXAS 77002
(713) 220-8800
FAX: (713) 222-0843/0940

ATLANTA
LOS ANGELES
MIAMI
NEW YORK
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

September 16, 2022

**VIA EMAIL**

Brock Akers
The Akers Firm
3401 Allen Parkway
Suite 101
Houston, Texas 77019
bca@akersfirm.com

> RE: Cause No. 4:22-cv-03096; *Konnech, Inc. v. True the Vote, et al.*, In the United States District Court, Southern District of Texas, Houston Division.

Dear Mr. Akers:

I write in further response to your September 14 and September 15, 2022 letters, and to again seek Defendants' voluntary compliance with the TRO in a final attempt to avoid contempt proceedings.

*First*, Defendants' position concerning Konnech's property and data has repeatedly changed since the emergence of their attacks against Konnech. Defendants initially claimed at The Pit—and then repeatedly on podcast appearances and social media postings following the event—that, as a factual matter, *they* were the ones who found data and personal identifying information on 1.8 million U.S. poll workers located on a Konnech Server that was allegedly only restricted by a default password; that it was Defendant Phillips' "analysts," or otherwise his "guys" (signifying more than one person), who gained unauthorized access to Konnech's servers and took data therefrom; that *Defendants* "took [Konnech's data] directly," and that they already did, or otherwise planned to release the data to their subscribers in an effort to somehow substantiate their false and malicious claims that Konnech is involved in election fraud or is otherwise affiliated with the Chinese Communist Party; and further, that this was all done at the direction of Defendants Engelbrecht and True the Vote.

## KASOWITZ BENSON TORRES LLP

Brock Akers
September 16, 2022
Page 2

After the TRO was issued, your correspondence has contradicted Defendants' prior statements. In your September 14 Letter, although you admit that Konnech data was acquired by Defendants, you claim the data and information was obtained by an "independent contractor" who contacted Defendant Phillips after having first obtained the information themselves. And now, your September 15 Letter claims for the first time that this alleged third party was not "contracted" by Defendants as your prior letter claimed (though, glaringly, neither letter denies that the third party was working in concert with Defendants). Further, and contrary to prior public statements by Defendants, Defendants suddenly claim in your September 15 Letter that they only saw "certain elements of the data" which was merely "characterized" by the undisclosed third party as containing sensitive poll worker data. Unsurprisingly, the repeated change in Defendants' position and, indeed, the contradictory nature of it all, makes it impossible for Konnech to take Defendants at their word.

*Second*, Defendants have still not complied with substantial obligations in the TRO and you have still not addressed those items, including in your September 15, 2022, *ex parte* communication with the Court.[1] Specifically, Defendants have not confirmed (1) who, other than a single undisclosed third-party and the FBI, in Defendants' knowledge, has had possession, custody, or control of any of the information or data taken from Konnech; and (2) how and when Konnech's servers were accessed. The answers to these questions is paramount to Konnech's ability to maintain a secure system and, therefore, the integrity of the upcoming midterm elections. Moreover, and most significantly, Defendants were <u>ordered</u> by Judge Hoyt to provide this information to Konnech immediately 4 days ago.

To be clear, Defendants' continued failure to comply with <u>all</u> provisions of the TRO will subject Defendants to contempt proceedings. Accordingly, please <u>immediately</u> provide the answers to these open questions as ordered by the TRO.

*Third*, to avoid any misunderstanding, please confirm that your September 15 Letter's reference to "True the Vote" encompasses the other two Defendants as well.[2] In other words, confirm that (1) neither Defendants Phillips, Engelbrecht, nor True the Vote viewed the contents of the alleged hard drive or connected it to their network or any device; (2) that Defendants Phillips' and Engelbrecht's knowledge about the data is likewise limited to what they were told by the undisclosed third party and as shown through a shared screen; and (3) that Defendants Phillips and Engelbrecht have likewise never obtained nor held any Konnech data, aside from their alleged transfer of said data to the FBI.

---

[1] Your September 15, 2022 *ex parte* letter only addressed the identity of the supposed hacker, and did not address the question of how and when Konnech's server was accessed, which Defendants have been ordered to do.

[2] For example, your September 15 Letter states that "*True the Vote* did not view the contents of this hard drive or connect it to their network or any device," that "*True the Vote's* knowledge about this data is limited to what they were told and shown by a 'screen share,'" and that "*True the Vote* has never obtained or held" Konnech data. But the letter is silent as to Defendants *Phillips and Engelbrecht*.

K A S O W I T Z   B E N S O N   T O R R E S   LLP

Brock Akers
September 16, 2022
Page 3


And *fourth*, to avoid any further shifts in Defendants' positions and to confirm that we have Defendants' final position on the TRO, we ask that Defendants each sign an affidavit that swears to the key factual statements identified in your September 15 Letter, and other key facts concerning Defendants' alleged involvement (or lack thereof) in accessing and obtaining data from Konnech's servers.  I do think this would go a long way toward resolving the obvious issues with Defendants' TRO compliance.  If Defendants are amenable, we will draft the proposed affidavits for your review and if agreed upon affidavits are executed, we are willing to negotiate an agreed preliminary injunction on the basis of such affidavit and avoid the preliminary injunction hearing altogether.

Please provide me with the information requested in this letter by **12:00 PM CT today**.


Sincerely,


*/s/ Dean Z. Pamphilis*
Dean Z. Pamphilis

# Exhibit B



BROCK C. AKERS

_____

BOARD CERTIFIED PERSONAL INJURY
AND CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
CIVIL TRIAL ADVOCACY
NATIONAL BOARD OF TRIAL ADVOCACY

DIRECT DIAL
713/552-0232
e-mail: bca@akersfirm.com

September 14, 2022

Dean Pamphilis
Kasowitz Benson Torres LLP
1415 Louisiana Street, Suite 2100
Houston, Texas 77002

      Re: Konnech, Inc. v. True the Vote, et al; No. 4:22-cv-03096; In the United States
      District Court, Southern District of Texas, Houston Division

Dear Mr. Pamphlis:

This letter is in response to your email relating to the TRO against my clients.  It was not
until Nathan Richardson sent the waivers to us that we were aware that you had
acquired a TRO.  Previously, my clients knew of the lawsuit itself from reading about it
in the press, but not the TRO.

As to that which is covered by the TRO, it is easy for them to comply with its
terms.  Despite the allegations to the contrary, my clients did not obtain any property or
data that was used, generated or stored by Konnech on a "protected computer."  As you
will learn through the course of this matter, anything acquired from Konnech was
retrieved from an open source.  There was no "hacking" involved in getting this data.
The information relevant to the voter integrity issues that was acquired was actually
stumbled upon in the course of doing other research on matters involving security of
elections and election data bases.  Neither Catherine Engelbrecht, Gregg Phillips nor
anyone employed or associated with True the Vote was responsible for this data
retrieval.  Instead, it was an independent contractor who located the information and in
turn contacted Gregg Phillips.

Mr. Phillips' immediate reaction, knowing and sensing the national security
implications of the information, was to contact the FBI.  He did so and handed all of the
information he had been given to the FBI.

With regard to the seven items in the TRO, we can respond directly to them.  Please note that all of the items are properly modified by "Konnech's protected computers."  Inasmuch as no data was obtained from a "protected computer" by anyone to our knowledge, there is nothing for us to produce or to refrain from doing.  Nevertheless, and so that we are not accused of playing semantics on these matters, we can respond more specifically:

1. *We are enjoined from accessing or attempting to access Konnech's protected computers.*   We readily agree to comply with this injunction.  We never accessed or attempted to access  Konnech's protected computers in the past, and we will not do so in the future.

2. *We are to return all property and data obtained from Konnech's protected computers.*   We have not acquired anything from a protected computer.  All of the information that we have given to the FBI was from an open source.  Importantly, you should know that all of the data and information was turned over to the FBI and my clients do not possess anything from Konnech's files or activities.  Therefore, there is nothing to turn over.

3. *We are enjoined from using, disclosing or exploiting the property and data.*   We have not done that, and will not do so, per the court's order.

4. *We shall not delete, destroy, conceal or alter files or data obtained.*   We will not delete, destroy or alter anything.

5. *We shall identify each individual or organization involved.*   This is a matter that we have turned over to the FBI.  Though we do not know the status of the FBI investigation, we are not willing to compromise it as a result of an *ex parte* order that you acquired on the strength of assertions and allegations that is inaccurate.  The FBI office in charge of this investigation was the Detroit field office.  We recommend that you contact them for this information.

6. *We shall confidentially disclose how, when and by whom.*    This is a matter that has been turned over to the FBI and it ought to be up to them to provide this information.

7. *We shall identify all persons who have possession, custody or control of information or data.*    This is a matter for the FBI, not us.  We know they have the data and information; we do not.  Since the information was gained from an open source, we of course have no idea how many other people may have had access to the information.

Based on the order as written, there is no action necessary for us in order to be in compliance.  I offer you the additional information to explain our position.

Because of the possibility of counterclaims, we ask that you inform your clients to preserve all records, data of any sort, including logs, server configurations, emails, texts, written communications, records of phone calls and other documents that may pertain to this matter.

Sincerely,

Brock C. Akers

BCA:pdg

# Exhibit C



BROCK C. AKERS
———————
BOARD CERTIFIED PERSONAL INJURY
AND CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
CIVIL TRIAL ADVOCACY
NATIONAL BOARD OF TRIAL ADVOCACY

DIRECT DIAL
713/552-0232
e-mail: bca@akersfirm.com

September 15, 2022

Hon. Kenneth Hoyt
United States District Judge
United States Courthouse
515 Rusk Avenue
Houston, Texas  77002

   Re: Konnech, Inc. v. True the Vote, et al; No. 4:22-cv-03096; In the United States
   District Court, Southern District of Texas, Houston Division

Dear Judge Hoyt:

I represent the Defendants in the above action, recently filed, and in which you have
entered a Temporary Restraining Order.  The TRO was, as is most often the case,
entered on an ex parte basis.  Had we been present at the hearing, we would have
raised an important matter with the Court relative to some aspects of that which we
have been ordered to do.

Plaintiff alleges that the Defendants have inappropriately acquired information from
them.  Discovery will reveal that the information which is the subject of their complaint
was actually acquired by a third person who in turn contacted Gregg Phillips, one of
my clients.  Sensing that the information itself was a matter of potential national
security, Mr. Phillips immediately contacted the FBI and provided all that he was given
to the FBI.  We were led to understand an investigation by the FBI followed, though we
do not know the current status of that investigation.

One of the matters which the TRO order requires of Defendants is to identify the person
or persons who acquired the data from Plaintiff.  That individual is, to our
understanding, integral to the FBI investigation.  That investigation may be hindered or
compromised if the identity of this individual was revealed at this time to Plaintiff.  We
do not believe that it is our call to make as to whether this person should be identified
at this time.  Plaintiff objects to our withholding the identity, citing the TRO itself which
directs us to provide the name.

**The Akers Firm** PLLC ,The Clocktower Building, 3401 Allen Parkway, Suite 101 Houston, TX 77019  Phone. (713) 877-2500 Fax. 1-713-583-8662 www.akersfirm.com

Defendants are of course anxious to comply with the Court's orders, but understandably concerned that they do not want to compromise an ongoing investigation as a result where perhaps the Court has not been made aware of the inherent risk created by providing this information as Plaintiff demands. With that in mind, and being guided mostly by that which seems to make most sense given the stakeholders involved, Defendants propose to provide the name and contact information to the Court under seal, while at the same time providing notice to the FBI that this process is taking place so as to allow the FBI the opportunity to be heard on this sensitive issue if that is its choice.

This letter is copied to Plaintiff. However, the name which follows has been redacted from their copy of this letter, the name only being provided under seal and in a letter to the FBI Special Agent in Charge.

The identity of the person whom we understand obtained the data from Plaintiff is:


(REDACTED)



Your honor, we are willing and anxious to comply with any and all of the Court's orders, as we are anxious to have the opportunity to defend ourselves against the allegations that have been made.


                                        Sincerely,



                                        Brock C. Akers


cc:

   Dean Pamphilis
   Kasowitz Benson Torres LLP
   1415 Louisiana Street, Suite 2100
   Houston, Texas 77002
        Attorney for Plaintiff
        (with redaction)

James Smith
Special Agent in Charge
Federal Bureau of Investigation,
Houston Field Office
1 Justice park Drive
Houston, Texas 77092
        (without redaction)

# Exhibit D



BROCK C. AKERS

—————

BOARD CERTIFIED PERSONAL INJURY
AND CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
CIVIL TRIAL ADVOCACY
NATIONAL BOARD OF TRIAL ADVOCACY

DIRECT DIAL
713/552-0232
e-mail: bca@akersfirm.com

September 15, 2022

Dean Pamphilis
Kasowitz Benson Torres LLP
1415 Louisiana Street, Suite 2100
Houston, Texas 77002

   Re: Konnech, Inc. v. True the Vote, et al; No. 4:22-cv-03096; In the United States
   District Court, Southern District of Texas, Houston Division

Dear Mr. Pamphlis:

Thank you for your letter of this morning. It reflects multiple inaccuracies and
misrepresentations regarding True the Vote's actions.

