**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KONNECH, INC.,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:22-CV-03096** |
| | § | |
| **TRUE THE VOTE, INC., GREGG** | § | |
| **PHILLIPS, and CATHERINE** | § | |
| **ENGELBRECHT,** | § | |
| | § | |
| **DEFENDANTS.** | § | |

## DEFENDANTS' MOTION TO RECUSE

A reasonable, thoughtful, well-informed observer could reasonably conclude that this court's impartiality is squarely in question. In fact, three thoughtful and well-informed observers on the Fifth Circuit Court of Appeals concluded that this court has already *"litigate[d this] case on Konnech's behalf." Phillips*, No. 22-20578, 2022 WL 17175826, at *1 (5th Cir. Nov. 22, 2022). For a judge to be said to litigate a case *on behalf of* a party is, of course, very unusual.

What's more, the Court of Appeals has now irreparably created the reasonable impression that this court has been favoring one party over another without adequate reason to do so, which is a good working definition of the appearance of bias. That impression will endure. The district court's one-sided procedural moves, questioned by the Court of Appeals, combined with its on-the-record conclusions about Defendants' probity and credibility, have irrevocably conveyed a strong impression of favoritism of Plaintiff, antagonism toward Defendants, and a lack of impartiality. For that reason alone, the court should recuse itself and transfer this matter to another court.

## I. Introduction

Judges are human. They cannot be expected to avoid irritation or annoyance or never to speak bluntly to counsel and parties. However, it is an unavoidable fact that in this case, a case far more politically charged than we see in the great majority of recusal motions found in the caselaw, a reasonable observer would expect a higher-than-usual standard of judicial evenhandedness and temperance. Such expectations were challenged once this court inherited Plaintiff's misrepresentations about unauthorized computer access – Plaintiff argues that Defendants' public statements about seeing data from an insecure server in China somehow constitute admissions of "accessing" a "Konnech computer" in the U.S. – and its fevered claims of urgency, all of which understandably gave the court reason to believe something serious was afoot here.

To the court, then, Defendants' confusion about what they were being asked to do in the court's TRO and preliminary injunction, and their good-faith desire to protect from doxing or violence people who were legally irrelevant to Plaintiff's demonstrably fabricated claims of computer access, made them seem intransigent, even contemptuous. Why were Defendants standing in the way of what might be a national security issue, a crime? Why were they withholding what seemed like crucial information? Why stubbornly oppose this Court? It's understandable that a court already on the record as distrusting litigants it precipitously deemed to be involved in "election destruction" would reveal a lack of impartiality toward such people. And this Court did so, and there's no undoing it. We begin with the fact of Plaintiff's *ex parte* presentation to the court, where its deluge of disparagement persuaded the court that this case somehow related to urgent and highly politicized issues of nationwide election fraud.

## II. Plaintiff's Deluge of Disparagement Created and Reflected a Charged Political Environment – and the Appearance of Bias.

On September 12, 2022, Konnech Inc. filed not only a Complaint against True the Vote Inc., Catherine Engelbrecht, and Gregg Phillips (Defendants), but an application for an *ex parte* TRO, whose alleged *ex parte* necessity was based on verifiable misrepresentations of Defendants' public statements. The Complaint and the TRO were based on alleged violations of the Computer Fraud and Abuse Act and related Texas statutes.

### A. Reasonable Observer Could Find that Plaintiff's Communications Conveyed Unavoidable Bias to the District Court.

The court's crucial first exposure to the parties' positions here consisted solely of Plaintiff's needlessly inflammatory Complaint and TRO, both of which were rife with disparagement of Defendants, including references to politically charged articles about Defendants; specious at best and irrelevant to this case. That disparagement included language alleging that Defendants Engelbrecht and Phillips were "the Bonnie and Clyde of election denial," a disparagement meant to invoke the contentious Presidential election that took place over two years ago and that has nothing whatsoever to do with Plaintiff's complaints of defamation and improper computer access.

From the Complaint's earliest paragraphs, Plaintiff piled on third-party articles disparaging Defendants as part of Plaintiff's extrajudicial theory that Defendants were allegedly in the money-making business of making false claims of election fraud. That theory was and is irrelevant to Plaintiff's causes of action. Defendants reproduce below, complete with the original numbering and extraneous argumentation from the tendentious articles Plaintiff saw fit to include in footnotes, the first few paragraphs of the Complaint that, as a reasonable observer could see, would go on to unavoidably influence the Court *ex parte*.

3.     Indeed, *Defendants are in business to capitalize from their [extrajudicial] claim that the **2020 Presidential Election** was "stolen." Defendants Phillips and Engelbrecht have been referred to as the "Bonnie and Clyde" of **election fraud**[1], and they have enriched themselves by spreading conspiracy theories*, which they present as factual in nature, about the ***2020 Presidential Election***, largely funded by money funneled through Defendant True the Vote, which some commentators have called a *"big grift."*[2] Defendants were in fact the subject of a suit filed in 2020 by a conservative megadonor, who, after speaking with Defendant Engelbrecht, donated $2.5 million to help fund Defendant True the Vote's efforts to fight election fraud. The donor later discovered, however, that his money was instead *siphoned through Defendant True the Vote*, and other entities established by Defendants Phillips and Engelbrecht, *for their own personal gain*.[3] (Emphases added.)

