# NATIONAL SECURITY COUNSELORS

4702 LEVADA TERRACE

ROCKVILLE, MD  20853

———

TELEPHONE: (301) 728-5908
FACSIMILE: (240) 681-2189

KEL MCCLANAHAN, ESQ., EXECUTIVE DIRECTOR (admitted in NY, DC)
    EMAIL: KEL@NATIONALSECURITYLAW.ORG
BRADLEY P. MOSS, ESQ., DEPUTY EXECUTIVE DIRECTOR (admitted in IL, DC)
    EMAIL: BRAD@NATIONALSECURITYLAW.ORG

22 December 2022

Hon. Jesse M. Furman
United States District Court for the Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, NY  10007

Re:   *United States v. Schulte*, Case No. 17-Cr-548

Dear Judge Furman:

On behalf of intervenor emptywheel, LLC, I respectfully submit this letter response in the above-captioned case in opposition to the Government's motion for continued sealing of the redacted transcripts of various proceedings conducted pursuant to Section 6 of the Classified Information Procedures Act ("CIPA") in advance of the June 2022 retrial in this case, D.E. 975.

Due to the formatting of the Government's motion as a letter motion and the straightforward questions before the Court at this time, this response will be relatively brief rather than a definitive treatise on the relevant questions of law and policy. Should the Court prefer a more exhaustive treatment of the subject matter, we respectfully suggest that it convene a hearing on the Government's motion, during which I—and Government counsel as well, I am certain—will address any lingering questions to the best of my ability.

As an initial matter, I write to confirm my understanding that the scope of the Government's motion is the transcripts created in response to the Court's 4 July 2022 Order, D.E. 872, which were limited to proceedings from 3 May 2022 forward.[1] However, to the extent that previous comparable proceedings occurred, such as the CIPA Sec. 2 conference apparently held on 9 March 2022, *see* D.E. 729, we maintain that the same logic applies to those, and that the unclassified portions of such transcripts should also be made publicly available.

These redacted transcripts easily fall within the scope of both the common law and First Amendment rights of access to judicial records, and the Government's arguments to the contrary cannot be squared with either the relevant case law or sound judicial practice, for two main reasons. First, even though the Court has already recognized the presumption in favor of

---

[1] To the best of our knowledge, this is limited to 3 May, 3 June, and 8 June 2022, but we recognize that there may be other proceedings that we are not aware of.

openness in such proceedings, the Government weakly attempts to assert that CIPA itself precludes such a presumption, without any meaningful support for the claim. Second, the Government argues that even if these proceedings did fall within the scope of the presumption of openness, the transcripts themselves warrant continued withholding, even though they have already been sanitized of the classified information which warranted the *in camera* treatment in the first place. Neither of these positions bears up to close scrutiny.

In the interest of readability, we will primarily focus on the First Amendment right of access, since it presents a more stringent test which is easily satisfied in this case. However, should the Court find that one or more of these proceedings do not fit within the First Amendment framework due to a technicality, it should have no problem seeing how they fit within the common law framework.

I. *CIPA does not preclude the presumption of openness*

It should be noted that this matter is merely the Government's most recent attempt to make this argument, and that to the best of our knowledge, it has not yet succeeded in convincing a court. *See*, *e.g.*, *United States v. Moussaoui*, 65 Fed. App'x 881, 887 (4th Cir. 2003) ("CIPA alone cannot justify the sealing of oral argument and pleadings."); *In re Wash. Post Co.*, 807 F.2d 383, 393 (4th Cir. 1986) ("[T]he district court may not simply assume that Congress has struck the correct constitutional balance."); *United States v. Ressam*, 221 F. Supp. 2d 1252, 1259 (W.D. Wash. 2002) ("It is important to make clear that the Court is not using Congress's enactment of CIPA to override the constitutional right of access."); *United States v. Poindexter*, 732 F. Supp. 165, 167 n.9 (D.D.C. 1990) ("CIPA obviously cannot override a constitutional right of access."); *United States v. Pelton*, 696 F. Supp. 156, 157 (D. Md. 1986) ("The court does not agree with the government that CIPA provides a statutory basis for the proposed closure" of a portion of a jury trial.). Once this argument is set aside, the issue becomes significantly clearer, as does the solution.

