# Plaintiff's Response in Opposition to Defendants' Emergency Motion to Inspect Property of Plaintiff:

# Exhibit A

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS
- - -
THE HONORABLE KENNETH M. HOYT, JUDGE PRESIDING

---

KONNECH, INC.,                )   Cause No. 4:22-cv-03096
                              )
        Plaintiff,            )
                              )
vs.                           )
                              )
TRUE THE VOTE, et al.,        )
                              )
        Defendants.           )
                              )

---

**HEARING**

OFFICIAL COURT REPORTER'S TRANSCRIPT

Houston, Texas

**October 27, 2022**

---

APPEARANCES:
On behalf of the Plaintiff:
   Constantine Z. Pamphilis, Esq.
   Nathan Richardson, Esq.

On behalf of the Defendants:
   Brock Cordt Akers, Esq. (Not present)
   Michael John Wynne, Esq
   John C. Kiyonaga, Esq.


Reported By:   Nichole Forrest, CSR, RDR, CRR, CRC
               Certified Realtime Reporter
               United States District Court
               Southern District of Texas


Proceedings recorded by mechanical stenography.
Transcript produced by Reporter on computer.

1  A.  I'm so sorry.  I don't recall the meeting.
2  So I assume probably a lot more, yeah.
3  Q.  So by your answer, I take it, there was
4  somebody else in that hotel room with you and
5  Mr. Hasson in January of 2021, wasn't there?
6  A.  Yes.
7  Q.  Who was that?
8  MR. WYNNE:  Your Honor, I'm object.  This
9  is beyond the scope.
10  THE COURT REPORTER:  Can you speak into a
11  mic, please?
12  MR. WYNNE:  I have to object.  Because
13  this is beyond the scope.  I also have a concern, not
14  only that, but the answer may compromise a
15  confidential informant of the FBI.
16  THE COURT:  How do you know all of this?
17  Have you talked to the FBI?
18  MR. WYNNE:  I --
19  THE COURT:  I'm sorry.  That's a yes-or-no
20  question.
21  Have you talked or discussed this matter
22  with the FBI?
23  MR. WYNNE:  This matter, I have not
24  discussed with the FBI.
25  THE COURT:  Overruled.  Let's proceed.

51

1     Q.   Of what year?
2     A.   2022.
3     Q.   So about 13 months after you had met him in
4  the hotel room?
5     A.   Yes.
6     Q.   What was the purpose of that communication?
7     A.   I don't recall.
8     Q.   Who contacted who?
9     A.   I don't recall that either.
10    Q.   When you left that hotel room in January of
11 2021, did you leave with any electronic device that
12 had any of that 350 terabytes of data on it?
13    A.   No.
14    Q.   So you didn't have a hard drive of data from
15 that meeting in January of 2021, did you?
16    A.   I don't think so.
17    Q.   You're not sure?
18         THE COURT:  I'm sorry.  Either you had it
19 or you didn't.
20         THE WITNESS:  I don't remember, sir.
21         THE COURT:  Then that's the answer.
22         THE WITNESS: Okay.  I'm sorry.  I don't
23 recall.
24 BY MR. PAMPHILIS:
25    Q.   You can't recall?

1    A.   I don't know the answer to that.

2    Q.   You don't know if he's the same --

3         THE COURT REPORTER:  Counsel, I did not
4  hear the question.

5  BY MR. PAMPHILIS:

6    Q.   So you don't know if Mr. Nguyen is a San
7  Antonio field agent or not?

8    A.   I don't believe he's a field agent.  I
9  believe he's a representative of the intelligence
10 community in the FBI.

11   Q.   Was there anybody else involved in accessing
12 this data in that hotel room that you saw, other than
13 Mike Hasson, yourself, and this person who you will
14 not identify?

15   A.   Mr. Hasson was the only one that accessed the
16 data that night.

17   Q.   Sir, listen very carefully.  I'm asking
18 because the TRO says "anyone who was involved."

19        So was there anybody else involved in
20 accessing that data, other than yourself, Mr. Hasson,
21 and this other individual you won't identify?

22   A.   No.

23   Q.   Do you know if Mr. Hasson had the help of
24 anybody else in accessing it before he arrived in that
25 hotel room?

136

1   A.   There are many ways that could be true, yes.
2   Q.   So do you or do you not know how Konnech's
3 computers were accessed?
4   A.   I have no personal knowledge of what
5 transpired to access that data.
6   Q.   So you do not know of security
7 vulnerabilities.  And that's fine if you don't.  We'll
8 move on.
9   A.   Or we can keep at that question if you would
10 like.
11   Q.   You haven't answered my question.  So I don't
12 know why we're going to waste any more time on it.
13   A.   Okay.
14   Q.   I want to step back.
15        You said the FBI asked you to go public.
16 When did they ask you to go public?
17   A.   It must have been -- to the best of my
18 recollection, it would have been around May or June of
19 2022.
20   Q.   How did they ask you to do this?  Did they
21 send you a letter?  Did they call you up?
22   A.   It was a phone call.
23   Q.   Who was the phone call with?
24   A.   Huy Nguyen.
25   Q.   And what specifically did he ask you to do?

1    A.   Well, he didn't ask me, to be very clear, he
2 suggested.  He said that the people who were involved
3 in Washington, DC were -- well, if I may.  Basically,
4 the way he described this is, he said:  I'm losing
5 sleep.  I can't believe that this is happening.  DC is
6 continuing down this path.  You need to be prepared to
7 take the nuclear option.
8         And I said:  What does that mean?
9         And he said:  You need to be prepared to
10 go -- I don't recall specifically if he said to the
11 press or go public.
12         Frankly, I was so overwhelmed by that
13 statement that I don't really remember.  Nonetheless,
14 it was basically essentially go public.
15   Q.   So what you're saying is that Mr. -- or what
16 Agent Nguyen asked you to do was essentially undermine
17 or obstruct the efforts of what the FBI in DC was
18 trying to do.  Is that correct?
19   A.   I can only tell you what he told me.  How
20 that impacts the rest of it, I couldn't say.
21   Q.   Well, would you agree, then, if FBI in
22 Washington, DC was not wanting to go forward with an
23 investigation, and they wanted to, you know, do
24 whatever with it, if another agent is asking you to go
25 public with it, would you disagree that that is

1  undermining the efforts of Washington, DC FBI?
2      A.   I don't know.
3      Q.   Is this what did you at The Pit?  Was that
4  your effort to go public and do the nuclear option?
5      A.   That was part of what we discussed, yes.
6      Q.   You don't think that that undermined any
7  efforts of agents in DC?
8      A.   I don't know.
9      Q.   What you were doing at The Pit, instead, was
10 sacrificing Konnech in an attempt to save yourself
11 from the FBI.  Isn't that right?
12     A.   No.
13     Q.   What were you doing at The Pit in connection
14 with Konnech?
15     A.   We were telling the story of the past 16
16 months working with the FBI and what had brought us to
17 that moment.
18     Q.   Again, you never even saw that data; right?
19     A.   No.
20     Q.   And you're not going to sit here and tell me
21 today how that data was found.  Is that right?
22     A.   I have no personal knowledge of that.
23     Q.   But you are claiming to have personal
24 knowledge of security flaws in any Konnech computer,
25 software or server.  Is that right?

175

C E R T I F I C A T E

     I hereby certify that pursuant to Title 28, Section 753 United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings in the above matter.

     Certified on October 30, 2022.

/s/ Nichole Forrest_____
Nichole Forrest, RDR, CRR, CRC