# EXHIBIT G

STATE OF TEXAS  §
§
HARRIS COUNTY  §

## AFFIDAVIT OF PETER MCALLISTER

Before me, the undersigned notary, on this day personally appeared Peter McAllister, whose identity is known to me, who under oath states as follows:

1. In mid-June 2021 I was appointed general manager of Konnech Australia, a separate company to Konnech, Inc., which is the Plaintiff in the case of Konnech, Inc. v. True the Vote et al, but which is, to the best of my understanding, a wholly owned Australian subsidiary of Konnech Inc. My bio may be found on an archived version of the page https://www.konnech.com.au/About.html, which is now no longer active but may be found at www.archive.org. I served in that position until my resignation in October 2022.

2. In that position I handled all contractual and management issues relating to Konnech Australia's contract with its sole Australian customer, the Electoral Commission of Queensland. I enjoyed the job greatly and had every intention of staying at Konnech long term and helping them acquire more clients in Australia. To this day my main regret is that circumstances did not allow me or the company to do so.

3. I quickly learned that the main reason for my employment was that:

    a) ECQ was unhappy that Konnech Australia, which had been set up as a provision of the contract, was too small and did not have the contractually required number of Australian personnel.

    b) ECQ was very mistrustful of Mr. Yu and regarded him as someone whose statements could not be relied on. (I mean this in the commercial sense; I did not hear any security concerns expressed about Mr. Yu at that time by ECQ). They wanted a manager that they could talk to directly and whom they hoped would prove more trustworthy. ECQ's internal project manager in fact, based on past experience with Mr. Yu, specifically requested that he (Mr. Yu) not speak to ECQ and requested that he not visit their office.

    c) ECQ were unhappy that almost all of Konnech Australia's work was done overseas and particularly that all development was done in China. Prior to my arrival commitments had been made by Mr. Yu that this would cease by Dec. 2021 and I believe ECQ pushed for my employment partly to see that this was done.

4. As part of that goal (3.c., above) I frequently made PowerPoint presentations to ECQ on Konnech Australia's progress towards getting development out of China. These were usually to the effect that alternate capacity had been set up in such other centers as: Spain, India, Brazil, Malaysia or North America. I quickly formed the view, however, that Mr. Yu had very little intention of following through on these promises, and that my role was not actually to effect the change, but to manage the client so that the change did not have to be effected. I based this view on the fact that:

1

    a) As far as I am aware none of the alternate development sites ever eventuated, except for one employee in Malaysia and one in North America.

    b) Despite Mr. Yu's instruction to me to tell ECQ that Konnech Inc had shuttered its Chinese subsidiary and no longer employed Chinese nationals to work on its elections software, I was aware that the work continued to be done by the same China-based teams but under a different contractual arrangement. As far as I am aware neither Konnech, Inc nor Konnech Australia Pty Ltd ever had any development staff and instead always drew on the more than 100 developer resources available to them in China. I believe these developers to be employees of JinHuaHongZheng Technology, an affiliated Chinese company.

    c) I personally had to ask ECQ to extend the deadline of Dec 2021 by 12 months to Dec 2022.

    d) I became aware, through ECQ's request for audit logs, that, despite strict contractual provisions against this, China-based staff were accessing ECQ's Microsoft Azure environment to perform version release tasks and that this practice only stopped when I insisted that Australian staff take over this role.

5. My belief is that Mr. Yu's main motivation in resisting this change was financial. Mr. Yu himself explained to me that "everyone", including companies like Microsoft, "was doing it" -- that is, using programmers in China, who were 4-6 times less expensive than programmers in Australia. Other staff members, however, told me that they thought Mr. Yu's main motive was control, since he alone controlled the staff in China, which would not be the case in another development locale.

6. While ECQ were worried about data security at that time, their main concern was simply to ensure that the data security provisions of the contract were being adhered to and that their data & systems were secure (although, unfortunately, as shown above, this was not always the case). As far as I am aware ECQ also did not have specific security concerns about Mr. Yu himself and I, along with the Australian Company Director, Mr. Greg Denton, personally brought to their attention that Mr. Yu had won two court cases in Australia against individuals and organizations alleging that he had an undisclosed connection with the Chinese Communist Party. I likewise did not believe any such connection was possible at that time.