Apparently, I did not do a good enough job explaining how my clients became aware of
and in contact with the source information you describe.  These facts hopefully provide
additional information so you will better understand our involvement.

1. As evidence will show, True the Vote was approached by a third party who
   claimed to have data originating from your client. He had already obtained that
   data prior to contacting us. He was not contracted to us or paid by us. We were
   led to understand that he acquired the information from an open, not protected
   source.
2. This individual "screen shared" certain elements of the data and characterized it
   as showing large amounts of personal and confidential information about poll
   workers and other sensitive material having been exfiltrated and stored on
   servers located in China.
3. He turned over to True the Vote a hard drive device containing the evidence of
   this, including the data. True the Vote did not view the contents of this hard
   drive or connect it to their network or any device. They turned it over to the FBI
   immediately with the representations made about it.  No portion of that which
   was turned over was retained.
4. True the Vote's knowledge about this data is limited to what they were told and
   shown by "screen share." They never possessed the actual data or any part of it

except as above. True the Vote has been advised that this person is in communication with the FBI.

5. Thus, True the Vote has never obtained or held any data as described in your petition.  This is just one of many inaccuracies contained therein.

6. We reject your contention that we have publicly communicated contrary to this.


Given this, we once again assure you that we are complying with all aspects of the TRO. We have been led to understand in the course of this process that this is an active and confidential matter with the FBI.  We are uncertain as to our authority to make public this identity, and feel as though we are being forced to violate federal disclosure laws on the basis of your ex parte order.  We will, therefore, provide the name and identity of this individual to the court under seal, and will simultaneously offer the FBI the opportunity to weigh in on its disclosure.  We predict the Court would most prefer the input of the FBI in this manner.  Upon further direction from the Court or the FBI we will release the name of the individual and what contact information we possess.


Sincerely,

Brock C. Akers

BCA:pdg

# Exhibit E

1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF TEXAS
                    -  -  -
3    THE HONORABLE KENNETH M. HOYT, JUDGE PRESIDING
     ------------------------------------------------------
4    KONNECH, INC.,            )  Cause No. 4:22-cv-03096
                               )
5              Plaintiff,      )
                               )
6    vs.                       )
                               )
7    TRUE THE VOTE, et al.,    )
                               )
8              Defendants.     )
                               )
9    ------------------------------------------------------

10                        **HEARING**

11        OFFICIAL COURT REPORTER'S TRANSCRIPT

12                   Houston, Texas

13                **October 27, 2022**

14   ------------------------------------------------------

15   APPEARANCES:
     On behalf of the Plaintiff:
16       Constantine Z. Pamphilis, Esq.
         Nathan Richardson, Esq.
17
     On behalf of the Defendants:
18       Brock Cordt Akers, Esq. (Not present)
         Michael John Wynne, Esq
19       John C. Kiyonaga, Esq.

20

21   Reported By:  Nichole Forrest, CSR, RDR, CRR, CRC
                   Certified Realtime Reporter
22                 United States District Court
                   Southern District of Texas
23

24   Proceedings recorded by mechanical stenography.
     Transcript produced by Reporter on computer.
25

2

1                          EXAMINATION INDEX

2      WITNESSES                                        PAGE

3      GREGG PHILLIPS
               Direct Examination  By Mr. Wynne         29
4              Cross-Examination By Mr. Pamphilis        37

5      CATHERINE ENGELBRECHT
               Direct Examination By Mr. Wynne          106
6              Cross-Examination By Mr. Richardson       109
               Redirect Examination By Mr. Wynne        166

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

33

1    screen.  Once he pulled it up, he went straight to his

2    files that he was showing me.

3        Q.   Was it your impression that information was

4    actively being retrieved at that moment in the hotel

5    room, or was it your impression that that had already

6    been done, and he was showing you something that had

7    been done in the past?

8        A.   I think it was being done in the past.  He

9    certainly wouldn't have been -- there wouldn't have

10   been enough bandwidth at the hotel to download that

11   kind of data.

12       Q.   Do you have, in your possession, a copy of

13   this electronic information that was displayed on that

14   screen in the hotel room in Dallas?

15       A.   No, sir.

16       Q.   Does Ms. Engelbrecht have a copy?

17       A.   No.

18       Q.   Does True The Vote have a copy?

19       A.   No, sir.

20       Q.   Does anybody associated with True The Vote

21   have a copy?

22       A.   No, sir.

23       Q.   Who else, if anyone, in your personal

24   knowledge -- let me put it like this:  To the best of

25   your knowledge, whether direct or indirect, has a copy

34

1   of that electronic data that you saw on the monitor or

2   projected on the monitor in --

3                    MR. PAMPHILIS:  I'm going to object.  That

4   calls for speculation.  He modified the standard for

5   the witness's testimony by saying to the best of his

6   knowledge.

7                    THE COURT:  I'm going to sustain it as to

8   the form of the question.

9   BY MR. WYNNE:

10       Q.   I guess everything is to the best of your

11   knowledge here.  So --

12                   THE COURT:  No, sir.  It's true or not

13   true.  If he doesn't know, that's the answer.

14   BY MR. WYNNE:

15       Q.   Okay.  Who else has copies?

16       A.   Federal Bureau of Investigations.

17       Q.   How do you know that?

18       A.   Because post the meeting, Catherine

19   Engelbrecht and I met with the bureau.  Told them that

20   it exists, told them who had it, and he transmitted it

21   to the bureau.

22       Q.   Did you ever have a copy of the electronic

23   data on your computer or otherwise in your individual

24   possession?

25       A.   No.

39

1      A.   I'm so sorry.  I don't recall the meeting.

2   So I assume probably a lot more, yeah.

3      Q.   So by your answer, I take it, there was

4   somebody else in that hotel room with you and

5   Mr. Hasson in January of 2021, wasn't there?

6      A.   Yes.

7      Q.   Who was that?

8           MR. WYNNE:  Your Honor, I'm object.  This

9   is beyond the scope.

10          THE COURT REPORTER:  Can you speak into a

11  mic, please?

12          MR. WYNNE:  I have to object.  Because

13  this is beyond the scope.  I also have a concern, not

14  only that, but the answer may compromise a

15  confidential informant of the FBI.

16          THE COURT:  How do you know all of this?

17  Have you talked to the FBI?

18          MR. WYNNE:  I --

19          THE COURT:  I'm sorry.  That's a yes-or-no

20  question.

21          Have you talked or discussed this matter

22  with the FBI?

23          MR. WYNNE:  This matter, I have not

24  discussed with the FBI.

25          THE COURT:  Overruled.  Let's proceed.

40

1          MR. PAMPHILIS:  Thank you, Your Honor.

2   BY MR. PAMPHILIS:

3      Q.   Who else was in that room with you and

4   Mr. Hasson in Dallas of January of 2021?

5      A.   A confidential informant for the FBI.

6      Q.   What's his name?

7      A.   I'm not at liberty to say.

8          THE COURT:  You are at liberty to say

9   because I'm ordering you to give the name.

10         THE WITNESS:  I'm a confidential

11  informant, too.  I can't do it.

12  BY MR. PAMPHILIS:

13     Q.   You're refusing to answer the question, sir?

14     A.   Yes.

15         MR. PAMPHILIS:  Your Honor, we ask that

16  Mr. Phillips be held in contempt for refusing to

17  answer this question.  This concerns item number 5 in

18  the TRO; specifically, who was involved in accessing

19  Konnech's protected computers.

20         This individual was in the room when it

21  was being accessed.  He was involved.  He should be

22  identified.

23         THE COURT:  Let's proceed.  Keep asking

24  questions.  Let's go.

25  BY MR. PAMPHILIS:

1        Q.    Of what year?

2        A.    2022.

3        Q.    So about 13 months after you had met him in

4    the hotel room?

5        A.    Yes.

6        Q.    What was the purpose of that communication?

7        A.    I don't recall.

8        Q.    Who contacted who?

9        A.    I don't recall that either.

10       Q.    When you left that hotel room in January of

11   2021, did you leave with any electronic device that

12   had any of that 350 terabytes of data on it?

13       A.    No.

14       Q.    So you didn't have a hard drive of data from

15   that meeting in January of 2021, did you?

16       A.    I don't think so.

17       Q.    You're not sure?

18             THE COURT:  I'm sorry.  Either you had it

19   or you didn't.

20             THE WITNESS:  I don't remember, sir.

21             THE COURT:  Then that's the answer.

22             THE WITNESS:  Okay.  I'm sorry.  I don't

23   recall.

24   BY MR. PAMPHILIS:

25       Q.    You can't recall?

58

1       A.    I don't know the answer to that.

2       Q.    You don't know if he's the same --

3             THE COURT REPORTER:   Counsel, I did not

4    hear the question.

5    BY MR. PAMPHILIS:

6       Q.    So you don't know if Mr. Nguyen is a San

7    Antonio field agent or not?

8       A.    I don't believe he's a field agent.   I

9    believe he's a representative of the intelligence

10   community in the FBI.

11      Q.    Was there anybody else involved in accessing

12   this data in that hotel room that you saw, other than

13   Mike Hasson, yourself, and this person who you will

14   not identify?

15      A.    Mr. Hasson was the only one that accessed the

16   data that night.

17      Q.    Sir, listen very carefully.   I'm asking

18   because the TRO says "anyone who was involved."

19            So was there anybody else involved in

20   accessing that data, other than yourself, Mr. Hasson,

21   and this other individual you won't identify?

22      A.    No.

23      Q.    Do you know if Mr. Hasson had the help of

24   anybody else in accessing it before he arrived in that

25   hotel room?

1              Restate the question.

2    BY MR. PAMPHILIS:

3        Q.    Sure.  Has anyone told you that they used a

4    default password to access this Konnech data that you

5    were shown in that hotel room in January of 2021?

6        A.    I don't have direct -- I don't have a

7    recollection.

8        Q.    You don't know?

9        A.    I just don't recall.

10       Q.    We've seen -- well, let me step back.

11             Have you seen the letters that your

12   lawyer, Brock Akers, was sending to us about your

13   compliance with the TRO?

14       A.    I don't know that I've seen any of them

15   actually.

16       Q.    Did you see any reference to Konnech's

17   computers being accessed using a default password?

18       A.    I don't recall.  No, I don't think I've seen

19   it.

20       Q.    You're certainly not in a position to swear

21   that that happened, are you?

22       A.    No.

23       Q.    Have you attempted to access any Konnech

24   protected computer since September 12 of 2022?

25       A.    No, sir.

1          THE COURT:  Nobody would have known that

2    you were a confidential informant had you not told us.

3          THE WITNESS:  I'm not a confidential

4    informant anymore.  So I'm more free to do that.

5          THE COURT:  When did you stop being a

6    confidential informant?

7          THE WITNESS:  A few months ago.

8          THE COURT:  I'm sorry?

9          THE WITNESS:  A few months ago.

10          THE COURT:  These other people -- what

11    about Hasson, is he still a confidential informant?

12          THE WITNESS:  As far as I know, yes, sir.

13          THE COURT:  Is the other gentleman still a

14    confidential informant?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  How do you know?

17          THE WITNESS:  Because I've been in

18    meetings with him and the FBI.

19          THE COURT:  So you're meeting with

20    confidential informants, exchanging information.

21    They're confidential but you're not?

22          THE WITNESS:  Yes, sir.  I haven't

23    exchanged anything with them since I stop being a

24    confidential informant.

25          THE COURT:  I'm trying to figure out

1   whether or not I should be talking to the FBI or not.

2                   THE WITNESS:  Yes, sir.

3                   THE COURT:  And I'll figure that out.  But

4   I want to know how I can get this name from you

5   confidentially?

6                   THE WITNESS:  I can't give you the name.

7                   THE COURT:  So you can't?

8                   THE WITNESS:  I can't.

9                   THE COURT:  It's not that you can't; it's

10  that you won't?

11                  THE WITNESS:  I can't.

12                  THE COURT:  What would prevent you from

13  doing that?