4.     Defendants *most recently capitalized* on their [extrajudicial] *claims of election fraud* through their involvement in the production of a so-called "documentary" titled 2000 Mules in which they sought to convince their followers that people, who they refer to as "mules," were paid to collect and deposit fake ballots into ballot boxes for the *2020 Presidential Election* which they contend changed its outcome. The theories peddled in 2000 Mules, however, have been *repeatedly disproven*.[4] Apparently realizing that their 2000 Mules tale had run its course, Defendants Phillips and Engelbrecht declared an end to "mules" at an August 2022 True the Vote, invitation-only event which they called "The Pit." (Emphases added.)

---

[1] Plaintiff's footnote: *See* Mimi Swartz, How True the Vote Fabricates Claims of Election Fraud, for Fun and Profit, Texas Monthly (Aug. 22, 2022), available at, https://www.texasmonthly.com/news-politics/true- the-vote-election-fraud/.

[2] Plaintiff's footnote: *See* Cassandra Jaramillo, She Helped Create the Big Lie. Records Suggest She Turned It Into a Big Grift, Reveal News (June 8, 2022), available at, https://revealnews.org/article/true-the-vote- big-lie-election-fraud/.

[3] Plaintiff's footnote: *See Eshelman v. True the Vote, Inc., OSPEC Group, LLC, Engelbrecht, Bopp, Jr., Phillips, and The Bopp Law Firm*, 4:2020-cv-04034, filed November 25, 2020 in the U.S. District Court for the Southern District of Texas; *see also* Richard Salame, Was Election Denial Just a Get-Rich-Quick Scheme? Donors' Lawsuits Look for Answers (Feb. 6, 2021), available at, https://www.typeinvestigations.org/investigation/2021/02/06/was-election-denial-just-a-get-rich- quick-scheme-donors-lawsuits-look-for-answers/.

[4] Plaintiff's footnote: *See* Fact Check-Does '2000 Mules' provide evidence of voter fraud in the 2020 U.S. presidential election?, Reuters (May 27, 2022), available at https://www.reuters.com/article/factcheck-usa-mules-id USL2N2XJ0OQ; FACT FOCUS: Gaping Holes in the Claims of 2k Ballot 'Mules', Associated Press (May3, 2022), available at https://www.usnews.com/news/politics/articles/2022-05-03/fact-focus-gaping-holes-in-the-claim-of-2k-ballot-mules; Tom Dreisbach, A pro-Trump film suggests its data are so accurate, it solved a murder. That's false, NPR (May 17, 2022), available at https://www.npr.org/2022/05/17/1098787088/a-pro-trump-film-suggests-its-data-are-so-accurate-it-solved-a murder-that's false; Phillip Bump, Even the geolocation maps in '2000 Mules' are misleading. The Washington Post (May 19, 2022).

5. The Pit, they promised, would be the event where Defendants would finally release "devastating information" that would definitively prove the *2020 U.S. Presidential election was stolen . . .* (Emphases added.)

In just its opening paragraphs, then, Plaintiff managed to put before the court, *ex parte,* a full-scale assault on the probity of Defendants by claiming without basis they are guilty of a cause of action that could be termed 2020 Presidential Election Denial and by relying on the following biased, inaccurate, and politically charged opinion pieces in the media that have no bearing on the discrete computer access and defamation claims being litigated in this case[5]:

- "Bonnie and Clyde of election denial"
- "How True the Vote Fabricates Claims of Election Fraud, for Fun and Profit" (extraneous article)
- "enriched themselves"
- "by spreading conspiracy theories" relating to 2020 Presidential Election
- "a big grift"
- "She [Ms. Engelbrecht] Helped Create the Big Lie. Records Suggest She Turned It Into a Big Grift" (extraneous article)
- Lawsuit filed against Defendants by third party alleging "siphoning" and "personal gain" by Defendants
- "Was Election Denial Just a Get-Rich-Quick Scheme? Donors' Lawsuits Look for Answers" (extraneous article)
- "repeatedly disproven" theories in a documentary irrelevant to this case
- "false" claims of solving a murder irrelevant to this case

Plaintiff continued its *ex parte* disparagements in Paragraphs 9-11, returning to their hidden cause of action here, that of 2020 Election Denialism. Plaintiff invoked more extrajudicial arguments about "the U.S. Presidential Election," "conspiracy theorists and con artists," Defendants' "dirty work", and the bogus argument, accepted by the court, that "Absent intervention of this Court" into Plaintiff's imaginary claim of computer access, "such damaging behavior will continue, and *even affect the then-upcoming 2022 midterm elections.*" (Emphasis added.)

---

[5] All of these allegations are false and have demonstratively been proven to be false.  In any event, True the Vote is prepared to provide the records showing they are false to any person or organization that may request them.