It goes without saying that the proceedings in question—and the transcripts thereof—are judicial records for purposes of the common law, and the Government does not make any serious argument to the contrary. Instead, it argues that CIPA established a presumption against disclosure, drawing an analogy to the statutory provision for sealing of wiretap applications at issue in *In re New York Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401 (2d Cir. 2009). It then goes *beyond* that analogy to argue that the presumption is even stronger because Congress allowed for wiretap materials to be unsealed for good cause but provided no comparable mechanism for CIPA proceedings. However, CIPA is not Title III, and the Government's argument requires that to be the case in order to succeed.

Simply put, *In re New York Times* dealt with a statute which included a "manifest congressional intent that wiretap applications be treated confidentially," *id.* at 408, but only because it includes a provision that *the records themselves* "shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction." 18 U.S.C. § 2518(8)(b). In contrast, CIPA only provides that a hearing shall be held *in camera* because "a public proceeding *may* result in the disclosure of classified information." 18 U.S.C. App 3 § 6(a) (emphasis added). It in no way exhibits any intent that the records created from such a hearing should be presumed

undisclosable, nor could it, since by its own terms the hearing might actually include *no classified information*. In other words, CIPA merely provides a protective procedure to guard against the chance that a hearing *may* include classified information,[2] based solely on the Attorney General's assertion that it *may* include classified information—hardly a high bar for the Government to clear. Congress voiced no opinion about what should then happen to the unclassified information included in that hearing, let alone a "manifest congressional intent."

The key question then becomes, what was the "role of the material at issue in the exercise of Article III judicial power" and its "resultant value . . . to those monitoring the courts?" *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995). The Court itself addressed both of these issues at various times. Most relevantly, it engaged in open court in an extensive discussion of a colloquy that appears to have taken place in the 3 May hearing, telling Government counsel, "I gave you two hypotheticals" about the Government's interpretation of the scope of the Espionage Act. (Tr. of 7/6/22 Hrg. at 149:3-151:12.) It did so in the context of a discussion of potential jury instructions, and expressed the sentiment several times that the Government's assertion that a person sharing National Defense Information ("NDI") that is already in the public domain would still be liable under that statute was "kind of a striking proposition." The role, then, of these transcripts—and the information they contain—in the exercise of Article III judicial power is clear, as is the resultant value to people monitoring the judicial process. In this case, according to this Court, the Government has—behind closed doors—pressed an argument that a person can violate the Espionage Act by handing a copy of a *New York Times* article containing leaked NDI to someone else, which is *definitely* something that interested persons in the field should know, and what they do *not* know is the degree to which the Government pressed this point, how it defended it, whether it has actually done so in the past, and what other positions it took when it was not expecting the transcripts to become made public.

By the same token, this convergence of factors also definitively demonstrates that the First Amendment right of access attaches to these records, because unlike the hypothetical CIPA hearing that the Government asks the Court to envision, at least this discussion strayed far from a simple discussion of evidentiary issues, with the Government presenting legal arguments about elements of the crime itself. Those types of arguments, wherever they might occur, "have historically been open to the press and general public," *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004), thus satisfying the first prong of the First Amendment analysis, and the mere fact that they occurred in a CIPA hearing instead of open court is of no moment. Moreover, the reason that these legal arguments take place in open court is *because* "public access plays a significant positive role in the functioning of the particular process in question," *id.*, because it is axiomatic that the Government should not be presenting arguments about the elements of a crime to a judge out of sight of the public. If anything, the fact that the Government is now attempting to keep these legal arguments—about which the public would be none the wiser without the Court's comments in the 6 July hearing—from public view because the proceeding was a CIPA hearing demonstrates why public access plays a significant positive role in even those proceedings, to preclude such gamesmanship.