7. ECQ's attitude to data security and sovereignty hardened considerably around July 2022 due to their receipt of a directive from the Australian Federal Government's cyber security agency dictating a new policy on interactions with China. ECQ's project manager, Mr. Darren Fisher, informed me that, as election systems were defined as critical infrastructure Konnech's assurances on data security could no longer be accepted at face value and that either new security measures, predominantly involving transfer of control over data, systems and environments from Konnech Australia Pty Ltd to ECQ, had to be instituted or ECQ would invoke several clauses of the contract regarding breaches to take ownership of the system and remove Konnech from its operation. (In summary, while prior to this directive ECQ regarded Konnech as being in breach of contract due to its failure to cease development in China they were prepared to cut Konnech Australia Pty Ltd some slack to remedy that breach and to trust Konnech for data administration, after the directive they regarded the risk as too great and demanded data administration be transferred to their control immediately and that serious proof of the transition out of China be provided).

2

8. Unfortunately, it was in this atmosphere of heightened anxiety that ECQ became aware, some time in September 2022 of the allegations raised by True the Vote that someone known to them had been able to access poll worker data from a Konnech server based in China. ECQ learned of this from complaints by an Australian citizen (i.e. before I, or anybody else at Konnech, was able to inform them).

9. Shortly thereafter I called Mr. Luis Nabergoi, who at that time was CTO of Konnech Inc. and who was a colleague whose integrity I respected. He and I had by then had many conversations about the sub-optimal practices at Konnech and how best to clean them up. I asked Mr. Nabergoi if the allegations that Konnech stored data in China could be true, and he told me they might be, because things might have been happening without his knowledge. This was because he had very little control or knowledge of what happened in China, despite his role, and was reliant on Mr. Yu, who did control activities there. Mr Nabergoi also expressed concerns about the reputational damage he might be incurring by working with Konnech and the "sketchy things" Mr. Yu did. He told me he lacked confidence in Mr. Yu's transparency.

10. Mr. Yu shortly thereafter contacted me, and other Australian staff, to inform us that he was going to aggressively pursue legal action against True the Vote. He told us that True the Vote were 'real scumbags' and 'spreaders of conspiracy theories' who he would defeat in court, as he had so many others. I counseled Mr. Yu, however, that this was not wise and suggested that he reach out to True the Vote instead. My reasons for that were:

    a) Based on my conversations with Mr Nabergoi and my previous experience with Konnech Inc's sloppy business practices, I had formed the view that the allegations might well be true

    b) I regarded True the Vote, and still do, as an organisation dedicated to election integrity, a cause I strongly believed in and which Konnech Inc claimed to support as well

    c) As an election software provider I felt that Konnech should take care not to be seen as too partisan and too ready to attack organizations on one side or the other of politics

11. Notwithstanding this advice, which in any case was not accepted, Mr. Yu asked me to draft a letter for his signature to the Electoral Commissioner of Queensland, Mr. Pat Vidgen, strongly denying the True the Vote allegations, promising to sue, and denying any connection to the Communist Party of China, which I did. However, I was later told that this letter was very poorly received by the commissioner who was enraged by the series of broken promises, untruths from Mr. Yu, and public scandals involving Konnech Inc.

12. On the 5th of October I was informed by the Australian office project manager, Mr. Charles Hong, who said he had been told by Mr. Eric Staats, that Mr. Yu had been arrested. I quickly informed ECQ of this, as I was bound to do. It became apparent to me that after that arrest Konnech Australia Pty Ltd was finished as an elections software provider in Australia since the reputational damage was irreparable. This was confirmed to me by ECQ's project manager, Mr. Darren Fisher, who later told me that other Australian governments such as the Northern Territory Government, who had been very interested in

3

purchasing Konnech software, would not be able to due to the scandal and the associated security concerns.

13. On Monday October 10th, 2022, a few days after Mr. Yu's indictment and the law enforcement raid on Konnech, Inc., I was contacted via WhatsApp video call by Mr. Nabergoi, who expressed his concern that somebody had tried to hack into his work Apple ID. He told me that he suspected that this was done by somebody who worked for Konnech, Inc. in China who was attempting to assume his identity in order to gain access privileges to, or change, information that he alone had access to. Mr. Nabergoi was administrator of all of the company's internal communications systems, such as email, Microsoft Teams, and so on, although, to the best of my knowledge, he was not the administrator of the China-based communications systems used by Konnech and its software programmers.