14                  THE WITNESS:  Well, first of all, it would

15  put his life in danger.  Beyond that, because I know

16  that he's a CI, you can't just unmask a person that is

17  a CI.  This person -- this particular person, Judge,

18  is -- he would be in such extraordinary danger that --

19                  THE COURT:  From?

20                  THE WITNESS:  From --

21                  THE COURT:  China?

22                  THE WITNESS:  From the cartels.  He works

23  on the border.  He does all kinds of work.

24                  THE COURT:  The cartels on the border, as

25  I understand, are drug dealers.

1              THE WITNESS:  Right.

2              THE COURT:  So a confidential informant

3    involved in this process has nothing to do with drugs.

4              THE WITNESS:  It's the same thing.  It's

5    the same CI.  You don't distinguish --

6              THE COURT:  I been doing this over 34

7    years.  I know every confidential informant with the

8    FBI is not in drug trafficking.

9              THE WITNESS:  I didn't say he was

10   trafficking, sir.  I said he's helping assist against

11   human trafficking and against drug trafficking,

12   against all of the things that are going on in the

13   border.  But that's not all he does.

14             THE COURT:  Nobody in this room would know

15   that except you are disclosing it now, aren't you?

16             THE WITNESS:  I didn't disclose his name.

17             THE COURT:  You're just telling us what

18   he's doing?

19             THE WITNESS:  Sure.

20             THE COURT:  And nobody in this room had to

21   know that, did they?

22             THE WITNESS:  It's not disclosing anything

23   private.  There is no private information.

24             THE COURT:  Well, I said no one in this

25   room would know the role that he plays as a

```
1    confidential informant --
2                   THE WITNESS:  Sir --
3                   THE COURT:  -- except you disclosed it
4    right now, didn't you?
5                   THE WITNESS:  This person is --
6                   THE COURT:  Did you just disclose --
7                   THE WITNESS:  I didn't disclose his name
8    nor any identifying information.
9                   THE COURT:  Did you just disclose what he
10   does as a confidential informant?
11                  THE WITNESS:  One of the things, yes.
12                  THE COURT:  Okay.
13                  That's all I have.
14                  Go ahead, counsel.
15                  MR. WYNNE:  No further questions.
16                  THE COURT:  You may step down, sir.
17                  THE WITNESS:  Your Honor, do I take these
18   or give these back?  Things that have been --
19                  THE COURT:  I don't know.
20                  MR. PAMPHILIS:  There is an exhibit that
21   we ask to be admitted, the photo of Mike Hasson.
22   That's the only one that I put up.
23                  THE COURT:  Hand them to the lawyers, not
24   to me.
25                  MR. PAMPHILIS:  May I have Plaintiff's
```

132

1    take a deeper dived around the security of software?

2         A.    To the best of my knowledge, there was

3    someone named John.

4         Q.    John what?

5         A.    I couldn't tell you.

6         Q.    Who else?

7         A.    There was someone -- I'm drawing a complete

8    blank.  I apologize.

9         Q.    What is John's position with Opsec?

10        A.    They're all researchers.  They all do

11   different things.

12        Q.    What do they research?

13        A.    Open-source intelligence.

14        Q.    Do they research security around software?

15        A.    It's certainly possible.  Clearly, in the

16   podcast, I said it.  And we have open-source records

17   to support findings.  So...

18        Q.    But you never even saw the data that we're

19   talking about here today.  So you don't know what

20   supports -- what you didn't see?  So --

21        A.    No.  That's actually not true.

22        Q.    How is it not true?

23        A.    The data is one aspect of this.  But the

24   insecurities around Konnech's websites, and there are

25   many, are fully available on open-source anything.

133

1   You can see it.

2       Q.   Let's go through that then.  So it sounds

3   like you know how it was accessed then?

4       A.   No.  I don't know how the data was accessed.

5       Q.   So how do you know there are any

6   vulnerabilities?

7       A.   You can use BinaryEdge.  It will show you the

8   vulnerabilities.

9       Q.   How does BinaryEdge show you the

10  vulnerabilities?

11      A.   A vulnerability would be, if you're able to

12  reside on the UNICOM backbone in China.

13      Q.   And that is a security vulnerability; to

14  access that server?  Or is that just a location of

15  something?

16      A.   Well, in that particular instance, and I

17  believe this has been submitted along with our other

18  things today, there are host of URLs.  Formation would

19  be, for example, vote for L.A., vote for Fairfax, vote

20  for Hillsborough.  Those are the front doors to a

21  product called PollChief.  That is how Konnech uses

22  its user interface to capture data.

23           MR. RICHARDSON:  Objection.

24  Nonresponsive.

25           THE WITNESS:  Those URLs resolve on the

144

```
 1        A.    Correct.

 2        Q.    Did that hard drive contain any Konnech data

 3   on it?

 4        A.    No.

 5        Q.    The hard drive was just a geolocation data

 6   that was used in 2000 Mules?

 7        A.    It was Arizona-specific data for the

 8   jurisdictions in which we conducted the research.

 9        Q.    Not any Arizona poll worker data?

10        A.    No.

11        Q.    Did Mr. Phillips bring with him to Houston --

12   when he left Dallas, did he bring with him a flash

13   drive, a hard drive, a copy of any Konnech data that

14   he received from that hotel room?

15        A.    I don't recall.  I don't know.  I never saw

16   that if it happened.

17        Q.    You don't know if he had --

18        A.    I don't know.

19        Q.    He never showed you a copy?

20        A.    No.  There would have been no need.

21        Q.    Did he tell you what he did that night?

22        A.    He told me what he had seen and the need to

23   report it to the FBI immediately.

24        Q.    He told you who he was with?

25        A.    He told me about Mike, yes.
```

1      Q.   He was there that night, in January of 2021,

2  in that hotel room in Dallas?

3      A.   I don't even have specific knowledge of that.

4      Q.   You've been told by Mr. Phillips.  Is that

5  right?

6      A.   I've been told generally, yes.  And so --

7  it's interesting, it's entire possible that we may not

8  even be talking about the same thing.  But, yes.

9      Q.   What do you think we're talking about?

10     A.   I believe I know the third person and I'm --

11     Q.   Who is the third person?

12     A.   -- very cautious.

13          I am sorry?

14     Q.   Who is the third person?

15     A.   This is a confidential that I cannot give the

16  name of.

17     Q.   Has the FBI told you that you can't give us

18  that name?

19     A.   I'm not sure what the rules are around that.

20  I wish I had more clarity.

21          MR. RICHARDSON:  Objection.

22  Nonresponsive.

23  BY MR. RICHARDSON:

24     Q.   I asked you:  Has the FBI told you

25  specifically that you cannot give us that name?

152

1                    It's yes-or-no question.

2        A.   No.  The FBI has never told me that

3   specifically.

4        Q.   So you are refusing to tell us that name here

5   today?

6        A.   I just don't think I'm supposed to do that.

7   I can't do that.  I'm sorry.

8        Q.   Are you aware that at the October 6 hearing

9   your counsel told Your Honor here that the FBI told

10  him they have no interest in protecting this

11  information?  Are you aware of that?

12       A.   Yes.

13       Q.   And despite that statement from your lawyers,

14  what they were told by the FBI, you're refusing to

15  tell me the name of the individual.  Is that right?

16       A.   Yes.

17            MR. RICHARDSON:  Pass the witness.

18            THE COURT:  I have a couple of questions.

19            THE WITNESS:  Yes, sir.

20            THE COURT:  So is it your personal choice

21  or decision not to disclose the name of that person?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  All right.

24            You've never seen the data I think you

25  said?

1    A.    Yes.

2              MR. WYNNE:   No further questions.

3              THE COURT:   All right.   I'm not going to

4    permit any additional questioning unless you can tell

5    me some good reason why we should continue this.

6              MR. RICHARDSON:   No further questions,

7    Your Honor.

8              THE COURT:   I'm going to reset this matter

9    to Monday morning at 9:00.   And here is the message,

10   lawyers and witnesses or parties:   If I am not

11   provided, and counsel is not provided -- you don't

12   have to turn anything over to me confidentially.   I

13   have the highest clearance of anybody in this country.

14   And so you cannot ask me to agree to keep something

15   confidential.

16              You can work out whatever arrangements you

17   want with counsel about confidentiality.   I put that

18   in there to protect you, if want that protection.   But

19   you cannot bargain with the Court by asking questions

20   about what somebody will do; if the Court does this.

21              What the Court is going to do, the Court

22   is going to find that these parties are in contempt

23   and that is what I find right now.   They're both in

24   contempt of court, and they have until 9:00 a.m. on

25   Monday morning to cure it.   Otherwise, they are to

173

1   report here, and I will have a U.S. marshal prepare to

2   arrest them until they give up the information.

3          Understood?

4          MR. WYNNE:  Absolutely, Your Honor.

5          THE COURT:  All right.

6          You may step down.

7          MR. KIYONAGA:  Your Honor, I'm unavailable

8   on Monday.

9          THE COURT:  I don't have a concern about

10  that, counsel.  That's not my problem.  I have this

11  lawyer and the lawyer, who he claims he is counsel of

12  record, and that he has authority to speak.  The

13  record reflects that counsel, Mr. Akers, is still in

14  the case, and that he represented that he is the

15  attorney-in-charge.

16         So you're not in this at all as far as I'm

17  concerned.  If you want to show up, feel free.  I have

18  nothing at all to say to you about anything going on

19  in this case.  If they want you to ask questions, they

20  should ask you to do that.  It's not appropriate for

21  you to jump up and just decide you going to intervene

22  in the case.

23         Understood?

24         MR. KIYONAGA:  Yes, sir.

25         THE COURT:  Thank you.

1               C E R T I F I C A T E

2

3

4

5          I hereby certify that pursuant to Title

6   28, Section 753 United States Code, the foregoing is a

7   true and correct transcript of the stenographically

8   reported proceedings in the above matter.

9

10

11          Certified on October 30, 2022.

12

13          /s/ Nichole Forrest_____

14          Nichole Forrest, RDR, CRR, CRC

15

16

17

18

19

20

21

22

23

24

25

# Exhibit F

1                        UNITED STATES DISTRICT COURT
                          SOUTHERN DISTRICT OF TEXAS
2                              HOUSTON DIVISION

3

4    KONNECH, INC.,                    .   4:22-CV-03096
                                       .   HOUSTON, TEXAS
5          PLAINTIFF,                  .   OCTOBER 6, 2022
     VS.                               .   1:59 P.M.
6                                      .
     TRUE THE VOTE, INC.,              .
7    GREGG PHILLIPS AND                .
     CATHERINE ENGELBRECHT,            .
8                                      .
           DEFENDANTS.                 .
9    ...............................   .

10

11            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
                 BEFORE THE HONORABLE KENNETH M. HOYT
12                  UNITED STATES DISTRICT JUDGE

13

14                           *APPEARANCES*

15

16   FOR THE PLAINTIFF:

17        Constantine Z. Pamphilis
          Nathan Richardson
18        KASOWITZ BENSON TORRES LLP
          Wedge International Tower
19        1415 Louisiana
          Suite 2100
20        Houston, Texas  77002

21   FOR THE DEFENDANTS:

22        Brock C. Akers
          J. Mark Brewer
23        THE AKERS FIRM
          3401 Allen Parkway
24        Suite 101
          Houston, Texas  77019

25

1                     *APPEARANCES - CONTINUED*

2

3

4     OFFICIAL COURT REPORTER:

5          Mayra Malone, CSR, RMR, CRR
           U.S. Courthouse
6          515 Rusk
           Room 8004
7          Houston, Texas   77002
           713-250-5787
8

9

10    Proceedings recorded by mechanical stenography.   Transcript
      produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14:21   1   their response, so I can't just rely on these unsworn

2   statements.  So part of what we need to ensure that the TRO has

3   been complied with is some sworn statement on Items 1

4   through 4.

14:21   5   And frankly, Your Honor, Items 5 through 8 -- I'm

6   sorry -- 5 through 7, if the defendants had complied with 5

7   through 7, that's a one-time thing.  If they give us that

8   information, it's moot for purposes of the preliminary

9   injunction.  We don't need it again.  But we do need them to

14:22   10   continue to comply with Items 1 through 4 once they give us 5

11   through 7.

12   And frankly, I don't see why there should be an

13   issue complying with 1 through 4, because all it says is that

14   they won't try to access our protected computers.  They won't

14:22   15   try to take our data, and if they come into possession of it,

16   they will give it back to us.

17   They don't have a right to do any of those

18   things, and so the fact that they won't agree to it is

19   concerning.

14:22   20   THE COURT:  All right.  Mr. Akers, do you want to

21   respond to the points made that your client has not complied

22   with 5 through 7 of the temporary restraining order?

23   MR. AKERS:  Yes, Your Honor.  And it is a fact that we

24   have not given up the name of the individual.