But Plaintiff was still not done trying to yoke Defendants to the 45th President of the United States, the third-rail issue of the 2020 election, Mar-a-Lago, Attorney General William Barr, election logistics companies outside this case, non-party conspiracy theorists, and various county elections departments. Plaintiff tried to connect all these extrajudicial matters to Konnech's imaginary claim of computer access:

> 26. . . .Unsurprisingly, Defendants *sought to capitalize* on certain public sentiment against the FBI on the heels of the recent raid on *Mar-a-Lago*, and claimed that the FBI turned the tables on them, and began an investigation of *Defendants* for hacking Konnech's protected computers and stealing its data. (first two emphases added)

> 56.  . . . [Defendants] have ignored former President Donald Trump's own *Attorney General William Barr*—the former chief law enforcement officer of the United States Federal Government—who has repeatedly declared that there was no evidence of voter fraud to overturn *the 2020 Presidential Election*.

> 59. … Defendants' conduct is not only damaging to Konnech, it also *deters other would-be election logistic companies* from entering the market—or will cause other such companies to shutter—without which, elections would be unmanageable for cities and counties, leading to further election integrity issues.

An outside observer could see that these irrelevant disparagements were crucial to Plaintiff's effort to weave a false narrative of urgency about the November 2022 election, as it successfully persuaded the Court that if Defendants had notice of Plaintiff's application for a TRO, they would somehow do something harmful. A reasonable observer could reasonably conclude it is simply human nature to be more influenced by the point of view that one sees fleshed out than the point of view that remains unexpressed. And this Court's October 6 statements about Defendants, made without the benefit of any evidence about or exposure to Defendants, surely gave reasonable observers the impression that the court had been influenced by the force-field of Plaintiff's urgency, and its indictment of Defendants' bad faith.

### B.  With No Evidence in the Record, The Court Compared Defendants Unfavorably to Donald Trump and Suggested They Were Lying.

By the time of the October 6 hearing, a reasonable observer could conclude the court had made up its mind that the Defendants, supposedly like President Trump, "played", or lied to, their lawyers. In an extraordinary colloquy, the court also declared it had no "confidence" in Defendants' election-related "destruction" work. Mr. Akers, then counsel for Defendants, begins:

> MR. AKERS: Judge, among my fears, as a guy who has been in the Bar for a few years, is that you would think that I am trying to play a game.
> THE COURT: Not you. *I'm thinking you may be played*.
> MR. AKERS: I think I'm a better judge of character than that.
> THE COURT: *You would have thought that of the President or a lot of lawyers who have been disbarred or who are being now sanctioned.* I have no reason to believe those weren't good lawyers, *but they were played*.
> MR. AKERS: . . . I'm confident that I have not been played and that the work that they have done is worthy.
> THE COURT: The work that who has done?
> MR. AKERS: The work that my client True the Vote in order to accomplish election integrity overall –
> THE COURT: *I don't really have any confidence in any of these folk who claim they are doing that. We did pretty good until about three or four years ago,* five or six years ago. The only people that I know of who have done something wrong are people who have been either caught or who have been charged and mistreated. Do errors get made? Yeah. Do people cheat? Perhaps. But all of this fuss and hustle and bustle about the integrity of a process and the way you fix that process is you tear it apart? *That's not integrity. That's destruction*.[6]

Oct 6, 2022, TR at 49 (emphases added).

---

[6] A reasonable observer could conclude, then, that the court's very next words – the order for Defendants' counsel to give up legally irrelevant names – was the direct result of the court's extrajudicial opinions about "election destruction":

> THE COURT: *So* I want it done now. You can get on the phone and call him, and I'm going to sit right here until I know it's done.

*Id.* at 50. In short, immediately after *appearing* to accuse Defendants – who were not present – of both lying and destruction of elections, the court ordered Defendants' counsel to reveal to Plaintiff, outside of normal discovery and without its protections, the name of one of the confidential informants to the FBI who was in the Dallas hotel room.

The entire last paragraph of the Court's ruminations on the country's elections debates is decidedly extrajudicial. And the Court's pointed comments about "these folk" who were "playing" their lawyers more likely than not signaled to a reasonable observer that the Court had already made up its mind about Defendants who merely "claim" (the Court's word choice) to be involved in elections integrity, its lack of "confidence" in their election work, its judgement that such people "tear apart" and engage in "destruction," and their case in general, but especially their probity and credibility.

### C. The Court Prejudged Defendants as Having "Look[ed] at Somebody's Else's Business," Therefore Warranting Death Threats.

In the same October 6 hearing, Defendants' counsel informed the court that Defendants had received death threats.

> MR. AKERS: Both Ms. Engelbrecht and Mr. Phillips have received death threats... She has drones flying over her house.

A reasonable observer could conclude that the Court, in its response, prejudged one ultimate issue in this case – whether Defendants had breached any computer belonging to Plaintiff – because the court apparently believed the threats justified on account of Defendants' computer-accessing nosiness:

> THE COURT: Well, let me say it like this: *If you are looking at somebody else's business*, whether it is shown to you by some person that you don't want to tell the name of, or whether it's because you are just nosy... *you should expect that... somebody is going to look for you*.