---

[2] A helpful analogy in another context is discussed in Note 3 below.

## II. There is no compelling interest in withholding unclassified information

The Government makes a series of arguments against withholding this unclassified information which largely boil down to one assertion: if the public saw the redacted transcripts, they might speculate about the redactions. This is an accurate statement. However, the next logical leap requires the Court to accept that such speculation would be *sufficiently damaging to warrant overriding the First Amendment right to access.* That is a bridge too far.

The best way to understand the fatal flaw in this argument is to step outside of the CIPA context and discuss the more common situation in which a court must balance the First Amendment against the Government's claims of national security: prepublication review. And in that context, the courts have clearly spoken. As of this writing, an author has a First Amendment right to publish unclassified information, and a court may only authorize Government censorship of a document pursuant to a national security nondisclosure agreement when the information is classified. *See*, *e.g.*, *Snepp v. United States*, 444 U.S. 507, 513 n.8 (1980) ("If in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned.");[3] *Wilson v. CIA*, 586 F.3d 171, 185 (2d Cir. 2009); *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983) ("The government has no legitimate interest in censoring unclassified materials.").

Simply put, when courts are put in the position of balancing claims related to national security against a writer's First Amendment concerns, they consistently and without exception find that only classified information tilts the balance. There is no reason for this dynamic to change when it involves a *reader's* First Amendment concerns, and while we acknowledge that some district courts have accepted the Government's arguments, there is no evidence to show that those courts were presented with *our* argument and no grounds for this Court to follow suit.

The Government has not offered any reason for the Court to conclude that these redacted transcripts would be "incoherent and, thus, functionally useless," *United States v. Zazi*, No. 10-Cr-60, 2011 WL 2532903, at *2 n.4 (E.D.N.Y. June 24, 2011), or that they are "so interrelated with classified information as to make impracticable the filing of meaningful redacted materials that do not divulge classified information," *United States v. Barrack*, No. 21-Cr-371, D.E. 135, 136 (E.D.N.Y. July 17, 2022). In fact, the very existence of the Court's 6 July summary of the two hypotheticals discussed above demonstrates the frivolousness of these arguments, since: (a) it was neither incoherent not functionally useless; and (b) the Court presumably did not divulge classified information in discussing it. While there may in fact be parts of these transcripts which fit that bill, it is obvious that not all of them do, and so, in the absence of a more particularized claim that certain unclassified information cannot be published without *actually* revealing classified information, the Court cannot sanction its continued sealing. And as far as *Zazi* is concerned, the common law and the First Amendment only ensure the public's right to judicial

---

[3] In fact, this *Snepp* footnote provides a helpful analogy for the previous argument that the fact that CIPA hearings are held *in camera* does not mean that everything said in them is presumed to be undisclosable, because the Court distinguishes the requirement that an author submit material for prepublication review because it *might* contain classified information from a determination that the information cannot be published. *See id*. ("The problem is to ensure *in advance*, and by proper procedures, that information detrimental to national interest is not published.).

records, not *coherent* or *useful* records. We appreciate the Government's concern for our time, but we will accept the risk that some parts of the redacted transcripts may not make sense.

As the D.C. Circuit aptly stated, "[t]he government has no legitimate interest in censoring unclassified materials." *McGehee*, 718 F.2d at 1141. It similarly has no legitimate interest in asking a court to censor unclassified materials. For all the foregoing reasons, the Court should deny the Government's motion and order the transcripts of these proceedings to be published on the public record, once they have been sanitized of properly classified—and *only* properly classified—information. Should the Court be unconvinced by this superficial treatment of the relevant issues, we ask for the opportunity to participate in a hearing on the matter.

Sincerely,

Kel McClanahan
Counsel for Intervenor emptywheel