14. Some hours later, Mr. Nabergoi again contacted me via WhatsApp text to inform me that "another weird thing" had happened:

   a) Somebody had been deleting files from "all the company computers," including those used by three employees of Konnech Australia (one based in the U.S.) who were the employees who had most often communicated with Konnech's China-based software development team. I have no reason to believe these employees were involved in any wrongdoing.
   b) All conversations referencing or involving Eugene's nephew, Jun Yu, on DingTalk, had suddenly been removed. Mr. Nabergoi wrote: "Jun Yu, eugene [sic] nephew has disappeared from all the chats in Dingtalk", as seen in this screenshot:



4

15. In a follow-up phone call that night, also on WhatsApp, Mr. Nabergoi and I discussed these issues further. In that phone call Mr. Nabergoi further informed me that:

    a) The files mentioned above were being deleted by someone acting from an IP address in Vietnam (which could have been a Virtual Private Network, or VPN, because we had no operations in Vietnam). (Brian Glicklich's prior affidavit mentioning a "website" in Vietnam is incorrect.)

    b) The files being deleted were all those that had a TXT or JSON file attached to them. Mr. Nabergoi said this indicated that somebody was removing all files with attached logs that might have gone to China.

    c) While I understood the files themselves would not be retrievable, the deletion of the files should be traceable in the audit logs and it should be possible to prove who had deleted them.

    d) Mr. Nabergoi said that Jun Yu, Mr. Yu's nephew, was the person responsible for depositing the data onto the server in China, where it was apparently found by a person evidently known to Gregg Phillips, one of the Defendants.

16. During our discussion Mr. Nabergoi and I agreed that the most likely explanation was that somebody in China was undertaking these deletions at Konnech's direction, probably from Mr. Yu. We also discussed the issue of possible Chinese government connections with Konnech. My research had shown me that JinHuaHongZheng Technology (which I believed to be associated with Konnech and which I believe provided the IT development engineers for Konnech) was the main supplier of election software products to the Communist Party of China. In fact, I recognized on the JinHuaHongZheng website, a software product (the meeting administration and voting software used in People's Consultative Congresses) that Mr. Yu had asked me, at one point, to sell to government clients in Australia. (This did not necessarily indicate to me that the motive was anything other than commercial but did indicate a connection not disclosed to Konnech's customers).

17. Mr Nabergoi told me, in return, that the current owner of JinHuaHongZheng Technology was Mr. Yu's older brother, who was based in China, and that the two frequently spoke. Mr Nabergoi's view was that Mr. Yu's older brother is "the brains" behind Konnech and gave Mr. Yu frequent strategic advice about the election software industry. From this discussion I concluded that my assertions of an absolute disconnect between Konnech Australia and the Chinese Communist Party were no longer sustainable.

18. In late October 2022, Mr. Yu asked me whether I still felt comfortable working at Konnech Australia, from which I surmised that Mr. Yu wanted me to resign. I replied that I understood his position, that I was an expensive contractor, and that, given that the company was effectively finished in Australia, the money he was spending on my contract would be better spent funding his litigation. I then offered to resign, and Mr. Yu accepted my offer.

19. Shortly after my resignation I learned that Catherine Engelbrecht and Greg Phillips had been arrested and jailed for several days. I was disturbed by this since I had personal knowledge that their allegations were very possibly accurate so I attempted to contact their

5

lawyers in Texas to convey the information that I had. That attempt was unsuccessful, however.

20. Then, in November 2022 I saw Brian Glicklich on the live-news podcast "War Room", one of several news sources I had been following since the True the Vote issue had arisen. A day later, I called him to tell him that I had information, relevant to the then-recent imprisonment of Catherine Engelbrecht and Gregg Phillips by the court in the above action, that I wanted to convey to him. Mr. Glicklich and I then had a 30-minute conversation, of which he took notes, and which formed the basis of his affidavit. The same information is included here and I do not think I have anything else salient to add.

21. If asked to do so, I would be willing to testify to these matters at trial, either remotely or, if my expenses in traveling from Australia were covered, in person.

22. I certify under penalty of perjury that the foregoing is true and correct.

23. Further Affiant Sayeth Not.

_____
Peter McAllister

Subscribed to and sworn before me on this 24th day of March, 2023.

_____
Notary Public in and for the State of Queensland

RODERICK MICHAEL SHUN WAH
Notary Public

Level 12, 269 Wickham Street
Fortitude Valley, Queensland 4006, Australia

My commission does not expire

6