14:23   25   THE COURT:  Why not?

14:25  1   to indicate that there was any investigation?

2   MR. AKERS:  I do not know this individual.  I do not

3   represent this individual.

4   THE COURT:  Which individual are you talking about?

14:26  5   MR. AKERS:  The individual who actually has the data

6   who then turned it over to the FBI.

7   THE COURT:  No.  But, I mean -- when Phillips claimed

8   that he turned it over to the FBI, he had to have possession of

9   it at the time in order to turn it over?

14:26  10  MR. AKERS:  Actually, yes.  It was kind of a

11  combination of the two of them getting together and, Here it

12  is.

13  THE COURT:  Well, I don't know what they did, and I

14  don't think you know either, but you know Phillips was involved

14:26  15  in the turning over?

16  MR. AKERS:  Yes.

17  THE COURT:  All right.  So here's my question that I'm

18  trying to get answered, and that is this:  What evidence do you

19  have or what reason do you believe that Mr. Phillips verified

14:26  20  that any of this data was coming from China?

21  MR. AKERS:  On the basis of what -- what Mr. Phillips

22  himself saw.

23  THE COURT:  What he told you he saw.  Have you seen

24  it?

14:27  25  MR. AKERS:  No.

14:29   1   there and then for them to say, Well, you know, the judge

2   withheld this information from whatever.  I mean, don't you

3   think that if the FBI -- let me ask it this way:  Did

4   Mr. Phillips tell the FBI that he has been sued by Konnech?  Or

14:30   5   do you know?

6           MR. AKERS:  Would you ask that question again?

7           THE COURT:  Oh, I'm sorry.  Did Mr. Phillips -- or has

8   Mr. Phillips or Ms. Engelburt -- Engelbrecht -- I'm sorry --

9   told the FBI that they have been sued about this and that they

14:30   10  need to be -- need to have the backing of the FBI to stand in

11  the position they are standing in?

12          MR. AKERS:  Yes, we have.

13          THE COURT:  They have told them that?

14          MR. AKERS:  Yes.

14:30   15          THE COURT:  You did that?

16          MR. AKERS:  Yes.

17          THE COURT:  And what was the response from the FBI?

18          MR. AKERS:  I was told by a different office --

19          THE COURT:  What do you mean "different office"?  The

14:30   20  people you reported it to was one place.  The response came

21  from a different place.  Is that what you mean?

22          MR. AKERS:  Yes.

23          THE COURT:  Okay.  Go ahead.

24          MR. AKERS:  That they were not interested in the

14:30   25  protection of this information.

14:47    1    data we're talking about, nowhere is it said to be Konnech.

2    They are only allegations.

3            THE COURT:  Let me ask you this:  How could your

4    client turn anything over to the FBI that he and she did not

14:48    5    have?  And I'm not asking you to answer that.  I'm posing that

6    as a question.  Where your client is going to claim that

7    something has been turned over to the FBI and said, I don't

8    have it, is it because he turned it over to the FBI?  Then who

9    in the FBI has it?  I need to know, and I need to know whether

14:48    10    or not it is this national security issue.  I need to know

11    whether or not the Department of Justice is involved in this in

12    some way.  They have got thousands of lawyers all over this

13    country.  Surely somebody could have contacted the Court by

14    now.

14:48    15            So I don't think the answer is, Well, there is

16    something wrong with their pleadings.  I think the answer is,

17    We are not having a hearing because his client has been

18    arrested by people who are intent on flipping the script.  He

19    has rights to the documentation.  That's undisputed.  He has

14:49    20    rights to the data that he had.  And the allegation that the

21    data was somehow sent to China, that's not in his pleadings.

22    His pleadings are, We sent different data.  So there is no

23    allegation in his pleading that he sent the data that he

24    received from clerks and county officials or whoever in the

14:49    25    United States.

15:04    1    and call him, and I'm going to sit right here until I know it's

         2    done.

         3             MR. AKERS:  I have the name.

         4             THE COURT:  I'm sorry?

15:05    5             MR. AKERS:  I said I have the name.

         6             THE COURT:  Well, then deliver it.

         7             MR. AKERS:  I need to look it up.

         8             THE COURT:  And if there are any other names --

         9        *(Simultaneous crosstalk)*

15:05   10             THE COURT:  Let me just finish.  If there are any

        11    other names associated with this Dallas group, those names are

        12    to be turned over.  And I understand that I'm hearing you say

        13    there is only one name that you have.

        14        *(Mr. Akers hands Mr. Pamphilis a piece of paper)*

15:06   15             MR. AKERS:  For the record, I just handed him the

        16    name.

        17             THE COURT:  All right.

        18             MR. PAMPHILIS:  Your Honor, I would prefer that the

        19    name be read by him into the record so that there is no dispute

15:06   20    about the name that I was given.

        21             THE COURT:  I don't think I have my copy here.

        22             MR. AKERS:  I have mine electronically.

        23             THE COURT:  Say what?

        24             MR. AKERS:  I have a copy of my letter electronically.

15:06   25             THE COURT:  You need to read it for the record then.

15:10    1   submitted.

2        THE COURT:  All right.  I will not stand in the way of

3    lawyers filing responses or replies.  He's filing a response.

4    You would be filing a reply to the response, and I'm saying

15:10    5   that I will not delay considering this matter waiting on a

6    reply.  If you want to file it, that's fine.

7        MR. AKERS:  Understood.

8        THE COURT:  Thank you, gentlemen.

9        MR. PAMPHILIS:  Thank you, Your Honor.

10     *(Court adjourned at 3:10 PM)*

11                 * * * *

12     I certify that the foregoing is a correct transcript from

13    the record of proceedings in the above-entitled cause.

14

15   Date: October 8, 2022

16

17                 /s/ Mayra Malone
                    ---------------------------------------

18                 Mayra Malone, CSR, RMR, CRR
                    Official Court Reporter

19

20

21

22

23

24

25

# Exhibit G

**No.**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

IN RE TRUE THE VOTE, CATHERINE ENGELBRECHT,
And GREGG PHILLIPS

_____

Mandamus from the United States District Court
for the Southern District of Texas

Case No. 4:22CV3096, *Konnech Inc. v True The Vote, Catherine Engelbrecht And Gregg Phillips*

_____

MICHAEL J. WYNNE
Attorney at Law
Texas State Bar No 0078529
Telephone: (281) 450-7403
mwynne@gwafirm.com

CAMERON POWELL*
Attorney at Law
DC Bar No 459020
Telephone: (832) 390-2644
cpowell@gwafirm.com

JAMES L. TURNER
Of Counsel
Texas State Bar No. 20316950
Telephone: (713) 305-5457
jturner@gwafirm.com

*Pro Hac Vice pending*

Attorneys for Petitioners

No. _____

IN RE TRUE THE VOTE, INC., CATHERINE ENGELBRECHT,
And GREGG PHILLIPS

Mandamus from the United States District Court
for the Southern District of Texas
Case No. 4:22CV3096, *Konnech Inc. v True The Vote, Inc., Catherine Engelbrecht
And Gregg Phillips*

The undersigned counsel of record certifies that the following listed persons
and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the
outcome of this case. These representations are made in order that the judges of this
court may evaluate possible disqualification or recusal. The judge below was the
Honorable Kenneth Hoyt.

Petitioners:                              Catherine Engelbrecht
                                          Phillip Gregg
                                          True the Vote, Inc.

Attorneys for Petitioner:                 Michael J. Wynne
                                          Cameron Powell
                                          James L. Turner
                                          GREGOR WYNNE ARNEY, PLLC
                                          909 Fannin Street, Suite 3800.
                                          Houston, Texas 77010
                                          mwynne@gwafirm.com
                                          cpowell@gwafirm.com
                                          jturner@gwafirm.com

ii

Brock C. Akers
The Akers Law Firm
3401 Allen Parkway, Suite 101
Houston, Texas 77019
bca@akersfirm.com

John C. Kiyonaga
Law Offices of John Kiyonaga
600 Cameron Street
Alexandria, Virginia 22314
john@johnckiyonaga.com

Respondent:                                    Konnech Inc.

Attorney for Respondent:                       Constantine Z. Pamphilis
                                               KASOWITZ BENSON TORRES LLP
                                               Wedge International Tower
                                               1415 Louisiana, Suite 2100
                                               Houston, Texas 77002
                                               dpamphilis@kasowitz.com


                                               */s/ Michael J. Wynne*
                                               Attorney of Record for Catherine
                                               Engelbrecht, Gregg Phillips, and
                                               True the Vote, Inc.

# **TABLE OF CONTENTS**

Certificate of Interested Persons…………………………………………………ii

Table of Contents………………………………………………….……...iv

Table of Authorities………..………………..……………………...……...vi

Relief Sought and Jurisdiction…………..…………………………………..1

Statement of The Issue…………..…………………………..………………1

Statement of The Case……..…………………………..……………………1

    A.    Course of proceedings and disposition below…………...…….…...1

    B.    Statement of facts………..…………………………………...2

        1. Defendants Phillips witnessed a portion of the Chinese server data……………………………………….……....6

        a. Defendants did not download the Chinese server data……….7

        b. No Defendant has a copy of the Chinese server data…………7

        c. Defendants did not witness hacking or means of access..…….8

        d. Defendants did not provide the Chinese server data to anyone…………………………………………………..9

        2. Data breach information…………………………………………11

        3. The missed opportunities in the Court below……………………13

        4. Defendants' actual public statements about public records………16

        5. The District Court's misunderstanding of the "concept" or "idea"………………………………………………………18

        6. Defendants in good faith feared unnecessary public disclosure

Of confidential informants……………………………………19

    C.    The Court's prejudgment of the Defendants' case…………………22

Summary of Argument………………………………………………………….23

Reasons for Relief and Authorities…………………………………………..23

  A. Standards of review…………………………………………………….23

    1. Mandamus……………………………………………………….23

    2. Contempt…………………………………………………………25

  B. Application of standards to the facts…………………………………..26

    1. What the District Court ordered petitioners to do……………………26

    2. Why the Court ordered the Petitioners detained………………………27

    3. The Court abused its discretion and that abuse resulted in
       Exceptional circumstances amounting to a judicial usurpation
       of power………………………………………………………………..31

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*American Airlines Inc. v. Allied Pilots Assn.*
228 F.3d 574, 578 (5th Cir. 2000)……………………….……………...….25, 26

*Cheney v. U.S. Dist. Court for D.C.*
524 U.S. 367, 380-81 (2004)……………………………………………………24

*In re Gee*
941 F.3d 153, 157 (5th Cir. 2019)………………………………………………23, 24

*Leonard v. Martin*
38 F.4th 481, 488-89 (5th Cir. 2022)……………………………………………24

*Waste Management Inc. v. Kattler*
776 F.3d 336, 339 (5th Cir. 2015)……………………………...………25, 32

## <u>Statutes</u>

18 U.S.C. § 1030 et seq……………………………………………………..2

28 U.S.C. § 1331……………………………………………...……..1

28 U.S.C. § 1367(a)……………………………….……………………..1

28 U.S.C. § 1651……………………………………………………........1

28 U.S.C. § 1651(a)……………………………………………………23

Computer Fraud and Abuse Act…………………………………………...2, 31

Texas Remedies Code § 143.002……………………………………………..2

## RELIEF SOUGHT AND JURISDICTION

Catherine Engelbrecht and Gregg Phillips, Petitioners herein and Defendants below, file this application for mandamus from the district court (Hoyt, SDJ)'s order finding them in civil contempt of court in Case No. 4:22CV3096, Konnech Inc. v True the Vote, Inc., et al. The jurisdiction of the district court was invoked under 28 U.S.C. §§ 1331 and 1367(a). This Court's jurisdiction is invoked under 28 U.S.C. § 1651.

## STATEMENT OF THE ISSUE

WHETHER THE DISTRICT CLEARLY ERRED AND ABUSED ITS DISCRETION WHEN IT FOUND PETITIONERS IN CONTEMPT OF COURT AND ORDERED THEM DETAINED.

## STATEMENT OF THE CASE

**A. Course of proceedings and disposition below**

On September 12, 2022, Plaintiff Konnech Inc. (Konnech) filed a Complaint against True the Vote Inc. (TTV), Catherine Engelbrecht, and Gregg Phillips (Defendants), and an Application for an *ex parte* Temporary Restraining Order (TRO), whose alleged *ex parte* necessity was based on fatally flawed misunderstandings of Defendants' public statements, (Dkt 1, 5). The Complaint and

the TRO are based on alleged violations of 18 U.S.C. § 1030 et seq., the Computer

Fraud and Abuse Act, and Texas Remedies Code § 143.002.