Oct. 6 transcript at 30, lines 11-17 (emphases added). A reasonable observer could also conclude that the Court's response made no sense unless the Court had already decided, without ever having met Defendants, that the things they said were not to be credited, or that, given the forceful, terrible picture painted by Plaintiff in its dossier of negative articles about Defendants, they were getting what they deserved.

### D.  The Court issued a Premature TRO and Held Defendants in Contempt.

Indeed, on September 12, 2022, only hours after Plaintiff's Complaint and Motion for TRO invoked unusually politically polarizing issues surrounding the 2020 Election and beyond, the district court accepted Plaintiff's arguments in their entirety. The Court accepted Plaintiff's proposed sweeping injunctions, *verbatim*, and ordered Defendants to make disclosures to Plaintiff that were alternatively impossible, premature, inappropriate, or legally irrelevant.

Highlighting the hazards of *ex parte* hearings, the district court uncritically (1) ignored Plaintiff's own statements that Defendants had "admitted" to being involved in accessing only a computer *based in China that Konnech did not claim to own, see* Compl. ¶¶ 46-48, and (2) accepted Plaintiff's counsel's *demonstrably* incorrect statement that Defendants had "*admitted hacking and theft* of financial and other sensitive personal data of purportedly 1.8 million U.S. poll workers allegedly from a Konnech protected computer." Plf's Mot. for TRO at 1 (emphasis added).

Among other things, the court ordered Defendants to identify any individual involved in "accessing Konnech's protected computers" -- an impossibility, given that Defendants had never accessed nor "admitted" to accessing any such computers. Defendants had spoken only of witnessing (1) after-the-fact access by others of (2) a server in China that (3) Konnech claimed not to own. It is also certainly a legal question as to whether looking at something already accessed by someone else via a default password constitutes "access" under the CFAA. Nevertheless, on September 21, 2022, Konnech filed a Motion for Order to Show Cause as to Contempt against Defendants. Defendants later disclosed more information responding to the remainder of the court's order, substantially complying with the court's order.

On October 17, 2022, the district court set a show cause hearing, and conducted the hearing, with only Defendants present to offer testimony, on October 27, 2022, continuing on to October

31, 2022. Defendants there declined to publicly name a *second* confidential informant who also was not alleged to have "accessed" any computers in this case, let alone Konnech's. The Court held Defendants in civil contempt.

### III.  Standard for Recusal

Defendants bring this motion under 28 U.S.C. § 455, which provides that:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding *in which his impartiality might reasonably be questioned*.

(b) He shall also disqualify himself in the following circumstances:

1.  Where *he has a personal bias or prejudice concerning a party* . . .

(Emphases added.)

Under section 455(a), a judge must recuse himself "in any proceeding in which his impartiality *might reasonably be questioned*" by reasonable observers, regardless of actual bias.[7] (Emphasis added.) "In applying § 455(a), the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) citing *Hall v. Small Business Admin.,* 695 F.2d 175, 179 (5th Cir.1983). Section 455(a) applies if a judge's impartiality would be questioned by a "well-informed, thoughtful observer rather than ... a hypersensitive or unduly suspicious observer." *Hook v. McDade,* 89 F.3d 350, 354 (7th Cir.1996). Under 455(b), a judge must disqualify himself when the judge "has a

---

[7] *See* H.R. REP. No. 1453, 93d Cong., 2d Sess. 3, at p.5, reprinted in 1974 U.S. CODE CONG. & AD. NEWS 6351, 6352-53, reprinted in 1974 U.S. CODE CONG. & AD. NEWS at 6355

Similarly, the Due Process Clause may mandate recusal by objective standards that do not require proof of actual bias. See *Tumey,* 273 U.S., at 532, 47 S.Ct. 437; *Mayberry,* at 465–466, 91 S.Ct. 499; *Lavoie,* 475 U. S., at 825, 106 S.Ct. 1580; *United States v. Couch,* 896 F.2d 78, 82 (5th Cir.1990). In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," a court's potential lack of impartiality "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow,* 421 U.S., at 47, 95 S.Ct. 1456." *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 883–84, 129 S. Ct. 2252, 2263, 173 L. Ed. 2d 1208 (2009).

personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

The proscription against objective bias tracks the ethical standards for lawyers: *the court must avoid even the appearance of bias*. *See Hampton v. Hanrahan,* 499 F.Supp. 640 (N.D.Ill.1980) *appeal dismissed Hampton v. Chicago,* 643 F.2d 478 (7th Cir.1981). Whether a reasonable observer might doubt a court's partiality depends on the context of the case and the full record in the aggregate. "Even though each of the allegations raised by Defendants does not, on its own, show bias, we must still consider whether these allegations in the aggregate demonstrate judicial bias." *United States v. Laureano-Perez*, 797 F.3d 45, 74 (1st Cir. 2015) citing *United States v. Candelaria-Silva*, 166 F.3d 19, 35 (1st Cir. 1999); *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997).