On September 21, 2022, Konnech filed a Motion for Order to Show Cause as

to Contempt against Defendants. (Dkt. 16). The district court set a show cause

hearing on October 17, 2022. (Dkt. 33). It conducted the show cause hearing on

October 27, 2022. The court continued the hearing until October 31, 2022, and

concluded it that day. It ordered defendants Catherine Engelbrecht and Gregg

Phillips to be detained until they fully complied with the Court's Order as set out in

the TRO. (Dkt. 51).

**B. Statement of Facts**

This contempt proceeding is founded on Defendants[1] grossly misunderstood

public statements, by Plaintiff and the district court, having to do with both (1)

***Chinese Server Data*** – sensitive data one defendant, Gregg Phillips, witnessed on a

TV monitor in a Dallas hotel room in late January 2021 – which data is the sole

subject of Plaintiff's claims of computer fraud – and (2) ***Election Breach***

***Information*** – summary information about the resulting election system

---

[1] In an October 6 hearing, Plaintiff's counsel said, "This TRO . . . was based on . . . public statements [Defendants] had made, threats to disclose information." Doc 30 TR at 13-15; *see also* Plf's Motion for TRO at 3 ("The Court should consider this Motion ex parte, because . . . Defendants may follow through on their threats to publicly release the data . . .") (emphasis added).

vulnerabilities, all publicly available, which Defendants wished to convey to the public as a warning.

As a result of its misunderstanding of Defendants' modestly technical descriptions, Plaintiff has misunderstood this case to be in some way about hacking, or the Computer Abuse and Fraud Act, or about disclosure of sensitive data (whether of Plaintiff or individuals). All of these assumptions are incorrect. But the district court perpetuated that misunderstanding in ordering Defendants to make disclosures to Plaintiff that were alternatively impossible, inappropriate, or legally irrelevant.

Based entirely on its demonstrably flawed assumptions, Plaintiff inappropriately *ex parte* obtained a TRO seeking discovery outside standard civil procedure.[2] Perhaps goaded by Plaintiff's characterizations of this case as being about "election denialism", the Court took the unusual step of issuing a TRO that compelled affirmative relief from Defendants (1) in the absence of any evidence from Plaintiff, (2) based on demonstrable mischaracterizations of Defendants' public statements, (3) without permitting Defendants to proffer all relevant evidence, and

---

[2] This court's issuance of a highly unusual TRO did not arise from extraordinary factual support, but rather the reverse. The motion for a TRO had been supported solely by the affidavit of Eugene Yu, founder and CEO of Konnech. Additionally, the affirmative portions of the TRO, by supplanting the typical discovery process, have prejudiced Defendants by forcing disclosures unprotected by the right to object and seek confidentiality attendant to civil discovery.

3

(4) based on the incorrect conclusion that a person who witnessed Chinese Server Data not shown to belong to Plaintiff somehow "accessed" a "protected computer" of Plaintiff. Highlighting the hazards of *ex parte* hearings, the district court uncritically accepted Plaintiff's counsel's incorrect statement that Defendants "admitted hacking and theft of financial and other sensitive personal data of purportedly 1.8 million U.S. poll workers allegedly from a Konnech protected computer." Plf's Mot. for TRO at 1.

Following the *ex parte* appearance by counsel for Konnech on the same day it filed its Complaint and motion for injunctive relief, whose merits and supposed urgency were both based on Plaintiff's grave misconceptions about the types of information Defendants had spoken of, this Court issued the TRO, which holds, in pertinent part, that the defendants are enjoined from:

- "accessing", "using", or "disclosing" "Konnech's protected computers" and data; or

- deleting or destroying same,

Defendants pledged to comply with this portion of the order soon after. But the TRO also compels Defendants to disclose:

- the identity of any individual involved in "accessing Konnech's protected computers",

- the manner, means and time of "accessing" such computers, and

- the identity of any individual to have received said data.

TRO (Doc 9 at paras. i through vii).

In a hearing on October 6, the court forced Defendants' prior counsel to reveal to Plaintiff, in open court and against their protests, the name of one of the confidential informants to the FBI who happened to be in the Dallas hotel room. Defendants subsequently disclosed information responding to the remainder of the court's order, substantially complying with the order and omitting *only* to publicly name a *second* confidential informant ("the Second Informant") (1) who was not alleged to have "accessed" any computers in this case, let alone Konnech's, (2) whom Plaintiff had failed to establish had relevant evidence, and (3) whose personal safety the district court said it did not care about.

On October 27, 2022, at a show cause hearing the Court held Defendants in civil contempt for failing to identify the third of three individuals. Aside from the fact that the individual in question had not "accessed" a "protected computer" known to belong to Konnech, Defendants' hesitation in disclosing another confidential informant was due, in part, to their attempts to grapple with the nature of Plaintiff's and the court's misunderstandings, in part because Defendants were concerned about blowing the cover of confidential informants to the FBI and putting them at personal

risk, and in part because their original counsel. But their hesitation was not, as Plaintiff and the court characterized it, contemptuous.

Crucially, in the October 6 hearing, Plaintiff misrepresented the disputed nature of their conclusions about Defendants' statements, saying, "[T]here is Fifth Circuit precedent that says that the Court can consider a preliminary injunction without live testimony *so long as there is no genuine issue of material fact*." DOC 30 TR at 9 (emphasis added). But there is a genuine issue of material fact here -- consistent mischaracterizations by Plaintiff's counsel about the nature of what Phillips saw (American poll worker data on a server located in China) and what Defendants have said they would do (report the fact of such data being breached and available in China – not the data itself).

### 1. Defendant Phillips Witnessed a Portion of the Chinese Server Data

Defendant Phillips witnessed, on a TV monitor in a Dallas hotel room, enormous amounts of data (he was told 350TB) on a server located in China, some of it including sensitive data on American poll workers.[3] Also present were the

---

[3] To clear up some confusion, the data did not include 1.8 million poll workers:

Q. How many poll worker records were there?

A. There were 1.8 million records in that particular system. But it wasn't just -- the way that they configure everything, it wasn't just poll workers. It was election judges. There was all sorts of

person who accessed the data, Michael Hasson, whose name was revealed during the hearing of October 6, and the third individual. Some of the data appeared to have come from, or been taken from, Plaintiff Konnech.

But while the court's order to show cause is entirely about this data, unrebutted testimony shows that Defendants did not themselves access the Chinese Server Data, did not download or copy it, do not otherwise possess it, and have never stated they would reveal it to anyone.

### a. Defendants Did Not Download the Chinese Server Data

Q. Did any -- forgive me if I get the terminology -- but did any downloading occur in your presence in that hotel room when the -- whatever was up on the TV screen was up on the TV screen -- was any access happening?

A. No.

Doc 47 TR, p.32 (Phillips answering).

### b. No Defendant Has a Copy of the Chinese Server Data

Q. Do you have, in your possession, a copy of this electronic information that was displayed on that screen in the hotel room in Dallas?

A. No, sir.

Q. Does Ms. Engelbrecht have a copy?

---

entries for the equipment; different software they used. There were millions of entries in the spreadsheet.

Doc 47 TR at 59 (statement of Phillips).

A. No.

Q. Does True The Vote have a copy?

A. No, sir.

Q. Does anybody associated with True The Vote have a copy?

A. No, sir.

Q. Did you ever have a copy of the electronic data on your computer or otherwise in your individual possession?

A. No.

Doc 47 TR, pp. 33-34 (Phillips answering).

On October 6, Defendants' prior counsel had already informed the court that the Chinese Server Data was something Phillips had only seen, and did not possess:

MR. BREWER: Your Honor, seeing it [data] and possessing it [data] are two different things.

THE COURT: Well, it may not be and it may be.

(DOC 30 TR at 37-38).

c. Defendants Did Not Witness Hacking or Means of "Access"

In unrebutted testimony, Defendant Phillips also made clear that what he saw in the hotel room was not "accessed" at that time. Rather, he was shown the results of the access on the TV monitor:

Q. What, if anything, was your impression on the temporal relationship -- that is the time relationship between when you walked into the hotel room and whenever whoever it was downloaded the information or data that appeared on the TV monitor that you saw?

8

A. It took about 20 minutes to get his computer hooked to the television screen. He had a problem with the cord that needed to hook into the hotel screen. Once he pulled it up, *he went straight to his files that he was showing me*.

Q. Was it your impression that information was actively being retrieved at that moment in the hotel room, or was it your impression that that had already been done, and he was showing you something that had been done in the past?

A. *I think it was being done in the past*. He certainly wouldn't have been -- *there wouldn't have been enough bandwidth at the hotel to download that kind [350TB] of data*.

Doc 47 TR at 32-33 (emphases added).

Defendants have also made clear exactly why they could not help Plaintiff – as it demanded in its supposedly urgent motion for a Temporary Restraining Order – with its serious security problems. Because the uncontroverted testimony is that Phillips did not know how the Chinese Server Data had been accessed:

THE WITNESS: *I don't know how it was accessed*. I know it was accessed because I saw it, and I subsequently learned that the information had become important to the FBI. [As to] when, given the size of the data that I understand was downloaded, it was somewhere in the 350-terabyte range, and was downloaded over approximately three months in the first quarter of 2021.

Doc 47 TR at 35-36.

c. Defendants Did Not Provide the Chinese Server Data to Anyone

In unrebutted testimony, Defendants also made clear who gave the Chinese Server Data to the FBI – and it was not Defendants:

Q. And so how was the data sent from Mr. Hasson to the FBI?

A. They have a method to transmit large chunks of data directly to them.

Q. What's that method?

A. I didn't do it. You'd have to ask Mike.

Q. Were you involved in it being done?

A. No.

Q. Did you see it being done?

A. No.

Q. Who told you it was done?

A. The FBI.

Doc 47 TR at 54-55 (statement of Gregg Phillips).

In the same podcasts Plaintiff has cited without understanding, Phillips has also explained unrefuted information about the China-based server that should have prevented the district court from attempting to make Defendants responsible for Plaintiff's own security problems in China: "Important keynote here, guys, for everyone ... We didn't steal anything. They left it open. *The database was a MongoDB database that they left open*. … There were no tools used to break in."[4]

---

[4] https://rumble.com/v1hz1jr-heres-how-theyll-try-to-steal-the-midterms-gregg-phillips-interview.html at 36:20 (emphases added)

The second type of information, or data, in this case is about the basic *fact* of the breach of American poll workers' data, which we will call Data Breach Information. This is the only information or data that Defendants "accessed", possessed, or wanted to disclose.

## 2. Data Breach Information

The Data Breach Information includes the general *fact* that sensitive data on American poll workers was being stored on a computer server located in China. The Data Breach Information consists of the publicly available fact that election-related domain names hosted by Konnech on behalf of American cities were being hosted on the same China-based server as its American poll worker data, as was Konnech's URL app.konnech.com (meaning that any data that ran through its apps ran through the insecure server in China), and, apparently, what appeared to be websites for the Chinese election system (e.g., 2dmeeting.com and 2dmeeting.cn).

Exhibit 1 shows a screenshot from the publicly available website Binary Edge, which provides information on computer servers around the world. It shows the server information for Konnech-owned domain name Vote4Fairfax.com, a website run on behalf of Plaintiff's client Fairfax County, Virginia, which Defendants confirmed was registered to Konnech before the domain name's ownership information (aka WHOIS information) was recently concealed. The Binary Edge

screenshot, taken before someone changed the server to one located in the U.S, reveals several key facts:

- The screenshot was taken sometime shortly after December 29, 2020.

- The domain name Vote4Fairfax.com was hosted in China, specifically, on Unicom, one of three "backbones" of the Chinese Internet, *which is owned by the Chinese government. See* https://en.wikipedia.org/wiki/China_Unicom

- The computer server has IP address 101.66.244.52.

- The same server hosted many other domain names – and their data – operated by Konnech on behalf of its American clients, such as the city of Boston (Vote4Boston.com), the city of Hillsborough (Vote4Hillsborough.net), and others.

- Server 101.66.244.52 also hosted apps.konnech.com, as well as all the data on applications used by Konnech customers who access apps.konnech.com

Exhibit 2 shows that the same domain names, as well as Konnech's PollChief.com website and a few more domain names that Konnech operates on behalf of clients in Detroit and Lake County, have been belatedly moved to a server based in the United States. *See* Ex. 2 (accessed on November 1, 2022). It is *this* Data Breach Information that Defendants said, in their podcasts and The Pit event and

other media, they wished to reveal to the public. This information does not belong to Plaintiff, was not accessed from them, is not defamatory, and is within Defendants' First Amendment rights to speak about.