Doubts should be resolved in favor of recusal. "If there is an appearance of partiality, that ends the matter." *Haines v. Liggett Group Inc.,* 975 F.2d 81, 98 (3d Cir.1992); *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982). "If there be real doubt created as to prejudice of judge, that alone may be [an] important factor to be considered by judge in determining whether he should withdraw from case." *Wolfson v. Palmieri,* 396 F.2d 121, (2d Cir.1968). "If the appearance of bias or prejudice is a close call, recusal is appropriate." *In re Marshall*, 403 B.R. 668, 679 (C.D. Cal. 2009), *aff'd*, 721 F.3d 1032 (9th Cir. 2013) *citing In re Boston's Children First,* 244 F.3d 164 (1st Cir.2001); *Nichols v. Alley,* 71 F.3d 347, 352 (10th Cir.1995).

The recusal statutes usually require that the judge's bias "stem from an extrajudicial source," *Liteky v. U.S.*, 510 U.S. 540, 544, 554 (1994), meaning from a source "other than what the judge learned from his participation in the case." *United States v. Grinell Corp.,* 384 U.S. 563, 583 (1966). Where adverse attitudes evinced by a trial judge toward defendants are based on his

study of depositions and briefs which parties have requested him to make, they are not extrajudicial and do not manifest disqualifying bias and prejudice. *See Grinnell Corp.*, 384 U.S. 563; *Duplan Corp. v. Deering Milliken, Inc.*, 400 F.Supp. 497 (D.S.Car.1975). Under the similar recusal statute, 28 U.S.C. § 144, where a judge's statements are based on the judge's "opinion of what the *properly submitted evidence at trial demonstrated,"* those statements "cannot be the basis for personal bias." *United States v. MMR Corp. (LA)*, No. CRIM. A. 88-559, 1991 WL 19067, at *4 (E.D. La. Feb. 11, 1991), *aff'd sub nom. United States v. MMR Corp.*, 954 F.2d 1040 (5th Cir. 1992) (emphasis added). The extrajudicial source doctrine is not absolute, however, and in some cases recusal is warranted if a judge's actions "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

### IV.  Application of Legal Standards

#### A. Where a Court Appears to Advocate for One Party, or to Judge Parties' Credibility Prematurely, Recusal is Necessary.

It is arguably dispositive that three independent, reasonable, thoughtful, well-informed observers have already announced to the public that this Court "litigated on Konnech's behalf." Those are unusually strong words. And a court's advocacy for any party is clearly mandatory grounds for recusal. The necessary appearance of neutrality is lost where a judge is seen to have acted as an advocate for one side. *See Reyes–Melendez,* 342 F.3d at 1007–08; *United States v. Singer,* 710 F.2d 431, 436–37 (8th Cir.1983) ("a trial judge cannot assume the mantle of an advocate"); *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 166 (3d Cir.1993) ("a judge's participation in a case must never reach the point where it appears, or is even perceived to appear, that the judge is aligned with any party in the pending litigation"). In *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993), the Tenth Circuit found the district court's actions were, as here, "an unusual thing for a judge to do, and it unavoidably created the appearance that the judge had

become an active participant in bringing law and order to bear on the protesters, rather than remaining as a detached adjudicator."

A reasonable observer could reasonably conclude, as the appellate court judges did, this Court's own statements, and the following unusual and premature procedural actions, that the Court's impartiality was in doubt:

1. Agreeing to hold an *ex parte* hearing and issue an invasive TRO in response to Plaintiff's disparaging pleadings and based on its facially meritless claims that one Defendant's alleged access of a computer in China somehow connoted access of a U.S. computer by all three Defendants.

2. Failing to require any evidence or testimony whatsoever from Plaintiff regarding its facially frivolous claims of access, nor to allow cross-examination, motions to dismiss, nor discovery by Defendants.

3. Showing bias against Defendants' election integrity mission – the same one pilloried by Plaintiff *ex parte* – by invoking against them extrajudicial charges of election "destruction."

4. Showing bias against Defendants' own integrity by suggesting in open court that they were "playing" (lying to) their lawyers and by comparing them to Donald Trump, a politically hot, unwarranted, and improper comment on the parties' motivations before the presentation of evidence, regardless of one's political views. This bias, in fact, improperly pre-judges one of the "ultimate issues" in the case: Defendants' state of mind in the course of their alleged defamation (*i.e.*, knowing falsity, malice).

5. Denying Defendants' crucial request to allow testimony from the LA District Attorney regarding the location of the server in China, which Konnech claimed not to own – which would have made clear the lack of subject matter jurisdiction relating to computers.

6. In the above context, aggressively questioning Defendants alone, while reflexively denying all well-grounded objections by Defendants during cross examination (five out of five rulings) and sustaining all four objections by Plaintiff.

7. Finding Defendants in contempt of court regarding matters of so-called computer "access" without ensuring that the Plaintiff had stated any emergency or adduced even allegations of access of an identified U.S.-based computer owned by Plaintiff, let alone evidence.