### 3. The Missed Opportunities in the Court Below

In fact, had the district court subjected Plaintiff's testimony to cross-examination, consistent with due process, the court could have determined whether Plaintiff does indeed own the above-named domain names, and whether it was Plaintiff who moved the domain names from the server in China to the one in the United States. If Plaintiff does own the domain names or did move them from an insecure server in China to a server in the United States, then its entire motion for contempt, and its argument that it needs immediate injunctive relief in the form of Defendants helping it to understand its server's "breach", could have been denied. Why? Because Plaintiff *knew* its information was on a server in China, and Plaintiff did not require the names of private individuals in order to secure its data, as Plaintiff insisted in its overheated and *ex parte* Motion for TRO. Lacking such urgency, the court's holding of the *ex parte* proceeding was itself inappropriate. And it made no sense for the court to order Defendants to tell Plaintiff what it already knew, nor to arbitrarily incarcerate them for a good-faith disinclination to disclose the names of

confidential informants who could have told them what they already knew: that they were hosting their domain names and data on a server in China.

The court did not allow Defendants to explain the crucial distinctions at issue here. It did not appear to appreciate the distinctions – admittedly somewhat technical in nature – when Defendants offered them. Witness the court's questioning of Phillips regarding the data – the Chinese Server Data – of American citizens he saw that night in the Dallas hotel room:

THE COURT: And you saw that there were bank accounts?

THE WITNESS: There were bank accounts.

THE COURT: You saw the names of the individuals?

THE WITNESS: Yes, sir.

THE COURT: You saw their Social Security numbers?

THE WITNESS: Yes, sir.

THE COURT: And you then said: We're going to post this on a public domain?

THE WITNESS: No, sir. There is two different datasets.

THE COURT: Well, I'm not -- *I don't care about the datasets*. You know what I am describing.

"It's unrelated," Defendant Phillips began, because he did in fact know what the court was describing, but the court cut him off before he could explain the crucial distinction. *See* Doc 47 TR [5]at 97, lines 3-17 (emphasis added).

This was not Defendants' only attempt to ensure the court was informed about the fundamental issues -- and what they had and had not said they witnessed, possessed, or would disclose – before it issued the contempt citation:

> THE COURT: Okay. Do you recall making a statement on the podcast to the effect that *you were going to create a website and would load the -- this data that you saw onto the website* for the people who would want to visit that site?

Note, again, that Defendants' podcast and website both relate to the open-source, publicly available *Election Breach Information*, not the Chinese Server Data.

> THE WITNESS: No, sir. That's not true.

> THE COURT: I'm asking you. This is what you said -- or what your podcast said.

> THE WITNESS: *My podcast was referring to something we called the ripcord*. The ripcord was related to an app called Open.INK, I-N-K. We were going to put the -- we do all sorts of other research. *We do a lot of open-source research*, meaning Googling around and trying to find things. But *we also do geospatial research*.

(DOC 47 TR at 93-94 (emphases added). In other words: Election Breach Information.

---

[5] DOC refers to the district clerk's docket; the docket number follows; TR refers to the transcript.

### 4. Defendants' Actual Public Statements About Public Records

Plaintiff cites Defendants' public statements in its Motion for TRO:

In the summer of 2022, Defendants advertised an event they dubbed "The Pit," scheduled for August 13, 2022, at which they claimed they would disclose "devastating" information …

Mot. for TRO at 4. Plaintiff includes, ostensibly as proof, a screenshot of a social media post, by a third-party, that does nothing but illustrate what is clearly Election Breach Information, none of it including any confidential information of Plaintiff or private individuals:



In the October 6 hearing, Defendants' counsel explained to the district court that *Plaintiff denies any "breach" of its servers*, which should have alerted both

16

Plaintiff and the court that the server, in China, that was easily breached by Mike

Hasson, is not the same as the servers Konnech maintained in the United States:

> MR. AKERS [reading from web content from Konnech.com]: "True the Vote
> claims to have downloaded personal data on 1.8 million poll workers early in
> 2021 from an unsecured Konnech server in Wuhan, China."

> "Truth: Konnech thoroughly investigated True the Vote's claims and found no
> evidence whatsoever of any breach of our systems or Konnech data anywhere
> in the world."

DOC 30 TR at 32-33.

In the "Patriots and Prophets" podcast that Plaintiff cites as Exhibit A-1[6],

Defendant Phillips further alerted Plaintiff, and the court below, about Defendants'

open-source Election Breach Information. He said that Defendants had discussions

with the FBI "in January of 2021, related to some information that we acquired from

an *open source research project* that we were doing." (emphasis added)


Regarding Plaintiff's PollChief software and its use by election jurisdictions

around the country, Phillips stated, in another podcast[7], that co-Defendant

"Catherine [Engelbrecht] started doing *open records requests* and started learning a

---

[6] https://rumble.com/v1h1pj9-rumble-only-prophets-and-patriots-episode-20-with-gregg-phillips-and-steve-.html
[7] https://rumble.com/v1hz1jr-heres-how-theyll-try-to-steal-the-midterms-gregg-phillips-interview.html at
00:33:14.530 (statement of Gregg Phillips).

17

little more about these contracts and a little more about it. As we dug into *using some open source tools* that help you track these things." (emphases added)

In the same podcast, Phillips went on, "One [open source tool] called Binary Edge, we realized that there's one particular IP address where all of these soft -- and basically this company [Konnech] created a software [PollChief] that manages elections. It manages all of the information, human information, facility-based information. It manages the RFID codes on the machines, everything there is to know about an election. It manages the hours that people work in these elections. And all of this data rolls up into, let's just say it's in Fairfax County, Virginia, Vote4Fairfax.com and then Vote4Boston.com, [and Vote4La.com]. And all over the country . . . this software is emerging out there." *Id.* at 33:48.

### 5. The District Court's Misunderstanding of the "Concept" or "Idea"

This Election Breach Information is what Defendants repeatedly discussed making public – not any data belonging to Plaintiff, nor even the Chinese Server Data, which has never been in Defendants' possession. Defendant Phillips reiterated that *it was the "idea" or "concept" of American election data being on servers in China* that he wished to reveal, saying, "And by Sunday, we had made a plan to hand this off, *this idea, this concept* off to the FBI, because it was national security." *Id.* at 38:25.

18

Given this context, Plaintiff has demonstrably misconstrued, misinterpreted, and misstated Defendants' public statements about the data breach Defendants witnessed. And the court inherited that confusion. To the extent Plaintiff's motion and the district court's finding of contempt are both based not on disputed facts but on their own material errors in interpreting Defendants' public statements, and misunderstanding two critical distinctions, the finding of contempt is arbitrary and unreasonable. It is an abuse of discretion and should be purged.

## 6. Defendants in Good Faith Feared Unnecessary Public Disclosure of Confidential Informants

Moreover, regarding the Chinese Server Data that Defendants did not access and have no legal obligation to assist Plaintiff in securing, Defendants have a good faith, reasonable basis to believe that identifying the third individual in the Dallas hotel room puts him/her at risk for serious harm. Defendants came to the show cause hearing on October 27, 2022, with evidence to corroborate their concerns, but were not permitted to present their evidence to the Court.

On October 6, the court responded to Defendants' counsel's "fear of the safety" of Michael Hasson with the *non sequitur* that "there are no Chinese in here doing anything" and the irrelevant observation that the name of Mr. Hasson "was not a typical -- or even appeared to be a name of a Chinese individual." Doc 30 at

19

24. Since his outing, Counsel is informed Mr. Hasson appears to have gone into hiding.

Defendants also informed the court they received death threats themselves. Around the time they were told Mr. Hasson had gone into hiding, Defendants hired personal security, who began to accompany them everywhere. Still assuming Defendants had breached anything belonging to Plaintiff, the court dismissed these threats out of hand and appeared to believe them justified:

> MR. AKERS: Both Ms. Engelbrecht and Mr. Phillips have received death threats... She has drones flying over her house.
>
> THE COURT: Well, let me say it like this: If you are looking at somebody else's business, whether it is shown to you by some person that you don't want to tell the name of, or whether it's because you are just nosy... you should expect that... somebody is going to look for you.

Doc 30 at 30, lines 11-17.

And when asked why he did not feel he had authority to give up the name of the third man in the room, Defendant Phillips explained his fears, and alluded to the informant work the unidentified individual has long done at the border.

> THE WITNESS: Well, first of all, it would put his life in danger. Beyond that, because I know that he's a CI, you can't just unmask a person that is a CI. This person -- this particular person, Judge, is -- he would be in such extraordinary danger that --
>
> THE COURT: From?
>
> THE WITNESS: From –

20

THE COURT: China?

THE WITNESS: From the cartels. He works on the border. He does all kinds of work.

THE COURT: The cartels on the border, as I understand, are drug dealers.

Doc 47 TR at 103.

All of this gave Defendants reasonable concern that they were about to be accomplices in outing yet another informant, either in open court or through other means. As did the district court's expressed lack of concern about "this man's safety or security":

> THE COURT: I'm not going to enter a protective order to protect anybody and *I'm not concerned about this man's safety or security*. So I'm not going to do it [seal the name]. You are going to do it [disclose the name openly] because you had no right to submit this to me under seal.

Doc 30 TR at 47-48 (emphasis added).

When the district court insisted, during the hearing on October 27, that Defendants also turn over the name of the second confidential informant, Defendants, recalling the district court's unnecessary outing of the first, had a reasonable fear for the safety of that confidential informant. Defendants' fear was only exacerbated when the district court claimed it had the highest security clearance in the land and could not be asked to keep anything confidential:

THE COURT: . . .And here is the message, lawyers and witnesses or parties: If I am not provided, and counsel is not provided -- you don't have to turn anything over to me confidentially. I have the highest clearance of anybody in this country. *And so you cannot ask me to agree to keep something confidentia*l.

DOC 47 TR at 172: lines 8-15.

## C. The Court's Prejudgment of the Defendants' Case

More worrying, the court unnecessarily and unfairly alluding to former President Trump, and thereby heightening the drama, seemed to have made up its mind that Defendants, had "played" their lawyers. The court said it had no confidence in Defendants' work, which is the basis of the non-profit True the Vote and this lawsuit:

MR. AKERS: I think I'm a better judge of character than that [to be played].

THE COURT: *You would have thought that of the President or a lot of lawyers who have been disbarred or who are being now sanctioned.* I have no reason to believe those weren't good lawyers, but they were played.

MR. AKERS: . . . I'm confident that I have not been played and that the work that they have done is worthy.

THE COURT: The work that who has done?

MR. AKERS: The work that my client True the Vote in order to accomplish election integrity overall –

THE COURT: *I don't really have any confidence in any of these folk who claim they are doing that. We did pretty good until about three or*

*four years ago*, five or six years ago. The only people that I know of who have done something wrong are people who have been either caught or who have been charged and mistreated. Do errors get made? Yeah. Do people cheat? Perhaps. But all of this fuss and hustle and bustle about the integrity of a process and the way you fix that process is you tear it apart? *That's not integrity. That's destruction.*

DOC 30 TR at 49. The court's comments reflect that it had already made up its mind about the Defendants, their work, and their case. Defendants saw the results in the court's overruling their every objection, and its refusal to let them put on their evidence or witnesses such as the Los Angeles County Assistant DA.

## SUMMARY OF ARGUMENT

The court below clearly abused its discretion when it found Catherine Engelbrecht and Gregg Philipps in contempt of court for failing to comply with an immaterial provision of a temporary restraining order that was entered *ex parte* and based on demonstrably flawed reasoning.

## REASONS FOR RELIEF AND AUTHORITIES

A. <u>Standards of review</u>

1. <u>Mandamus</u>

"Under the All Writs Act, federal courts 'may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.' 28 U.S.C. § 1651(a)." *In re Gee*, 941 F.3d 153, 157 (5th Cir. 2019).

Included among these writs is the writ of mandamus. Before a court of appeals will issue a writ of mandamus, the applicant must satisfy three conditions:

> First, the party seeking issuance of the writ must have no adequate means to attain the relief he desires – a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process. Second, the petitioner must satisfy his burden of showing that his right to issuance of the writ is clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

*Id*, at 157 (quoting *Cheney v. U.S. Dist. Court for D.C.*, 524 U.S. 367, 380-81 (2004). These conditions ensure that the writ is reserved "for really extraordinary cases." *Id*., at 158. In extraordinary cases, mandamus petitions serve "as useful safety valves for promptly correcting serious errors." *Id*. *See also, Leonard v. Martin*, 38 F.4th 481, 488-89 (5th Cir. 2022).