The Court's public lecture of Defendants' counsel, on what a reasonable observer could conclude was a trivial matter, has also created an appearance of antagonism toward Defendants that, if repeated before a jury, would severely prejudice Defendants' case. In the October 27 hearing, Defendant's counsel Michael Wynne was asked to give the witness, Mr. Phillips, his notes, in order to help refresh his recollection of the names of some FBI agents. Mr. Wynne did what lawyers frequently do in court, which was to explain what he was doing – in this case, "Handing the affidavit" to the witness. The Court's response was sufficiently inexplicable, and belabored, as to appear biased to a reasonable observer:

THE WITNESS: Can I -- can I get my notes?

THE COURT: Sure. Counsel, you'll give him his notes, so he can refer to his notes as to who they were or who they are. He's going to bring them to you.

MR. WYNNE: Handing the affidavit to which I referred earlier. I don't know if that's sufficient or if he needs --

THE COURT: I'm not asking you to make any record, counsel.

MR. WYNNE: Thank you.

THE COURT: ***What you're doing is improper.*** You know that, don't you?

MR. WYNNE: I'm just trying --

THE COURT: I'm sorry. ***What you're doing is improper.*** If you have not, I want you to get the local rules to this district, I want you to look at all the attachments and appendixes, and *you will understand what the conduct of lawyers ought to be in Federal Court.*

We're in Federal Court, not state court, not county court, not the JP's office. You're in Federal Court in the Southern District of Texas, and they are available to all; yourself, as well as other lawyers in this matter. ***So what you're doing is improper.***

(emphases added)

It remains unclear what was "improper," but the concern that the Court might repeat such unnecessary humiliations before a jury is real. At the same time, the Court unaccountably saw no issue with Plaintiff's counsel's irrelevant and snide questioning of Defendants, not even responding to Defendants' objection to tendentious, irrelevant, and needlessly politicizing questions like this: "Q. Do you have to believe the election was stolen from Trump to be considered a patriot?" Oct. 27 transcript at 113.

In the context of the unusual behavior described above, for better or worse, the Court of Appeals has cast further doubt, in the mind of a reasonable observer, on this court's impartiality. The Fifth Circuit used language of unusual clarity in the recusal caselaw when it said, "The district court then used a temporary restraining order, a preliminary injunction, and a civil-contempt order *to litigate the case on Konnech's behalf.*" The Fifth Circuit then gave reasonable observers further cause to suspect that the district court's impartiality could be in question:

> the record does not reveal what sort of emergency justified the district court's demand for that information *before* the parties could file Rule 12 motions, *before* the defendants could file an answer, *before* the parties could file their initial disclosures, or *before* discovery could begin let alone conclude in the ordinary course. . . .Much less did the district court explain what sort of emergency could warrant jailing the petitioner-defendants for not making such immediate disclosures. Rather, the district court made clear that it was imposing its disclosure requirements because it—the district court—wanted to add defendants to the lawsuit. Resp. 13; App. 188. That is not how the Federal Rules of Civil Procedure work.

(Emphases in original.)

In short, regardless of the Court's actual bias, and regardless even of whether a reasonable person, viewing the Court's actions, could have found them of concern, the Fifth Circuit's opinion has created an additional barrier to the public perception of the impartiality of this court.

### B. A Reasonable Observer Could Doubt the Court's Impartiality Based Not on Evidence Presented in the Proceedings but Extrajudicial Information about Nationwide Election Disputes and Plaintiff's *Ex Parte* Persuasion.

A reasonable observer could conclude this court's unusual procedural directives, all in Plaintiff's favor, and its extrajudicial comments against Defendants, gave an appearance of lacking impartiality. The Court's opinions, expressed on October 6, were clearly extrajudicial: the Court's apparent judgment of the absent Defendants as liars ("playing their lawyers") bent on "election destruction" was based on the Court's outside knowledge of, and apparent antipathy toward, the kind of elections work it *believed* was done by Defendants, as well as on Plaintiff's *ex parte* representations, while the Court had yet even to hear testimony from Defendants.

These are exactly the sorts of extrajudicial views, not formed through proceedings and evidence, about *groups or types* of litigants, that call into question a court's impartiality. Before plaintiffs like Konnech were painting dire pictures of election deniers to discredit their opponents before the courts, judges were faced with German Americans after World War I[8], communists in the 1950s[9], Microsoft in the early 2000s[10], immigrants pretty much any time[11], tobacco companies[12], and anti-abortion protesters[13]. In all these cases, recusal was mandated. It doesn't

---

[8] *Berger v. United States,* 255 U.S. 22, 28, 41 S.Ct. 230, 65 L.Ed. 481 (1921).

[9] *Connelly v. United States District Court*, 191 F.2d 692 (9th Cir. 1951).

[10] *United States v. Microsoft Corp.,* 253 F.3d 34, 109 (D.C. Cir. 2001).