If the issue raised in the petition is one committed to the discretion of the trial court, "a clear and indisputable right to the issuance of the writ will arise only if the district court has clearly abused its discretion, such that it amounts to a judicial usurpation of power." *In re Gee*, 941 F.3d at 159. "Demonstrating a clear and indisputable right to a writ of mandamus 'requires more than a showing that the district court misinterpreted the law, misapplied it to the facts, or otherwise engaged in an abuse of discretion." *Leonard*, 38 F.4that 489. The petitioner must show "a clear abuse of discretion that produces patently erroneous results" or "exceptional

24

circumstances amounting to a judicial usurpation of power." The petitioner must show not only that the district court erred, but that it clearly and indisputably erred. *Id*.

## 2. Contempt

Contempt findings are reviewed for abuse of discretion. Facts are accepted as true unless clearly erroneous, but questions of law concerning the contempt order are reviewed de novo. A factual finding "is clearly erroneous only if, viewing the evidence in light of the record as a whole, [the appellate court] is left with the definite and firm conviction that a mistake has been committed." Whether a contemnor was denied due process of law is a question of law that is reviewed de novo. *Waste Management Inc. v. Kattler*, 776 F.3d 336, 339 (5th Cir. 2015); see also *American Airlines Inc. v. Allied Pilots Assn.*, 228 F.3d 574, 578 (5th Cir. 2000).

Due process requires "that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel and have a chance to testify and call other witnesses." *Waste Management*, 776 F.3d at 340. "Adequate notice typically takes the form of a show-cause order and a notice of hearing identifying each litigant who might be held in contempt." *Id*.

In *Waste Management*, the Court summarized the requirements for a sufficient contempt order in detail:

> "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." To hold a party in civil contempt, the court must find each violation by clear and convincing evidence. Evidence is clear and convincing if it "produces in the mind of the trier of fact a firm belief … so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction without hesitancy, of the truth and precise facts of the case." The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order.

*Id.*, at 341; *American Airlines*, at 581. An alleged contemnor may defend against a *prima facie* showing of contempt by demonstrating a present inability to comply with the court order. *Id.*

### B. Application of the standards to the facts

#### 1. What the district court ordered Petitioners to do

On September 12, 2022, after reviewing Konnech's Original Complaint, its Motion for a Temporary Restraining Order (TRO) and Eugene Yu's supporting affidavit, the district court granted Konnech a TRO. Notwithstanding the fact the court had only considered the pleading, the court found that the evidence supported the following findings: (1) Konnech had a substantial likelihood of succeeding on the merits because the Petitioners had allegedly confessed as to having gained unauthorized access to Konnech's protected computers, (2) Konnech was subject to

26

immediate irreparable harm without the TRO, (3) the harm outweighs any potential

harm the Petitioners might have suffered, and (4) the TRO was in the public interest.

(DOC 9, pp. 1-2).

The court thereafter entered the following injunctions: (1) Petitioners were not

to access or attempt to access Konnech's protected computers; (2) Petitioners were

ordered to return all property and data obtained from Konnech's protected

computers; (3) Petitioners were enjoined from exploiting any property or data

gleaned from Konnech's protected computers; (4) Petitioners were ordered to

preserve any information or data obtained from Konnech's protected computers; (5)

Petitioners were ordered to identify any and all individuals and entities involved in

accessing Konnech's protected computers: (6) Petitioners were ordered to

confidentially disclose how, when, and by whom Konnech's protected computers

were accessed; and (7) Petitioners were ordered to identify all persons or entities

who once had possession, custody, or control or any information or data from

Konnech's protected computers. (DOC 9, pp. 2-3).

## 2. <u>Why the Court ordered the Petitioners detained</u>

During the show-cause hearing on October 27, 2022, Konnech complained

that the Petitioners had failed to comply with the fifth, sixth, and seventh directives

of the TRO. (DOC 47, pp. 9, 17-19). Petitioners, through counsel, attempted to

introduce an affidavit from Gregg Phillips averring that True The Vote had turned over any information in their possession of FBI special agents, that the amount of information Petitioner Phillips had seen in a Dallas hotel room was too massive to have come from an individual computer, and the material Phillips saw may not even have come from a Konnech protected computer. (DOC 47, pp. 10-12). The district court insisted on receiving the Petitioners' testimony. (DOC 47, pp. 13, 21).

Gregg Phillips testified. (DOC 47, p. 29). Phillips identified one individual that he personally had "access" to material germane to items five through seven of the court's order (DOC 47, p. 31). Phillips testified that he met this individual in a Dallas hotel room in January or February of 2021 (DOC 47, pp 31-32). Phillips testified that what he saw was information that had been downloaded in the past – there was far too much information for a single computer. Neither of the petitioners had possession, custody, or control of that information. (DOC 47, p. 33).

After the meeting, the petitioners turned over what they had to the FBI (DOC 47, p. 34). Phillips testified that he did not know how or when or by whom the information was downloaded but the FBI appeared to deem it significant in light of the volume – more than 350 terabytes had been downloaded over the first quarter of 2021. (DOC 47, pp.35-36). Finally, Petitioner Phillips testified that he was aware of

28

only two individual agent of the FBI who may have exercised possession, care, custody, and control over the information he saw. (DOC 47, p. 36).

On cross-examination, Phillips admitted one other individual attended the meeting in the Dallas hotel. (DOC 47, p. 39). Phillips refused to identify this individual because Phillips believed him to be an FBI confidential informant (DOC 47, pp. 39-40). Phillips held his position to refuse to identify the individual after the court ordered him to do so. (DOC 47, p. 40). Petitioner Phillips testified that he did not share any of this information with Petitioner Engelbrecht. (DOC 47, p. 52).

Aside from the other individuals in the hotel room and the FBI agents, Phillips had no knowledge of who may have accessed the Konnech-protected computers. When counsel asked Petitioner Phillips whether the data he saw came from a Konnech-protected computer, Phillips said his contacts believed that it came from a server in China. (DOC 47, p. 73).

Petitioner Phillips testified that he had never accessed or attempted to access a Konnech computer himself. (DOC 47, p. 74). During an examination by the court, Phillips continued to refuse to identify the other individual attending the Dallas hotel meeting. (DOC 47, pp. 83-88). When the court asked whether or not Petitioners were going to post personal identification information online, Phillips demurred and advised the court he was alluding to a separate data set, as explained above. The

court declared that it was not interested in separate data sets. (DOC 47, pp. 96-97). The court posed a series of questions that touched upon the toxic culture of internet downloads related to election officials and other public figures. (DOC 47, pp. 97-100). In the end Phillips refused to identify the third individual in the hotel room. (DOC 47, p. 101-103). Phillips confessed if the individual's identity became known his life would be jeopardized by the border drug and smuggling cartels. (DOC 47, p. 43).

Petitioner Catherine Engelbrecht testified. (DOC 47, p. 106). Petitioner Engelbrecht testified that she did not have any personal knowledge with respect to the fifth, six, and seventh directives of the TRO – she received all of what she knew from Petitioner Phillips. (DOC 47, p. 108). Indeed, Petitioner Engelbrecht confessed that she did not have any technical knowledge as to how computer data was conveyed to the FBI. (DOC. 47, p. 114). Engelbrecht testified that she was aware of a program called "BinaryEdge" that could be used to determine the location of a computer server. (DOC 47, pp. 134-135). Information gleaned from these public programs gave Petitioner Engelbrecht that information showing information about American elections ended up on servers in the Republic of China. (DOC 47, p. 139). Petitioner Engelbrecht refused to disclose the identity of the third individual who

attended the Dallas hotel room conference. In fact, because she was not there, she had no direct knowledge. (DOC 47, p. 151).

Notwithstanding Petitioner Engelbrecht's demonstrative lack of knowledge with respect disclosure of information as required by the TRO, the court held her in contempt. (DOC 47, p. 172).

### 3. The court abused its discretion and that abuse resulted in exceptional circumstances amounting to a judicial usurpation of power.

The district court clearly abused its discretion when it held the Petitioners in contempt of the TRO. The contempt orders rest upon putative violations of the last three directives: to identify any and all individuals and entities involved in **accessing** Konnech's protected computers; to confidentially disclose how, when, and by whom Konnech's protected computers were **accessed**; and to identify all persons or entities who had possession, custody, or control or any information or data from Konnech's protected computers. Violations of these orders turn on the Petitioners' knowledge of unauthorized **access** of Konnech's computers and knowledge of individuals who had possession of data and information gleaned from an unauthorized access. Any analysis of these provisions turns in some part on an understanding of the meaning of "access" under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030. The Petitioners had to know who had actually acquired unauthorized access to Konnech's computers. Here, the record does not support the district court's factual

determination that either Catherine Engelbrecht or Gregg Phillips had direct personal knowledge that anyone obtained information from Konnech's protected computers by way of unauthorized access.

"Access" is not defined under the CFAA. "'Exceeds authorized access' is defined as: 'to access a computer with authorization and to use such access to obtain information or alter information in the computer that the accesser is not entitled to obtain or alter." *Dresser-Rand Co. v. Jones*, 957 F. Supp.2d 610, 614 (E.D. PA 2013); 18 U.S.C. § 1030(e)(6). The CFAA governs activity that involves accessing or damaging computers. "Use of the computer is integral to the perpetration of a fraud under the CFAA and not merely incidental. Whatever happens to the data subsequent to being taken from the computers subsequently is not encompassed in the purview of the CFAA." *Id.*, at 615. Here, Petitioner Phillips did not execute an unauthorized access into Konnech-protected computers: he saw data on a server, ostensibly located in China, that someone unknown had acquired by accessing a Konnech-protected computer. In fact, the record is bereft of any evidence that Phillips was unaware of anyone who had accessed a Konnech computer.

It has never been established that the computer Mike Hasson evidently accessed belonged to Konnech. At the same time, Konnech has denied its servers

were breached or that it maintained any in China. If that is so, this entire case is moot. That aside, the immediate issue is the arbitrary confinement of two citizens.

To hold a party in civil contempt, the court must find each violation by clear and convincing evidence. Evidence is clear and convincing if it "produces in the mind of the trier of fact a firm belief … so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction without hesitancy, of the truth and precise facts of the case." *Waste Management*, *supra*, at 341. Here the clear and direct weight supports a finding that the district court abused its discretion and usurped judicial authority when it found Petitioner Phillips in contempt and ordered him detained.

Petitioner Catherine Engelbrecht's uncontroverted testimony reveals that she had absolutely no knowledge of any unauthorized access to Konnech protected computers. Indeed, she was not event present with Petitioner Phillips in the Dallas hotel room when he was shown on the China data. The finding of contempt against her is a clear abuse of discretion and must be reversed.

## **CONCLUSION**

Petitioners Catherine Engelbrecht and Gregg Phillips pray that this Court grant their petition for writ of mandamus, that the order of contempt be set aside, and that they be released from confinement forthwith.

Respectfully submitted,

GREGOR | WYNNE | ARNEY, PLLC

MICHAEL J. WYNNE
Attorney at Law
Texas State Bar No 0078529
Telephone: (281) 450-7403
mwynne@gwafirm.com

CAMERON POWELL*
Attorney at Law
DC Bar No 459020
Telephone: (832) 390-2644
cpowell@gwafirm.com

JAMES L. TURNER
Of Counsel
Texas State Bar No. 20316950
Telephone: (713) 305-5457
jturner@gwafirm.com

*Pro Hac Vice pending

ATTORNEYS FOR PETITIONERS

34

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF e-service on November 3, 2022, on the following counsel of record:

Constantine Z. Pamphilis
KASOWITZ BENSON TORRES LLP
Wedge International Tower
1415 Louisiana, Suite 2100
Houston, Texas 77002
dpamphilis@kasowitz.com

ATTORNEYS FOR RESPONDENT

By: /s/ *Michael J. Wynne*
Michael J. Wynne

## Certificate of Compliance

This brief complies with the type-volume limitation of FED. R. APP. P. 32(g)(1) and 27(d)(2)(a) in that it contains 7,225 words. It also complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) in that it has been prepared in a proportionally spaced typeface using Microsoft Word, Windows 11 in Times New Roman 14 point font.

By: /s/ *Michael J. Wynne*
Michael J. Wynne

35

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

November 03, 2022

Mr. Michael Wynne
Gregor Wynne Arney, P.L.L.C.
909 Fannin Street
Suite 3800
Houston, TX 77010

        No. 22-20578    In re: Gregg Phillips
                        USDC No. 4:22-CV-3096

Dear Mr. Wynne,

We have docketed the petition for writ of mandamus, and ask you to use the case number above in future inquiries.

Filings in this court are governed strictly by the Federal Rules of **Appellate** Procedure. We cannot accept motions submitted under the Federal Rules of **Civil** Procedure. We can address only those documents the court directs you to file, or proper motions filed in support of the appeal. See **FED. R. APP. P.** and **5TH CIR. R.** 27 for guidance. We will not acknowledge or act upon documents not authorized by these rules.