[11] *Wang v. Attorney General*, 423 F.3d 260, 270 (3d Cir.2005) (immigration judge's statements were based on her broader views outside of the proceeding); *Reyes–Melendez v. INS*, 342 F.3d 1001, 1007–08 (9th Cir.2003) (due process absent where immigration judge's contempt for litigant based on his infidelity prevented consideration of relevant facts and made judge a "partisan adjudicator").

[12] *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 98 (3d Cir. 1992).

[13] *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir.1993) (after district court issued a preliminary injunction against blocking abortion clinics, he appeared on TV program and said, "these people [the protestors] are breaking the law",

matter by what means a judge acquires a dislike of a litigant. "If a judge has acquired a dislike of a litigant because of events occurring outside of the courtroom, a duty to recuse might ensue." *United States v. Antar*, 53 F.3d 568, 574 (3d Cir. 1995).

The Court's statements here were not based on the court's study of depositions and briefs, *cf. Grinnell,* nor on evidence properly submitted at trial, *cf. MMR Corp.*, or even any testimony submitted by Plaintiff. And even if the Court's comments had been based on deep experience with a full record, its comments and its unusual procedural directives alike could still convey to a reasonable observer an antagonism toward Defendants and favoritism toward Plaintiff. A reasonable observer could reasonably conclude that a district court that takes a side on the highly partisan, hot-button issue of election integrity, that "litigates" (in the view of other reasonable people) on one party's behalf, and that makes statements about Defendants' mission, probity, and credibility, is displaying a "deep-seated antagonism."

In *Alexander v. Primerica Holdings*, Inc., 10 F.3d 155, 164 (3d Cir. 1993), the district court prejudged the witnesses for a party, as a reasonable observer might believe occurred here, "without having heard all of the testimony". Much as the court here did in its "elections destruction" dismissal of Defendants' activities, the lower court in *Alexander* stated, without evidence, that a party had conducted the litigation "in bad faith". Unsurprisingly, the Third Circuit held that the district court's recusal was warranted because the judge had "already determined that *important witnesses for the petitioners are not credible*." In short, the Court of Appeals said, the lower court had "tarred the petitioners as 'bad faith' participants 'despite an absence of record evidence'." A reasonable observer could well conclude the Court in the instant case had, in the same way, already impugned the credibility of Defendants Engelbrecht and Phillips when it suggested before meeting

---

which court of appeals found "unavoidably created the appearance that the judge had become an active participant in bringing law and order to bear on the protestors, rather than remaining as a detached adjudicator").

them that they were playing – lying to, essentially, or gaslighting – their own lawyers, and that the court didn't "have any confidence in any  …. who claim they are doing [elections integrity work]."

### C.  Courts Have Recused Themselves on Less Compelling Facts.

The last few decades have produced an extraordinary amount of research into the subject of cognitive error, including unconscious bias.[14] Reasonable persons, as a result, are by now aware that most bias is unconscious, a fact that makes perceiving it in oneself nearly impossible. Although it is undoubtedly a difficult act to stand outside of oneself and objectively judge whether *others* might reasonably perceive a potential for impartiality, some judges have provided admirable examples of doing just that. Several courts have cited Judge Shadur's recusal in *Hampton,* 499 F.Supp. at 645, where he reasoned, "[t]hough I am morally certain that I would in fact be impartial in this proceeding, which is not the standard; the test is rather whether my impartiality 'might reasonably be questioned.'" *See also In re Grossman*, 147 B.R. 903, 908 (Bankr. N.D. Ill. 1992) (citing *Hampton* and adding "a judge's personal view of his or her impartiality is not a basis for ruling on a recusal motion"); *In re Wyslak*, 94 B.R. 540, 545 (Bankr. N.D. Ill. 1988); *In re Nowak*, 143 B.R. 154, 157 (Bankr. N.D. Ill. 1992).

In a decision remarkable for both its self-awareness and fair-mindedness, the district court in *Fairley v. Andrews*, 423 F. Supp. 2d 800, 820–21 (N.D. Ill. 2006), reasoned that:

> though this Court can state without hesitation that nothing in Defendants' briefs or affidavits sufficiently demonstrates this Court's actual bias, after a careful evaluation of the record and transcripts in this case, ***this Court finds that reasonable minds may disagree as to whether recusal is appropriate in this matter*** under section 455(a).
>
> In applying this standard, the Court must bear in mind that these outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be... ***This Court reluctantly concludes that recusal is the most prudent course in this matter***...

---

[14] *See, e.g.*, https://en.wikipedia.org/wiki/List_of_cognitive_biases.

(Emphases added.) (Citations omitted.)

The *Fairley* court did not end its "required self-evaluation" there, but rather probed the record to conclude it had made, in its statements about "public corruption," "a mistake in judgment": "This Court admits in retrospect that it may have pushed too hard to reach a compromise settlement in this lawsuit. The Court did not intend to have its colorful statements coerce a settlement between the parties. The Court will avoid these types of statements in the future."