You must pay the court of appeals' $500.00 docketing fee to the **United States Court of Appeals**, within 15 days from the date of this letter. If you do not, we will dismiss the petition, see **5TH CIR. R.** 42.3. An electronic payment can be submitted via pay.gov, if you are a registered electronic filer. To register, visit www.pacer.gov. If paying by check, the check should be made payable to United States Courts, and mailed to the Clerk's Office, USCA, Mail Remittance, 600 S. Maestri Place, New Orleans, LA, 70130.

All counsel who desire to appear in this case must electronically file a "Form for Appearance of Counsel" naming all parties represented within 14 days from this date, see **FED. R. APP. P.** 12(b) and **5TH CIR. R.** 12. This form is available on our website www.ca5.uscourts.gov. Failure to electronically file this form will result in removing your name from our docket. Pro se parties are not required to file appearance forms.

ATTENTION ATTORNEYS: Attorneys are required to be a member of the Fifth Circuit Bar and to register for Electronic Case Filing. The "Application and Oath for Admission" form can be printed or

downloaded from the Fifth Circuit's website, www.ca5.uscourts.gov. Information on Electronic Case Filing is available at www.ca5.uscourts.gov/cmecf/.

ATTENTION ATTORNEYS:  Direct access to the electronic record on appeal (EROA) for pending appeals will be enabled by the U S District Court on a per case basis.  Counsel can expect to receive notice once access to the EROA is available.  Counsel must be approved for electronic filing and must be listed in the case as attorney of record before access will be authorized.  Instructions for accessing and downloading the EROA can be found on our website at                    http://www.ca5.uscourts.gov/docs/default-source/forms/instructions-for-electronic-record-download-feature-of-cm.  Additionally, a link to the instructions will be included in the notice you receive from the district court.

Sealed documents, except for the presentence investigation report in criminal appeals, will not be included in the EROA.  Access to sealed documents will continue to be provided by the district court only upon the filing and granting of a motion to view same in this court.

We recommend that you visit the Fifth Circuit's website, www.ca5.uscourts.gov and review material that will assist you during the appeal process.  We especially call to your attention the Practitioner's Guide and the 5th Circuit Appeal Flow Chart, located in the Forms, Fees, and Guides tab.

ATTENTION:  If you are filing Pro Se (without a lawyer) you can request to receive correspondence from the court and other parties by email and can also request to file pleadings through the court's electronic filing systems.  Details explaining how you can request this are available on the Fifth Circuit website at http://www.ca5.uscourts.gov/docs/default-source/forms/pro-se-filer-instructions. This is not available for any pro se serving in confinement.

**Special guidance regarding filing certain documents:**

General Order No. 2021-1, dated January 15, 2021, requires parties to file in paper highly sensitive documents (HSD) that would ordinarily be filed under seal in CM/ECF.  This includes documents likely to be of interest to the intelligence service of a foreign government and whose use or disclosure by a hostile foreign government would likely cause significant harm to the United States or its interests.  Before uploading any matter as a sealed filing, ensure it has not been designated as HSD by a district court and does not qualify as HSD under General Order No. 2021-1.

A party seeking to designate a document as highly sensitive in the first instance or to change its designation as HSD must do so by motion. Parties are required to contact the Clerk's office for guidance before filing such motions.

**Sealing Documents on Appeal:**  Our court has a strong presumption of public access to our court's records, and the court scrutinizes any request by a party to seal pleadings, record excerpts, or other documents on our court docket.  Counsel moving to seal matters must explain in particularity the necessity for sealing in our

court.  Counsel do not satisfy this burden by simply stating that
the originating court sealed the matter, as the circumstances that
justified sealing in the originating court may have changed or may
not apply in an appellate proceeding.  It is the obligation of
counsel to justify a request to file under seal, just as it is
their obligation to notify the court whenever sealing is no longer
necessary.  An unopposed motion to seal does not obviate a
counsel's obligation to justify the motion to seal.


                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    By: _____
                    Roeshawn Johnson, Deputy Clerk
                    504-310-7998

cc:  Mr. Nathan Ochsner
     Mr. Constantine Z. Pamphilis

Provided below is the court's official caption.  Please review the
parties listed and advise the court immediately of any
discrepancies.  If you are required to file an appearance form, a
complete list of the parties should be listed on the form exactly
as they are listed on the caption.

———————

Case No. 22-20578

———————

In re:  Gregg Phillips; Catherine Engelbrecht,

Petitioners

# Exhibit H

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3  KONNECH, INC.                )    NO. 4:22-cv-03096
                                 )
 4                               )
    VS.                          )    Houston, Texas
 5                               )    9:12 a.m.
                                 )
 6  TRUE THE VOTE, INC., ET      )    OCTOBER 31, 2022
    AL                           )
 7

 8

 9    ********************************************************

10                       CONTEMPT HEARING

11            BEFORE THE HONORABLE KENNETH M. HOYT

12              UNITED STATES DISTRICT JUDGE

13

14    ********************************************************

15  APPEARANCES:

16  FOR THE PLAINTIFF:

17       Mr. Constantine Z. Pamphilis
         MR. Nathan Richardson
18       Kasowitz Benson Torres LLP
         Wedge International Tower
19       1415 Louisiana
         Suite 2100
20       Houston, TX 77002
         713-220-8852
21       Email: Dpamphilis@kasowitz.com

22

23  Proceedings recorded by mechanical stenography.

24  Transcript produced by computer-assisted transcription.

25
```

2

 1 FOR THE DEFENDANTS:

 2      Mr. Michael John Wynne
        Mr. Joseph R. Larsen
 3      Mr. Cameron Powell
        Gregor Cassidy Wynne, PLLC
 4      909 Fannin, Suite 3800
        Houston, TX 77010
 5      Tel:  713-450-7403
        Email: Mwynne@gwafirm.com

 6

 7 ALSO PRESENT:

 8      Mr. Todd Burns

 9 COURT REPORTER:

10      Ms. Kathleen K. Miller, CSR, RMR, CRR
        515 Rusk, Room 8004
11      Houston, Texas  77002
        Tel:  713-250-5087

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                Now, we're tracking down now, Mr. Burns

2 is, whether the handling agents in San Antonio and

3 throughout the border have an issue with or if, in fact,

4 this will compromise any agent, and I don't know the answer

09:18:41   5 to that, so I am asking for six hours.  They're tracing it

6 down right now.  I can have Mr. Burns attest to that, and

7 then if -- if, in fact, he is, we're in a very, very

8 different situation.

9                THE COURT:  Well, that's not something that I

09:18:59   10 have any intentions of engaging in, this back and forth.  I

11 simply -- Mr. Phillips, as well as Ms. Engelbrecht, who

12 apparently either got it directly or indirectly, the

13 information, from Mr. Phillips indicated that there was a

14 third person in the room.  And there may have been other

09:19:22   15 persons in the room.  I have never gotten a straight answer

16 from either of them as to what happened in the hotel room.

17                And when you use language that "no longer

18 have access," it suggests that they had access to the -- to

19 the data.  And the fact that they don't have access now

09:19:42   20 simply is a matter of them choosing not to exercise the

21 intelligence and the knowledge that they have to gain

22 access.

23                This suggests to me that they had access.

24 They had the -- they have provided this access information

09:19:58   25 to other entities.  They even went on their website, I

1 believe, indicating on their website that they had

2 cooperated.

3                    I mean, this is public knowledge that

4 they're saying, you know, we have -- we provided this

09:20:12  5 information to the sheriff's department, or some other

6 department in California, or the District Attorney.  We've

7 had this information.  We gave it to them.

8                    And then how would they give it to the FBI

9 if they didn't have it in the first place?  How could they

09:20:30 10 disclose anything to the FBI if they didn't have it?  And I

11 am not asking you to give me your opinion.  I am not asking

12 you to do anything except understand that the knowledge of

13 understanding has been evasive.  Whatever their knowledge

14 is, they have evaded the Court.

09:20:48 15                    I stepped into the matter and tried to

16 figure out how to get this data from them.  They have not

17 done so.  And all I have heard from you is, Judge, give us

18 some time to go ahead and work something out with counsel.

19 I mean, this has been going on for weeks.  Lawyers don't

09:21:05 20 have that much business that they can't work out something

21 significant in something as important as this data is.

22 Particularly, in light of the fact that in the public

23 domain, people are being threatened, and harassed,

24 including your client said they have been threatened and

09:21:19 25 harassed.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 that, Judge.

2          THE COURT:  All right.  Irrespective as to how

3 this might be handled by the clerk's office, the Court is

4 going to deny your motion as it relates to opposed -- as

09:30:55   5 your opposed motion or your motion opposing the -- the --

6 placing, should I say, the picture under seal.

7          MR. WYNNE:  Yes, sir.

8          THE COURT:  And further, and finally, anything

9 else?

09:31:09  10          MR. PAMPHILIS:  Not from the plaintiff, Your

11 Honor.

12          MR. WYNNE:  May I confer with co-counsel one

13 moment?

14          THE COURT:  Sure.  Sure.

09:31:30  15          MR. WYNNE:  Nothing further, Your Honor.

16          THE COURT:  Then the Court, having previously

17 found the Defendants Gregg Phillips and Catherine

18 Engelbrecht in contempt for failure to comply with the

19 Court's ex parte temporary restraining order that address

09:31:45  20 unauthorized access by the Defendants, their agents,

21 assigns, or entities, on the plaintiff's protected computer

22 network, the return of all data belonging to Konnech, the

23 disclosure and/or the identity of all persons, entities who

24 had or have possession, custody, control, or access to any

09:32:03  25 information located on Konnech's protected computers, and

1  to confidentially disclose to Konnech how, when, and by

2  whom Konnech's protected computers were accessed, the Court

3  finds that although time to cure and thereby render the

4  holding of the contempt motion -- the holding of contempt

09:32:25   5  moot, as provided, the Defendants have yet to comply with

6  the Court's order.

7                     Therefore, it is ordered that Gregg

8  Phillips and Catherine Engelbrecht are ordered detained by

9  the United States Marshal for one day and further until

09:32:40   10  they fully comply with the Court's order as set forth in

11  TRO exhibit -- or Documents Numbers 8 and 9.  That's it.

12                     You're to remain in the courtroom.

13                     Counsel may be excused.  Thank you very

14  much.  Y'all have a good day.

09:32:59   15                     U.S. Marshals, you're to take them into

16  custody, please.

17  (Concluded at 9:32 a.m.)

18                     COURT REPORTER'S CERTIFICATE

19

20      I, Kathleen K. Miller, certify that the foregoing is a

21  correct transcript from the record of proceedings in the

22  above-entitled matter.

23

24  DATE:  Nov. 1, 2022      /s/    _Kathleen K. Miller_

25                          **Kathleen K. Miller, RPR, RMR, CRR**

# Exhibit I

**True the Vote** 🇺🇸 ✓
@truethevote · 4d

And ye shall know the truth, and the truth shall make you free. John 8:32

To help in our cause, please donate here: true-the-vote.revv.co/rd_donat...



"IN A TIME OF DECEIT TELLING THE TRUTH IS A REVOLUTIONARY ACT."

George Orwell

⟲ 846   ❤ 2,100                    Oct 31, 2022, 12:34 PM

🔍 Reply          ⟲ ReTruth          ♡ Like          ⬆          •••

# Exhibit J

 **True the Vote** 🇺🇸 ✅
@truethevote · Nov 3

Good Afternoon Patriots, it's Chelsea again, Operations at True the Vote. We have a beautiful message from Catherine Engelbrecht on Day 4 in prison.

As always she is a beacon of love, light, and hope. Her primary concern is for the American people, and she encourages you to exercise the power of your voice to get out and vote.

Live Fearlessly, for God is with us.

Ever Onward!

#EverOnward #freegpce #voteservepray #LiveFearlessly #flippingtables #fearisaliar @greggphillips



ON THE PHONE
CATHERINE ENGELBRECHT
TRUE THE VOTE

💬 178   🔁 971   ♡ 2.39k   ⬆   • • •

# Exhibit K

 **True the Vote** 🇺🇸 ✔
@truethevote · 1h

A True the Vote patriot has created a merch site to support Catherine and Gregg in their fight against government tyranny.

You can help us by going to FreePatriots.us. You'll find great gear with 100% of the proceeds being donated to True the Vote.

Show the world where you stand — FOR FREEDOM!

@greggphillips #voteservepray #fearisaliar #flippingtables #freegpce #livefearless



○ 7    ⇄ 144    ♡ 309    ⬆    •••