### D.  The Duty to Recuse is Strongest When the District Court Appears to Opine on an "Ultimate Issue" in the Case.

The duty to recuse is all the greater when a district court judge has expressed partiality toward a group or way of thinking that is at the heart of the "final decision" or "ultimate issue" in the case. In *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 98 (3d Cir. 1992), as amended (Sept. 17, 1992), the district court, in an opinion[15], had expressed some partiality about a group -- tobacco companies that did not voluntarily disclose the risks of tobacco -- related to the "ultimate issue" in the case, which was whether companies that sold tobacco had instead conspired to withhold information. The Court of Appeals found disqualification mandatory:

> The *final decision* to be rendered by an eventual jury here is whether petitioners, consisting of leading members of the tobacco industry, conspired to withhold information concerning the dangers of tobacco use from the general public. The plaintiff seeks to prove that petitioners participated in an organized concealment of potential health hazards. This, we

---

[15] The opinion language quoted by the court of appeals:

> In the light of the current controversy surrounding breast implants, one wonders when all industries will recognize their obligation to voluntarily disclose risks from the use of their products. All too often in the choice between the physical health of consumers and the financial well-being of business, concealment is chosen over disclosure, sales over safety, and money over morality. Who are these persons who knowingly and secretly decide to put the buying public at risk solely for the purpose of making profits and who believe that illness and death of consumers is an appropriate cost of their own prosperity?

> As the following facts disclose, despite some rising pretenders, *the tobacco industry may be the king of concealment and disinformation*. (emphasis added).

repeat, is the *ultimate issue* to be determined by a jury, as fact finders, after appropriate instructions given them by the trial judge.

(Emphases added.)

In *United States v. Microsoft Corp.,* 253 F.3d 34, 109 (D.C. Cir. 2001) (ruling district court was disqualified), the D.C. Circuit held the district judge had created an appearance of partiality by discussing with reporters numerous topics relating to the case. Among them was his distaste for the defense of technological integration—*one of the central issues in the lawsuit*. Similarly, in *Republic of Panama v. Am. Tobacco Co. Inc.*, 217 F.3d 343, 346–47 (5th Cir. 2000), where a district judge's name was listed (before he had become a judge) on an amicus brief whose argument against tobacco companies embraced the ultimate issue in the case before him, including what the defendants "knew or should have known," recusal was mandated even though the then-lawyer had not even worked on the brief.

The ultimate issues here involve both whether Defendants accessed a computer without authorization, and, regarding Plaintiff's defamation claim, delicate matters of reputation, credibility, and probity. As pointed out above, a reasonable observer could find the Court had prejudged – in the affirmative – the ultimate issue of whether Defendants had "accessed" a computer without authorization when the Court dismissed the death threats against them by saying, "If you are looking at somebody else's business … you should expect that... somebody is going to look for you." In short: Somebody is making death threats, looking for you, ***because you were looking*** at their computer.

The defamation claims, in turn, will require a court to assess Defendants' state of mind, including whether Defendants had "actual malice" when they made the allegedly defamatory statements. A reasonable observer could well note that Plaintiff's claims here include many

contested issues regarding Defendants' probity and integrity, highlighted here with added emphasis:

55.  Defendants' statements have been made with ***actual malice, knowing or reckless disregard for the truth***, including ***intentional lies*** concerning their possession of evidence of fraud or meddling by the Chinese Communist Party that simply does not exist. Defendants have further ***manufactured, misrepresented and cherry-picked*** information available on the internet to draw ***unsubstantiated connections*** to support their *false accusations*. They have purposely ***avoided or intentionally disregarded publicly available evidence***, facts, and reliable resources rebutting and disproving their false claims. And they have ***formed and stuck to a false preconceived narrative*** in spite of the facts, by relying on and putting forward ***facially unreliable and anonymous sources***, ***all in a plan to enrich themselves***.

56.  Defendants have perpetuated their claims after being put on notice of the ***falsity*** of their accusations.

The Court's statements here about Defendants' lying to their lawyers, about their being in the "elections destruction" business, and about the judge's lack of "confidence" in them as they "play" their lawyers have all given a reasonable observer the appearance of a judge having already developed strong views on the ultimate issues of Defendant's credibility, probity, and intent. In the interests of justice, the court should recuse itself.

Respectfully Submitted,

GREGOR | WYNNE | ARNEY, PLLC

By: */s/ Michael J. Wynne*
     Michael J. Wynne
Attorney at Law
Texas State Bar No. 0078529
SDTX No. 0018569
Telephone: (281) 450-7403
mwynne@gwafirm.com

CAMERON POWELL*
Attorney at Law
DC Bar No. 459020
Telephone: (832) 390-2644
cpowell@gwafirm.com

**\*PRO HAC VICE PENDING**              **ATTORNEYS FOR DEFENDANTS**

## **CERTIFICATE OF CONFERENCE**

I certify that I have conferred with counsel for Plaintiff and that Plaintiff is opposed to this motion.

By: */s/ Michael J. Wynne*
Michael J. Wynne

## **CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing on counsel for Plaintiff on this 5th day of January 2023, by notice of electronic filing.

By: */s/ Michael J. Wynne*
Michael J. Wynne